**Honorable Thomas S. Zilly**

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ST. PAUL FIRE AND MARINE INSURANCE COMPANY, a Minnesota corporation and ST. PAUL GUARDIAN INSURANCE COMPANY, a Minnesota corporation, | No. C05-0388TSZ |
| | PLAINTIFFS ST. PAUL FIRE AND MARINE INSURANCE COMPANY AND ST. PAUL GUARDIAN INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| Plaintiffs, | |
| v. | **Clerk's Action Required** |
| HEBERT CONSTRUCTION, INC., et al., | **Note on Motion Calendar:** |
| Defendants. | **July 21, 2006** |
| v. | **Oral Argument Requested** |
| ADMIRAL INSURANCE COMPANY, a Delaware corporation, | |
| Third Party Plaintiff, | |
| v. | |
| AMERICAN ECONOMY INSURANCE COMPANY, an Indiana corporation, et al., | |
| Third Party Defendants. | |

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 1
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

## I.  MOTION

Plaintiffs St. Paul Fire and Marine Insurance Company ("St. Paul Fire") and St. Paul Guardian Insurance Company ("St. Paul Guardian") (collectively "St. Paul") move for partial summary judgment dismissing the defendants' claims for (1) breach of contract against St. Paul Fire; (2) bad faith and Consumer Protection Act against St. Paul Fire and St. Paul Guardian and (3) underlying attorney's fees as "costs taxed" against St. Paul Fire and St. Paul Guardian.[1]

## II.  SUPPORTING MEMORANDUM

**A.    Facts**

**1.    The Meadow Valley condominium**

On March 10, 1998, defendant Meadow Valley, LLC ("MVLLC") incorporated itself as a limited liability company in order to develop the Meadow Valley condominiums in Auburn, Washington.[2]  Construction began in 1999 and was completed in 2000.[3]  MVLLC was both the developer of the project and the declarant within the meaning of the Washington Condominium Act.[4]  Defendant Hebert Construction, Inc. was the general contractor for the project.[5]  The Meadow Valley Owners Association ("Association") filed its articles of incorporation on February 24, 1999.[6]  After the project was completed, the members of MVLLC controlled the Association until control passed to the unit owners in 2001.[7]

---

[1]    Defendants are MVLLC, Hebert Construction, Roger and Shelly Hebert, Henry and Karen Hebert, James and Anne Kossert and Andrzej and Roma Lawski ("Meadow Valley defendants").

[2]    Declaration of Stephanie Andersen in Support of Plaintiffs St. Paul Fire and Marine Insurance Company and St. Paul Guardian Insurance Company's Motion for Partial Summary Judgment ("Andersen Decl."), Exhibit 1.

[3]    Andersen Decl. Exh. 2.

[4]    Andersen Decl. Exh. 3.

[5]    Andersen Decl. Exh. 4.

[6]    Andersen Decl. Exh. 5.

[7]    Andersen Decl. Exh. 6.

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 2
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

### 2.    Hebert Construction and MVLLC's construction liability insurance

Roger Hebert and his older brother Henry formed Hebert Construction in 1979 and are its principals.[8]  They are also two of the four members of MVLLC.  Roger is MVLLC's managing member.[9]  Edith Jacks of Marsh McLennan was the long-time insurance broker for all the Hebert brothers' legal entities, including Hebert Construction and MVLLC.[10]

Fidelity & Guaranty Insurance Company, a predecessor company to St. Paul Fire and St. Paul Guardian, issued a construction liability policy to Hebert Construction effective January 4, 1998 to January 4, 1999.  MVLLC was not an insured under this policy.[11]  When this policy expired St. Paul Guardian issued construction liability policy no. KK08400026, effective January 4, 1999 to January 4, 2000, to Hebert Construction and MVLLC.  St. Paul Guardian charged $12,934 in liability premiums for this policy.[12]  The policy's liability form, form no. 47175, begins:  "This insuring agreement provides general liability protection for your business."[13]  The St. Paul Guardian policy did not insure either condominium associations or unit owners.[14]

In November 1999, three-quarters of the way into the policy period, St. Paul notified Ms. Jacks it would not be renewing the St. Paul Guardian policy "due to the significant construction defect loss potential":

> As we discussed last week, we will not be in a position to renew Hebert Construction, Inc.  The premium size is smaller that we currently would like, but more importantly one of the entities is involved with the construction of

---

[8]    May 25, 2006 Deposition Transcript of Roger Hebert ("Hebert Dep."), p. 7, 11. 20-25, p. 8, ll. 1-8; Andersen Decl. Exh. 7.

[9]    *Id*. at p. 25, 11. 9-18, p. 48, ll.18-25, p. 49, l. 1; Andersen Decl. Exh. 7.

[10]    Declaration of Edith Jacks ("Jacks Decl."), ¶ 3.

[11]    Andersen Decl. Exh. 8.

[12]    Andersen Decl. Exh. 9 at SPT00837.

[13]    *Id*. at SPT00927.

[14]    *Id*.

---

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 3
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

habitational buildings.  *We are not a market for this kind of contractor due to the significant construction defect loss potential.*[15]

Ms. Jacks' colleague, Cheryl Smith, requested more time to find replacement coverage for her clients.  As Ms. Smith's telephone note shows, the St. Paul underwriter with whom she was negotiating was reluctant to oblige, telling her she would get fired if she allowed St. Paul to remain on this construction risk:

> [A]bsolutely getting off - she feels gave us plenty of time. . . *she says she'd get fired.*  Could give us 30 more days but that's it.[16]

St. Paul Guardian extended its policy for one month, from January 4, 2000 to February 4, 2000, for an additional liability premium of $1,099.[17]  By the time the extension ran Ms. Jacks had procured replacement construction liability coverage for Hebert Construction and MVLLC with Admiral Insurance Company ("Admiral").  The Admiral policy incepted February 4, 2000 and renewed for two years, ending on February 4, 2003.[18]  Its first year liability premium was $18,000.[19]  Each Admiral policy contained a "specified operations exclusion" that barred coverage for residential construction, but in the first year the exclusion carved out an exception specifically for construction of the Meadow Valley condominiums:

> This exclusion does not apply to construction of Meadow Valley, LLC a 72 unit condominium complex.[20]

---

[15]    Jacks Decl. ¶ 17 Exh. 1 (emphasis added).

[16]    Andersen Decl. Exh. 10.

[17]    Andersen Decl. Exh. 11.

[18]    Andersen Decl. Exhs. 12, 13.

[19]    Andersen Decl. Exh. 12.  See also Jacks Decl. ¶ 17.

[20]    The Admiral policy provided by endorsement:

**SPECIFIED OPERATIONS EXCLUSION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

This insurance does not apply to any "bodily injury", "property damage", "personal or advertising injury" liability arising out of any residential construction including condominiums, townhomes, singe and multiple family dwellings conducted by or for you.

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 4
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

Like the St. Paul Guardian policy, and unlike the St. Paul Fire policy (below), the Admiral policy did not insure either condominium associations or unit owners.[21]

### 3. MVLLC's condominium association liability insurance

#### a. Condominium associations are required to have liability insurance

The first unit at Meadow Valley condominiums closed on September 9, 1999.[22]  MVLLC managing member Roger Hebert, who with his older brother Henry had been involved as an owner in the development of at least four other condominiums before Meadow Valley, testified he knew condominium associations should have their own liability coverage, which coverage should ideally be in place before the first unit closes.[23]

Mr. Hebert's understanding comports with the association insurance requirements of both the Washington Condominium Act and the Condominium Declaration for Meadow Valley, A Condominium ("Declaration").  The Condominium Act and the Declaration each require that the condominium association have liability coverage in place "at the time of the first conveyance of a unit to a person other than a declarant," and that unit owners be named as insureds.[24]

---

*This exclusion does not apply to construction of Meadow Valley, LLC a 72 unit condominium complex.*
[Emphasis added.] *Id*.

[21]    *Id*.

[22]    Andersen Decl. Exh. 14.

[23]    Hebert Dep. p. 20, ll. 19–22, Andersen Decl. Exh. 7.

[24]    RCW 64.34.352 requires that, no later than the date the first unit is conveyed, a condominium association carry liability coverage for property damage arising out of the "use, ownership, or maintenance" of the common elements:

(1)    Commencing not later than the time of the first conveyance of a unit to a person other than a declarant, the association *shall* maintain, to the extent reasonably available:

* * *

(b)    *Liability insurance*, including medical payments insurance, in an amount determined by the board of directors but not less than the amount specified in the declaration, covering all occurrences commonly insured against *for . . . property damage* arising out of or in connection with the use, ownership, or maintenance of the common elements (emphasis added).

* * *

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 5
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1    Accordingly, on October 21, 1999, shortly after the first unit sold, Marjorie Syria, the

2    Hebert Construction employee responsible for procuring insurance for all the Hebert brothers'

3    legal entities, contacted broker Edith Jacks to secure association coverage for the

4    condominium.[25]  Ms. Jacks asked Ms. Syria to send her the Declaration and Bylaws so Marsh

5    could solicit quotes for this necessary coverage.[26]

6    **b.    MVLLC applies for insurance as a condominium association**

7    There was some delay in receiving the documents, but three months later Martha

8    Washburn at Marsh on behalf of MVLLC electronically submitted a 52-page insurance

9    application to St. Paul Fire.  The application stated that the insured would be MVLLC, and the

10   "nature of [its] business" was "6513 - apartment bldg. operators condominium association."[27]  In

11   response to the question, "What business activities or operations has the insured been involved in

12   that they are not involved in currently?"  MVLLC answered "none."[28]

13   The GL hazard detail Ms. Washburn prepared described the insured risk as

14   "condominiums — residential — (association risk only)," with an exposure basis of "u = unit per

15   unit," annual exposure of "78 [units]" and class code "62003."[29]  St. Paul Fire underwriter Scott

16   Gilliland, who underwrote this policy, testified the class code "62003" is an insurance-industry

17   wide code meaning a condominium association.[30]  After reviewing what he believed was a

18   perfectly acceptable condominium association risk, Mr. Gilliland faxed a quote to Marsh

19   _____

20   (3)    Each unit owner is an insured person under the policy with respect to liability
       arising out of the owner's interest in the common elements or membership in the
       association . . . .

21   [25]    Jacks Decl. Exh. 2, and Jacks Decl. ¶¶ 7-9 and 12.

22   [26]    Jacks Decl. ¶ 9.

23   [27]    Andersen Decl. Exh. 15.  Before providing a quote, St. Paul Fire clarified that the risk
       was a condominium association, not an apartment.  June 8, 2006 Deposition Transcript of Scott Gilliland
       ("Gilliland Dep."), p. 60, 11.8-13, p. 61, 11. 2-13, Andersen Decl. Exh. 16.

24   [28]    Andersen Decl. Exh. 15.

25   [29]    Andersen Decl. Exh. 17.

26   [30]    Gilliland Dep. p. 112, ll.15-25, p. 113, ll. 1-10; Andersen Decl. Exh. 16.

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 6
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

showing an annual liability premium of $622 for this coverage.  On Ms. Syria's directive,

Ms. Jacks bound this condominium association coverage:

> [A]ttached is our proposal for this *Condo Association Insurance*.  Per your request we have bound this coverage effective 4-18-00 for 36 months policy with monthly payments of $927 (financing without interest will be directly through AFCO) . . [31]

### c.    The St. Paul Fire "community association" liability policy

St. Paul Fire issued policy no. BC01900003 policy for a three year term, from April 15, 2000 — April 15, 2003.  (A "BC" prefix meant the insured was a condominium association or an apartment complex; a "KK" prefix, as in the St. Paul Guardian policy, meant the insured was a contractor or developer.)[32]  The named insured on the declaration page is "Meadow Valley, LLC."  The Association was added (retroactively) as a named insured on March 06, 2001.[33]  The primary liability portion of the policy, form no. 41326, is entitled "Community Association Package General Liability Protection."  This is the form St. Paul Fire always used when the insured was a condominium association.[34]

The introductory paragraph of form 41326 states:  "This insuring agreement provides general liability protection for your *association activities*."[35]

On the same form, the "Who is Protected Under This Agreement" provision includes:

> The "association" and its "directors and executive officers."
>
> "Unit owners," but "only for the ownership, maintenance, or repair of your [*i.e.*, the association's] premises."
>
> "Developers," but "only for the ownership, maintenance, or repair of that part of your premises [not] solely owned or occupied by that developer."[36]

---

[31]    Andersen Decl. Exh. 18; Exh. 19.  See also Jacks Decl. ¶ 15.

[32]    Gilliland Dep. p. 104, ll. 7-16, 23-25, p. 105, l.1; Andersen Decl. Exh. 16.

[33]    Andersen Decl. Exh. 20 at bates no. SPT00718.

[34]    Gilliland Dep. p. 105, l. 25, p. 106, ll. 1, 11-16; Andersen Decl. Exh. 16.

[35]    Andersen Decl. Exh. 20 at bates no. SPT00780.

[36]    *Id*. at bates no. SPT00784.  The Condominium Declaration required the Association to have liability insurance under which the declarant (MVLLC) and unit owners were listed as insureds. Declaration, Art. 21.3.  It also required the declarant to be responsible for "maintenance [and] repair" of

---

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 7

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

And, on the same form, the insuring agreement states:

> We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that:
>
> happens while this agreement is in effect; and
>
> is caused by an occurrence.

MVLLC paid the premiums for this policy.[37]  By summer 2002, when association control passed from MVLLC to the unit owners, responsibility for paying the premiums for this policy passed to them as well.[38]  (The unit owners would not have agreed to pay premiums on a construction policy issued to a developer.)

The St. Paul Fire policy issued to MVLLC was in effect at the same time as the Admiral policy issued to MVLLC *that specifically provided construction liability coverage for the Meadow Valley condominiums* — at 30 times the premium.[39]

### d.   MVLLC continues to represent that it is the association

Even after the policy had been issued, MVLLC continued to represent to St. Paul Fire that it was, or was acting as, the condominium association.  In MVLLC's Quarterly Checklist (submitted in lieu of an audit), MVLLC represented that it had no "new or discontinued operations" and was not "planning any changes in [its] operations."[40]

And, in the November 8, 2000 loss control services report prepared for St. Paul Fire by a consultant who walked the property to report back to Mr. Gilliland about risks and potential

---

the property.  *Id.* at Art. 10.4.  This dovetails exactly with the St. Paul Fire policy developer coverage, which under policy form no. 41326 is limited to the ". . . maintenance or repair" of the property.

[37]   Andersen Decl. Exh. 21.

[38]   *Id*.  See also, RCW 64.34.312, which states:

(1)   Within 60 days after the termination of the period of declarant control . . . the declarant shall deliver to the association all property of the unit owners and of the association held or controlled by the declarant, including but not limited to . . . .

\* \* \*

(k)   Insurance policies or copies thereof for the condominium and association[.]

[39]   See n.18, *supra*.  The St. Paul Fire liability premium was $601 for each of the three years of coverage; the Admiral premium, $18,000 the first year and higher the second and third.

[40]   Andersen Decl. Exh. 22.

---

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 8

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1  hazards, the consultant indicated his contact at the project was MVLLC managing member

2  Roger Hebert, and that MVLLC was acting as the project's condominium association until a true

3  association could be formed.[41]  No one ever told St. Paul Fire the association had in fact been

4  formed fourteen months before this policy was issued.[42]

5      When Mr. Gilliland prepared his underwriting analysis he relied on this loss control

6  services report, specifically the representation (presumably from Roger Hebert) that MVLLC

7  was acting as the association, when he wrote the insured "is a condominium association:"

8      *Insured is a condominium association* composed of 16 frame buildings with 78
       total units.  Location was constructed in 2000 and at date of last visit 50% of units
9      were occupied with others filling up fast.  *Building contractor is still the sole
       association until the unit owner association is formed.*[43]

10     The "Financials" section of Mr. Gilliland's underwriting analysis similarly states, "Brand

11  new and *unit owner assoc. not formed yet.*  No financial info to receive."[44]

12     And the "Operations — Nature of Business" section reflects the same information:

13     [M]ulti-unit townhouse development consisting of 78 units in 16 buildings (plus
14     clubhouse) with about 50% of the units sold to date.  *The association has not been
       developed yet and the contractor is the sole association.*[45]

15     Finally, in the "General Liability Narrative," Mr. Gilliland discusses the premises liability

16  nature of the liability risks.  Notably, his narrative includes no reference to construction risks:

17

18  _____

19      [41]    Andersen Decl. Exh. 23.

20      [42]    Gilliland Dep. p. 53, ll. 1-14; Andersen Decl. Exh. 16.  Although the Association was
    incorporated on February 24, 1999, a year before MVLLC applied for condominium association coverage
    with St. Paul Fire, MVLLC's application and two consistent post-policy representations reflected its
21  position that it either was the association or was acting as the association until a true association could be
    formed.  Even MVLLC managing member (and Association president) Roger Hebert could not explain
22  why MVLLC applied for insurance as the condominium association when an actual association already
    existed, except to surmise it was because MVLLC controlled the association.  Hebert Dep. p. 30, ll. 8-22,
23  p. 52, ll. 13-25, p. 53, ll. 1-6; Andersen Decl. Exh. 16.

24      [43]    Andersen Decl. Exh. 24; Gilliland Decl. ¶ 14; Gilliland Dep. p. 66, ll. 4-25, p. 67,
    ll. 20-25, p. 68, ll. 11-13; Andersen Decl. Exh. 16.

25      [44]    I*d.* (emphasis added).

26      [45]    Andersen Decl. Exh. 23 (emphasis added).

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 9
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

The premises have asphalt drives, concrete walks for the access to the units and concrete drives.  There is security gate across the front.  The units are landscaped and have carpet throughout the units and linoleum in the kitchen, bathroom and laundry rooms.  There are stairs with wood railings.  The bathtubs have a non-skid surface.  There were no trip and fall hazards observed.[46]

In other words, the largest risk St. Paul Fire contemplated in issuing this liability policy was that someone would trip and fall — an exposure wholly in line with a condominium association risk, but out of line with a developer's construction risk.  In all his years as a St. Paul underwriter, Mr. Gilliland never wrote a construction risk.  He would not have written this risk if MVLLC had applied for coverage as a developer.[47]

### 4.    Lawsuits against MVLLC and Hebert Construction

In August 2003, just before the statute of limitations for condominium construction defect claims ran, the Association conducted its first professional inspection of the project to determine whether construction defects existed.  The resulting findings led to the Complaint styled *Meadow Valley Owners Association v. MVLLC*.[48]  The Association alleged, among other things, that certain defects in the construction of the condominium buildings caused water intrusion through the building envelope and resulting damage.[49]

The Association's lawsuit and resulting settlement negotiations were focused on the Meadow Valley defendants' alleged liability under the implied warranty of quality construction set forth in Washington's Condominium Act, RCW 64.34.445.  The Association's construction expert, Art Schroeder of Pacific Engineering Technologies ("PET") and its architectural expert, Studio Meng Strazarra, prepared reports regarding, and PET prepared a scope of recommended repairs for, alleged defects at the Meadow Valley Condominiums.  The result was a scope of repair for everything from inconsistent spacing of handrail brackets to insufficient attic

---

[46]    See *id.*

[47]    Gilliland Dep. p. 103, ll. 24-25, p. 104, ll. 1-6, 17-20; Andersen Decl. Exh. 16.

[48]    Andersen Decl. Exh. 25.

[49]    *Id.*

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 10
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1  insulation.[50]  The Association's cost estimator, Charter Construction, prepared an item-by-item

2  cost estimate for the PET scope of repair.[51]

3      **5.    St. Paul defends its insureds**

4      St. Paul Fire issued condominium association liability policy no. BC01900003 to

5  MVLLC, effective April 15, 2000 — April 15, 2003 (the Association was later added to this

6  policy by retroactive endorsement).  St. Paul Guardian issued construction liability policy

7  no. KK08400026 to Hebert Construction and MVLLC, effective January 4, 1999 — February 4,

8  2000.

9      MVLLC tendered the Association's lawsuit to St. Paul Fire on or about September 30,

10  2003.  St. Paul Fire promptly appointed Francis Floyd of the law firm of Floyd & Pfleuger to

11  represent MVLLC and member Roger Hebert.  Mr. Floyd entered his appearance on October 7,

12  2003.  After completing its initial coverage analysis, St. Paul Fire sent a letter to MVLLC and

13  Roger Hebert on October 29, 2003, agreeing to defend MVLLC and Hebert subject to a complete

14  reservation of rights to later deny coverage on any basis, whether or not identified in that letter.[52]

15      MVLLC later filed a third-party complaint against Hebert Construction, and Hebert

16  Construction tendered that claim to St. Paul as well.[53]  On April 27, 2004, Fidelity & Guaranty (a

17  St. Paul predecessor company) agreed to defend Hebert Construction under a complete

18  reservation of rights.[54]  St. Paul retained Steven Jager of Lee Smart Cook Martin & Patterson to

19  represent Hebert Construction a month before it even issued its reservation of rights letter.[55]

20

21

22

[50]    Andersen Decl. Exh. 26.

23  [51]    Andersen Decl. Exh. 27.

[52]    Andersen Decl. Exh. 28.

24  [53]    Andersen Decl. Exh. 29.

[54]    Andersen Decl. Exh. 30.

25  [55]    Andersen Decl. Exh. 31.

26

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 11

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

**6.     St. Paul Fire tells MVLLC this is an association policy and doesn't apply**

On May 5, 2004, Craig Yeary, Regional Director of the Major Case Unit, Construction Defect Claims for St. Paul, took over as the adjuster for the MVLLC claim.[56]  Upon review of the St. Paul Fire policy under which MVLLC had tendered and St. Paul Fire had been defending, Mr. Yeary determined the policy may have been issued as a condominium association liability policy, not as a policy that covered developer construction risks, and so might not apply.[57]  He ordered the underwriting materials for this policy and further investigated.

Upon review of the underwriting file, Mr. Yeary determined that MVLLC had applied for coverage as a condominium association, that St. Paul Fire had issued the policy to MVLLC as a condominium association, and that the policy covered only condominium association risks. Mr. Yeary therefore determined that St. Paul Fire owed no coverage to MVLLC under this policy.[58]  At the same time, he knew no other insurer had stepped up to defend MVLLC.[59]

On July 6, 2004, two months after he was assigned this claim, Mr. Yeary sent the policy and other materials to coverage counsel to verify or rebut his conclusion.[60]  *The same day*, he sent a letter to MVLLC notifying it that the St. Paul Fire policy did not provide coverage for construction defect claims against it and requesting information about other insurance:

> As you are aware, the coverage issued by the St. Paul Fire and Marine Insurance Company under policy number BC01900003 provides coverage to both the Meadow Valley Owners Association and Meadow Valley LLC.  The policy is subject to the Condominium Association Commercial General Liability Protection Form # 41326 (3/98).  You will note that in the insuring agreement found at the top of page 1 of the form it states:
>
> This insuring agreement provides general liability protection for your <u>association activities</u>.

---

[56]     Andersen Decl. Exh. 32.

[57]     June 1, 2006 Deposition Transcript of Craig Yeary ("Yeary Dep."), p. 75, ll. 2-25; Andersen Decl. Exh. 33.

[58]     *Id* at p. 76, ll. 21-25, p. 77, ll. 1-10; p. 113, ll. 5-22; Andersen Decl. Exh. 33.

[59]     *Id* at p. 114, ll. 4-13; Andersen Decl. Exh. 33.

[60]     *Id* at p. 76, ll. 9-19; Andersen Decl. Exh. 33.l.

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 12
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

There are, of course, limitations and exclusions which apply to that protection. As a result, this agreement should be read carefully to determine the extent of the coverage provided to you and other protected persons.

It appears that this policy does not provide coverage to Meadow Valley LLC for claims made against it for construction defects.  We have referred the matter out to coverage counsel for further review.  I will be back in touch with you with regards to our coverage position as soon as counsel has had an opportunity to review the matter.  It is imperative that you report this matter to any other insurer that might provide coverage to the Meadow Valley LLC as soon as possible.[61]

I will be back in touch with you shortly as to the coverage position of the St. Paul Fire and Marine Insurance Company.

(Emphasis in original.)[62]

It does not appear Mr. Yeary received any type of reply from MVLLC.  He did, however, continue to investigate on his own, and later that summer discovered MVLLC was an insured under the St. Paul Guardian policy issued to Hebert Construction.  As a result, on September 22, 2004, Mr. Yeary wrote MVLLC withdrawing from the defense and denying coverage on behalf of St. Paul Fire, and simultaneously informing MVLLC that St. Paul Guardian under a reservation of rights would immediately assume MVLLC's defense.[63]

Thus, although MVLLC knew on July 6, 2004 — two and a half months before St. Paul Fire officially denied coverage — that this policy did not apply to the construction claims against it, it continued to receive the benefit of a defense under the policy until St. Paul (not MVLLC!) found other coverage under which to provide it a defense.  From the time MVLLC was sued to the time it settled this matter, St. Paul always and with no interruption defended it.[64]

### 7.    The underlying covenant judgment settlement

During a year and a half of litigation, during which MVLLC and Hebert Construction were completely defended by St. Paul Fire or St. Paul Guardian, the Association's settlement

---

[61]    Andersen Decl. Exh. 34.

[62]    *Id*.

[63]    Andersen Decl. Exh. 35.

[64]    Yeary Dep. p. 115, ll. 18-21; Andersen Decl. Exh. 33.

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 13
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1    demands consistently exceeded the value of the claims St. Paul believed could possibly be

2    covered by its policies.  Because of this impasse, a cash settlement was never possible.

3    In April 2005, at the third mediation in the underlying action, the Association, MVLLC

4    and Hebert Construction entered into a $7,200,000 covenant judgment settlement comprised of

5    $4,800,000 in repair related costs and half that amount ($2,400,000) in attorney's fees.  The

6    Association relied on the Condominium Act as the basis for its attorney's fee claim.[65]

7    At the reasonableness hearing, the trial court found the attorney's fee award too high,

8    reduced the entire settlement to $6,400,000 ($4,800,000 in repair-related costs and $1,600,000 in

9    attorney's fees) and entered judgment on the reduced amount.[66]  The court at the hearing made a

10   point to say that MVLLC and Hebert Construction had received outstanding defenses from the

11   attorneys St. Paul had appointed to represent their interests.[67]  And, neither MVLLC or Hebert

12   Construction ever alleged they were dissatisfied with the defense St. Paul provided, or the results

13   obtained by that defense.

14   **B.    Argument**

15   Washington law governs this diversity matter.[68]

16   **1.    The St. Paul Fire policy does not provide coverage to MVLLC**

17   Interpretation of an insurance contract is a question of law properly determined on

18   summary judgment.  *American Star v. Grice*, 121 Wn.2d 869, 854 P.2d 622 (1993).  Summary

19   judgment may be granted against a party that fails to adduce facts sufficient to establish the

20

21   [65]    Andersen Decl. Exh. 35.

22   [66]    St. Paul has appealed entry of this judgment.

     [67]    Andersen Decl. Exh. 36.

23   [68]    In a suit in federal court pursuant to diversity jurisdiction, the court applies the choice of

24   law rules of the state in which it sits.  *Orange St. Partners v. Arnold*, 179 F.3d 656, 661 (9th Cir. 1999).
     Under Washington law, the parties' rights under an insurance policy are determined by the law of the
     state with the most significant contacts with the policy.  *Dairyland Ins. Co. v. State Farm Mut. Auto. Ins.*

25   *Co.*, 41 Wn. App. 26, 31, 701 P.2d 806 (1985), *rev. den.*, 104 Wn.2d 1016 (1985).  Here, Washington law
     controls because MVLLC's headquarters are here and it negotiated and placed its insurance here.

26

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 14
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

existence of any element essential to the party's claim, and upon which that party will bear the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S. Ct. 1689 (1993).

Washington has adopted the context rule for interpreting contracts. *Berg v. Hudesman*, 115 Wn.2d 657, 667, 801 P.2d 222 (1990); *Lynott v. National Union Fire*, 123 Wn.2d 678, 871 P.2d 146 (1994) (applying context rule to insurance contracts). This means that, without a predicate showing of ambiguity, a court may consider not only the language of the agreement at issue but also all the surrounding circumstances leading to its formation. *Berg*, 115 Wn.2d at 667. The only limitations are that extrinsic evidence which contradicts the plain language of the agreement or shows only one party's subjective understanding of what was to be covered, is not admissible. *Id.; Lynott*, 123 Wn.2d at 684; *Findlay v. United Pacific*, 129 Wn.2d 368, 917 P.2d 116 (1996).

As the *Berg* court explained:

> May we say here that we are mindful of the general rule that parol evidence is not admissible for the purpose of adding to, modifying, or contradicting the terms of a written contract, in the absence of fraud, accident, or mistake. But, as stated in *Olsen v. Nichols,* 86 Wash. 185, 149 P. 668 [(1915)], *parol evidence is admissible to show the situation of the parties and the circumstances under which a written instrument was executed, for the purpose of ascertaining the intention of the parties and properly construing the writing. Such evidence,* however, *is admitted,* not for the purpose of importing into a writing an intention not expressed therein, but *with the view of elucidating the meaning of the words employed.* Evidence of this character is admitted for the purpose of aiding in the interpretation of what is in the instrument, and not for the purpose of showing intention independent of the instrument. It is the duty of the court to declare the meaning of what is written, and not what was intended to be written. If the evidence goes no further than to show the situation of the parties and the circumstances under which the instrument was executed, then it is admissible.

115 Wn.2d at 669 (emphasis added).

### a.    The St. Paul Fire policy must be construed as a whole

An insurance policy is construed as a whole, with the policy given a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance. *Panorama Village v. Allstate*, 144 Wn.2d 130, 138, 31 P.3d 628 (2001). The policy

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 15
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1   should be read so that each clause is given force and effect. *Overton v. Consolidated*, 145 Wn.2d

2   417, 38 P.2d 322 (2002). It must be viewed in its entirety; a phrase cannot be interpreted in

3   isolation. *Allstate v. Peasley*, 131 Wn.2d 420, 424, 932 P.2d 1244 (1997). MVLLC argues it is

4   entitled to construction coverage under the St. Paul Fire policy because the policy is a general

5   liability policy under which MVLLC is a named insured against whom damages for property

6   damage are sought. But focusing on just the two lines of the insuring agreement, as this

7   argument does, while ignoring all the other component parts of association liability form

8   no. 41326, disregards *Overton* and *Peasley,* above, and is contrary to the law.

9       The structure of an insurance policy provides "an important objective source of meaning

10  and intent." *Findlay v. United Pacific*, 129 Wn.2d 368, 377, 917 P.2d 116 (1996). Liability

11  form no. 41326 is entitled "Community Association Package General Liability Protection." Its

12  introductory statement reads: "[t]his insuring agreement provides general liability protection *for*

13  *your association activities*."[69] By contrast, the liability form no. 47175 for the St. Paul Guardian

14  policy is entitled "Contractors General Liability Protection," and its introductory statement reads:

15  "[t]his insuring agreement provides general liability protection for your *business.*"[70]

16      Under the St. Paul Fire policy, the association and its directors and officers are insureds.

17  Unit owners and developers are also insureds, but only for the "ownership, maintenance, or

18  repair" of [the common elements] ▬ language that tracks almost exactly with the Condominium

19  Act and Declaration liability insurance requirements for a condominium association.[71] This

20  language is typical of condominium association liability policies. *See, e.g., First Londonderry v.*

21

22

---

23      [69]     Andersen Decl. Exh. 20 at bates no. SPT00780.

        [70]     Andersen Decl. Exh. 9, at bates no. SPT00927.

24      [71]     The Condominium Act requires condominium associations carry liability coverage for

25  the "use, ownership, or maintenance" of the common elements. RCW 64.34.352(1)(b). The Declaration
    requires the Meadow Valley condominium association carry liability coverage for the "operation,
    maintenance, and use" of the common elements. Andersen Decl. Exh. 3 § 21.3.

26

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 16
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1  *CNA*, 140 N.H. 592, 669 A.2d 232 (1995).  But, under the St. Paul Guardian and Admiral

2  policies, associations, their directors and officers, unit owners and developers are not insureds.[72]

3        Where the St. Paul Fire liability policy was written on a community association form, no

4  other policy provided association coverage during the St. Paul Fire policy period, and the

5  contemporaneous Admiral policy provided construction coverage to MVLLC *specifically for this*

6  *project*, common sense dictates that the policy should be interpreted as providing condominium

7  association coverage only.  *See Morrison Fruit v. Scarlett Fruit*, 72 Wn. App. 687, 693, 865 P.2d

8  570 (1994) (when construing an insurance policy a court should use common sense).

9        **b.     MVLLC is the named insured because it said it was the association**

10        The oddest thing about this case is that MVLLC applied for insurance as a condominium

11  association when, in fact, a condominium association already existed.[73]  Roger Hebert can't

12  explain it.[74]  No one seems to know why it happened.  Maybe it was because when MVLLC

13  applied for this policy it controlled the association.  It still owned most of the units.[75]  Its

14  members were the only officers of the association from February 24, 1999, when the association

15  was formed, to February 7, 2002, when MVLLC ceded association control to the unit owners.[76]

16  Maybe no one realized an association was already in existence, and Ms. Syria, the Hebert

17  Construction employee responsible for procuring insurance for the Hebert brothers' various legal

18  entities (including the condominium associations they would create after the buildings were

19  done) thought she was doing the right thing by naming the developer as the *de facto* association.

20        Odd or not, the fact remains that MVLLC applied for insurance, and St. Paul Fire issued

21  it insurance, as a condominium association.  Underwriter Scott Gilliland testified that his

22

23        [72]        Andersen Decl. Exhs. 9, 12.

24        [73]        Andersen Decl. Exh. 5.
           [74]        See n.42, *supra*.

25        [75]        See Andersen Decl. Exh. 15 at bates no. SPT01121.

26        [76]        Andersen Decl. Exh. 6.

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 17
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

department, middle commercial accounts, never wrote construction coverage.  In fact, in all his time at St. Paul he has never issued a single construction policy.[77]  He issued this policy solely because MVLLC on its application represented itself to be the condominium association.[78]  And, after the policy was issued, MVLLC continued to represent that it was a condominium association or acting as one until one was formed.[79]  Based on these representations, St. Paul Fire had no reason to believe it had issued a policy to anyone other than a condominium association.

<strong>c.    Extrinsic evidence "elucidates the meaning of the words employed"</strong>

Besides the policy itself and the parallel association insurance requirements in the Condominium Act and the Declaration, five independent pieces of extrinsic evidence corroborate MVLLC and St. Paul Fire's manifested mutual understanding of the type of coverage afforded MVLLC under this policy, and elucidate the meaning of the words employed.

**Course of dealing.**  The course of dealing between St. Paul and MVLLC shows MVLLC knew five months before this policy even incepted that St. Paul was non-renewing the St. Paul Guardian policy because it wanted off all residential construction risks.[80]

**The application.**  In its insurance application MVLLC described itself as a condominium association, said it was not a contractor, rated its liability hazard "condominiums —residential — (association risk only)" and requested its coverage be rated on a per unit basis (not, as typical with construction risks, on sales or payroll).  Scott Gilliland issued this policy because he understood, based on the application, that the policy was for a condominium association.[81]  The court may consider the underwriting decisions of an insurer in determining the intent of the parties.  *Kelly v. Aetna Cas. & Sur. Co.*, 100 Wn.2d 401, 405, 670 P.2d 267 (1983).

---

[77]    Gilliland Dep. p. 104, Andersen Decl. Exh. 26.
[78]    Gilliland Decl. ¶ 12.
[79]    Andersen Decl. Exhs. 15, 22.
[80]    Jacks Decl. Exh. 2.
[81]    Gilliland Decl. ¶¶ 13-14.

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 18
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

**The premium.** St. Paul Fire submitted a $622 annual liability premium bid to MVLLC broker Marsh before the policy was issued.[82] When MVLLC saw this bid it already had contemporaneous construction liability coverage with Admiral for which it paid $18,000 per year.[83] And it had paid $12,934 a year for the earlier St. Paul Guardian policy. The premium MVLLC paid for the St. Paul Fire policy was just *three percent* of the premium it paid for the contemporaneous Admiral policy. Put another way, Admiral's premium was 30 times St. Paul's.

*Aetna v. Kent*, 85 Wn.2d 942, 540 P.2d 1383 (1975), has almost identical facts. In that case, as here, the insured had two liability policies, a contractor's policy and a contemporaneous auto policy. The insured paid $41 in premiums for the contractor's policy and $1,294 for the auto policy — and, like here, the first policy premium was three percent of the second, and the second 30 times the first. The *Kent* court found the remarkable premium disparity "clear evidence" the two policies were intended to provide mutually exclusive coverage, with the premium charged accordingly:

> Moreover, the gross disparity in premium costs is clear evidence the contractor and automobile liability policies were not intended to provide the same coverage but rather were intended to provide mutually exclusive coverage. In the automobile policy, coverage was provided for each person sustaining bodily injury up to $25,000, with the maximum for each occurrence of $100,000. The annual premium charged was $1,294. In the contractor's policy, however, the coverage was $250,000 for bodily injury for each person covered by the policy and $500,000 for each occurrence. The annual premium charged was $41. Clearly, Aetna did not intend by the contractor's policy to provide $250,000 of automobile liability coverage for 41/1294 of the premium costs of the automobile liability coverage contained in the automobile policy. Similarly, it is unreasonable to believe that Kent in purchasing the contractor's policy for $41 reasonably expected thereby to obtain automobile liability coverage for which he paid $1,294. *It is more reasonable to believe the parties intended each policy to provide mutually exclusive coverage and the premium was charged accordingly.*

---

[82]    The actual premium was lower — $601 a year for three years.

[83]    The St. Paul Fire policy was effective April 15, 2000 - April 15, 2003. The Admiral policy was effective February 4, 2000 - February 4, 2003. The Admiral annual liability premiums were $18,000, $21,600 and $50,000, respectively. Andersen Decl. Exhs. 12 and 13.

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 19
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1  *Aetna v. Kent,* 85 Wn.2d at 947 (emphasis added).  An insurer is entitled to contractually limit its

2  risk by limiting coverage to situations contemplated at the time of computing premiums.  *Kelly v.*

3  *Aetna Cas. & Sur. Co.*, 100 Wn.2d 401, 404, 670 P.2d 267 (1983).  St. Paul Fire should not be

4  penalized for doing exactly that.

5      Finally, it would make no sense for the unit owners who took over paying premiums for

6  this policy in 2002 to do so since that would mean they were paying for MVLLC's developer

7  risks.

8      **MVLLC's post-policy representations.**  After the policy began, MVLLC submitted a

9  quarterly checklist to St. Paul Fire that stated its business (being a condominium association) had

10  not changed, and there were no plans for it to change.[84]  In November 2000, a loss control

11  consultant hired by St. Paul Fire walked the Meadow Valley property.  The consultant's report

12  indicated his contact at the property was MVLLC managing member Roger Hebert, and

13  confirmed (presumably from speaking with Mr. Hebert) that MVLLC was acting as the

14  condominium association until a true association could be formed.[85]  Scott Gilliland relied upon

15  this information to assess the continued appropriateness of this risk.[86]

16      **The broker's and underwriter's corroborated understanding.**  In *Lynott v. National*

17  *Fire*, 123 Wn.2d 678, 684, 871 P.2d 146 (1994), the court held that negotiations for placement of

18  an insurance policy are admissible under the "context rule" to interpret the policy.  Edith Jacks

19  and Scott Gilliland, who negotiated this policy, have both unequivocally testified the policy was

20  intended to provide association risk coverage to MVLLC as the condominium association, not

21  construction risk coverage to MVLLC as a condominium developer.[87]

22

23  [84]    Andersen Decl. Exh. 22.

   [85]    Andersen Decl. Exh. 15.

24  [86]    Gilliland Dep. pp. 54, ll. 5-17, p. 101, ll. 10-23, p.102, ll. 7-21, p. 103, ll. 24-25, p.104,
   ll. 1-6; at Andersen Decl. Exh. 16.

25  [87]    See Jacks Decl. ¶ 17, Gilliland Decl. ¶¶13-14 and Gilliland Dep. p. 103, ll. 18-25, p. 104,
   ll. 1-6; Andersen Decl. Exh. 16.

26

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 20
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1    All the evidence in this matter is consistent with the parties' mutual intent to insure

2    condominium association risks, and inconsistent with a mutual intent to insure construction risks.

3    Summary judgment for St. Paul Fire on this issue is appropriate.

4    **2.    St. Paul Fire and St. Paul Guardian did not act in bad faith**

5    The Meadow Valley defendants have alleged that St. Paul Fire and St. Paul Guardian

6    committed bad faith by (1) failing to raise the "association risk only" coverage defense in

7    St. Paul Fire's original reservation of rights letter, and (2) failing to settle the underlying action

8    filed against the Meadow Valley defendants.  As to the first allegation, MVLLC seeks to estop

9    St. Paul Fire from relying upon the "association risk only" defense.  But in order to do so, it

10   must establish that St. Paul Fire acted in bad faith to MVLLC's detriment, or that MVLLC was

11   prejudiced by the late assertion of the defense, which it cannot do.

12   As to the second allegation, St. Paul Fire and St. Paul Guardian are in good faith

13   contesting coverage and there can be no duty to make any indemnity settlement payments unless,

14   and only to the extent that, the coverage dispute is resolved in Meadow Valley defendants' favor.

15   There is, therefore, no basis for a bad faith failure to settle claim.

16   **a.    St. Paul Fire is not estopped from raising the "association risk only" coverage defense, which is a complete defense to coverage**

17   MVLLC claims St. Paul Fire is estopped from raising the "association risk only" because

18   it failed to raise it in St. Paul Fire's initial reservation of rights letter.  MVLLC's argument fails

19   for two reasons.  First, estoppel cannot be applied to create insurance that never existed.  Second,

20   even if it did apply, St. Paul Fire cannot be estopped from raising this defense unless MVLLC

21   can prove St. Paul Fire acted in bad faith to MVLLC's detriment, or that MVLLC was prejudiced

22   by the late assertion of this defense.  Because estoppel does not apply here, and even if it did

23   MVLLC cannot prove bad faith or prejudice, St. Paul Fire is entitled to summary judgment.

24

25

26

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 21
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1

### i.    MVLLC cannot create coverage, by estoppel or otherwise, that was never purchased

2

"One may not, by invoking the doctrine of estoppel or waiver, bring into existence a

3

contract not made by the parties and create a liability contrary to the express provisions of the

4

contract the parties did make." *Saunders v. Lloyds of London, et al.*, 113 Wn.2d 330, 335-36,

5

779 P.2d 249 (1989). The Washington Supreme Court explained:

6

> The underlying rationale is that an insurance company should not be required to
> pay for a loss for which it received no premium.  [Cit. om.]  That rationale

7

> supports precluding waiver or estoppel in situations where the insured attempts to
> broaden coverage to protect against risks not stipulated in the policy or expressly

8

> disclaimed.

9

*Saunders*, 113 Wn.2d at 336.

10

The Washington Supreme Court has established an exception to this rule where an

11

insurer has a duty to defend a claim and breaches that duty by either defending in bad faith or in

12

bad faith refusing to defend. *Kirk v. Mt. Airy Ins. Co.*, 134 Wn.2d 558, 563-64, 951 P.2d 1124

13

(1998). Here, there is no allegation that St. Paul Fire either defended in bad faith or in bad faith

14

refused to defend. Because this policy was issued solely as a condominium association policy,

15

St. Paul Fire never even had a duty to defend MVLLC.

16

More fundamentally, MVLLC has not alleged that St. Paul Fire breached its duty to

17

defend. That is because, under the mistaken impression that it issued a policy that potentially

18

covered the risk at issue, St. Paul Fire timely accepted the tender of defense, under a complete

19

reservation of rights to deny coverage on any grounds, whether or not identified in the letter.[88] It

20

notified MVLLC as soon as it was sure the policy did not apply,[89] but continued to defend *for*

21

*two and a half more months* until it found another insurer (St. Paul Guardian) to do so.

22

23

24

25

[88]    Andersen Decl. Exh. 28.

26

[89]    Andersen Decl. Exh. 34.

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 22
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

MVLLC makes no allegation that it received an inadequate defense and, indeed, is currently arguing before the Court of Appeals that the amount for which it settled represents a reasonable resolution of its liability.  Estoppel for breach of the duty to defend cannot apply.

ii.    **Even if coverage by estoppel did apply, MVLLC's attempt to obtain it fails because it cannot prove bad faith or prejudice**

In order to preclude St. Paul Fire from raising the "association risk only" defense, MVLLC must prove bad faith or prejudice:  "Under these forms of estoppel, insureds must demonstrate either that they suffered prejudice or that the insurer acted in bad faith when the insurer failed to raise all its grounds for denial in its initial denial letter."  *Hayden v. Mutual of Enumclaw*, 141 Wn.2d 55, 63, 1 P.3d 1167 (2000).  To survive summary judgment, the insured must come forward with evidence to establish the insurer's denial was unreasonable:

> If the insured claims that the insurer denied coverage unreasonably in bad faith, then the insured must come forward with evidence that the insurer acted unreasonably.  The policyholder has the burden of proof.  The insurer is entitled to summary judgment if reasonable minds could not differ that its denial of coverage was based upon reasonable grounds.

*Smith v. Safeco*, 150 Wn.2d 478, 486, 78 P.3d 1274 (2003).

To prove a claim for bad faith, the insured must prove not only that the insurer breached the insurance contract, but that its breach was "unreasonable, frivolous, or unfounded."  *Kirk v. Mt. Airy Ins. Co.*, 134 Wn.2d 558, 560, 951 P.2d 1124 (1998).  Bad faith will not be found where a "denial of coverage or a failure to provide a defense is based upon a reasonable interpretation of the insurance policy."  *Id*.  While an insurer can breach its duty of good faith by conduct short of fraud or intentional bad faith, *Industrial Indem. Co. of the Northwest v. Kallevig*, 114 Wn.2d 907, 916-17, 792 P.2d 520 (1990), an insurer will not be penalized for a good faith mistake.  *Kirk*, 136 Wn.2d at 280.  Alleged "mistakes and clumsiness alone do not amount to bad faith."  *Ins. Co. of Pennsylvania v. Highlands Ins. Co.*, 59 Wn. App. 782, 786, 801 P.2d 284 (1990).  Neither will delay alone constitute bad faith where there is no unfounded or frivolous denial of benefits.  *Felice v. St. Paul Fire & Marine Ins. Co.*, 42 Wn. App. 352, 361, 711 P.2d 1066 (1985).  As long as the insurance company acts with honesty, bases its decision on adequate

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 23

N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1   information, and does not overemphasize its own interests, an insured is not entitled to base a

2   bad faith claim against its insurer on a good faith mistake.  *Kirk*, 136 Wn.2d at 280.

3          It is difficult to imagine how St. Paul Fire's mistake could be deemed made in bad faith

4   when it harmed only St. Paul Fire — *i.e.*, St. Paul Fire paid for a defense it was not required to

5   pay.  Furthermore, there has been no allegation that the defense provided by St. Paul Fire or

6   St. Paul Guardian was somehow inadequate or in bad faith.  How could St. Paul Fire have

7   committed an act of bad faith by providing a good faith defense that did not harm the insured?

8          Even if St. Paul committed bad faith, there is no cause of action if the alleged bad faith

9   conduct did not cause MVLLC harm.  In *Safeco v. Butler, et al.*, 118 Wn.2d 383, 389, 823 P.2d

10  499 (1992), the Washington Supreme Court confirmed that "harm is an essential element of an

11  action for bad faith handling of an insurance claim."  If the insured meets its burden to prove bad

12  faith, harm will be presumed, but that presumption is rebuttable.  Making the presumption

13  rebuttable "protect[s] insurers from frivolous claims."  *Id.* at 390-92.  The uninterrupted defense

14  MVLLC received fully rebuts any presumption of harm.

15         Likewise, prejudice is required as an essential element of any cause of action for

16  estoppel.  Equitable estoppel has three elements, and focuses on the insured's justifiable reliance:

17         (1)    an admission, statement, or act inconsistent with the claim afterwards
                  asserted,
18         (2)    action by the other party on the faith of such admission, statement, or act,
                  and
19         (3)    injury to such other party resulting from allowing the first party to
20                contradict or repudiate such admission, statement, or act.

21  *Saunders*, 113 Wn.2d at 340.  Essentially, "[i]n Washington, injury, prejudice and detrimental

22  reliance have been used interchangeably to express the requirement that a party asserting

23  equitable estoppel must show a detrimental change of position."  *Kramarevcky v. Department of*

24  *Social & Health Services*, 122 Wn.2d 738, 747, 863 P.2d 535 (1993).

25         St. Paul Fire in fact corrected its omission of failing to specifically raise the "association

26  risk only" defense by bringing it to MVLLC's attention on July 6, 2004, just two months after

---

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 24

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1   Craig Yeary, Major Case Unit Regional Director, Construction Defect Claims, was assigned the

2   file (and six months after St. Paul Fire sent its initial reservation of rights letter, expressly

3   reserving the right to rely on any coverage defense, whether or not identified in the letter).[90]

4          Mr. Yeary noticed the liability form no. 41326, ordered the underwriting file, realized

5   this was an association policy and ultimately determined it afforded no coverage for the

6   Association's claims against MVLLC.  He sent the file to coverage counsel and the same day

7   notified MVLLC that the policy did not cover the construction claims against it because it was an

8   association policy.  He told MVLLC it was "imperative" that it put on notice any other insurers

9   that might provide coverage, and said he would be back in touch shortly.[91]

10         It does not appear, as a result of this July 6, 2004 letter, that MVLLC did at that time put

11  any other insurers on notice.  Mr. Yeary, however, continued to search for potential coverage for

12  MVLLC.  On September 22, 2004, as promised, he sent a  reservation of rights letter to MVLLC,

13  withdrawing from its defense under the St. Paul Fire policy but simultaneously providing it a

14  defense under the St. Paul Guardian policy.[92]  MVLLC was completely defended, without

15  interruption, by either St. Paul Fire or St. Paul Guardian, for the entire underlying action.[93]

16         Three months before the first mediation, and nine months before the mediation that

17  settled the case, MVLLC knew St. Paul Fire's position was that this policy did not apply because

18  it covered association risks only.  In pleadings and discovery, MVLLC has identified nothing it

19  would have done differently had it been notified of this defense earlier, nor has it identified any

20  other prejudice or harm it suffered because of the eight month delay in raising this defense.

21  When St. Paul asked the Meadow Valley defendants to state the basis of their bad faith claims,

22

23  [90]    *Id*.

    [91]    Andersen Decl. Exh. 34.

24  [92]    Andersen Decl. Exh. 35.

25  [93]    Hebert Dep. p. 78, ll. 23-25, p. 79, ll. 1-3, 14-15; Andersen Decl. Exh. 7; Yeary Dep.
    p. 114, ll. 4-13; Andersen Decl. Exh. 33; "I felt that I didn't want to leave them in a position where they
26  weren't [defended].  I wanted to make sure that they continued to have a defense."

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 25
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

1   they responded with a vague explanation that did not articulate any detrimental change of

2   position taken in reliance upon any act by St. Paul.[94]

3          In fact, Roger Hebert, managing member of MVLLC, testified he understood that

4   St. Paul Fire's initial reservation of rights letter meant there may be no coverage under this

5   policy.[95]  Mr. Hebert further testified that Marjorie Syria of his office took care of insurance

6   matters for his various legal entities, and that she and Mr. Hebert relied upon their insurance

7   broker, Edith Jacks, to obtain appropriate coverage for each.[96]  Edith Jacks has in turn testified

8   that the St. Paul Fire policy was issued to MVLLC as the condominium association to provide

9   condominium association liability coverage, not as a developer to provide construction liability

10  coverage.[97]  Thus, MVLLC itself understood that the St. Paul Fire policy did not provide the

11  construction liability coverage it now seeks.  Further, the fact that MVLLC was not misled as to

12  the scope of coverage is alone sufficient to rebut any presumption of harm and deny the

13  requested estoppel remedy.  *See Capelouto v. Valley Forge Ins. Co., et al.*, 98 Wn. App. 7, 20-

14  24, 990 P.2d 414 (1999).  (An omission in a declination letter will not estop an insurer from

15  denying coverage where the insured was not misled by the omission.)

16          *Hayden, et al. v. Mutual of Enumclaw Ins. Co.*, 141 Wn.2d 55, 1 P.3d 1167 (2000), is

17  instructive.  In *Hayden*, Hayden Farms sued a grafting expert, James Krause, for crop loss

18  allegedly due to Krause's negligence.  *Hayden*, 141 Wn.2d at 57-58.  Krause tendered the suit to

19  his insurer, who declined the tender based on certain policy exclusions.  The parties settled and

20  Krause assigned his insurance rights to Hayden Farms.  Hayden Farms then sued the insurer for

21  coverage.  *Id*. at 59.  On summary judgment in the declaratory judgment action, the insurer —

22

23          [94]      Andersen Decl. Exhs. 37 and 38 at Interrogatory No. 4.

24          [95]      Hebert Dep. p. 48, l. 25, p. 49, l. 1, p. 81, ll. 16-25, p. 82, ll. 1-14; Andersen Decl. Exh. 7.
            [96]      Hebert Dep. p. 23, ll. 20-25, p. 24. ll. 1-16, p. 26, ll. 23-25, p. 27, ll. 1-4, p. 32, ll. 16-25,
25  p. 33, ll. 1-2, p. 34, ll. 13-24; Andersen Decl. Exh. 7.
            [97]      Jacks Decl. ¶ 17.

26

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 26
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

like St. Paul Fire here — raised additional defenses not identified in its initial letter. *Id*. at 60.

Hayden Farms argued WAC 284-30-380 precluded the insurer from raising any defenses not

raised in its initial denial letter, but the Washington Supreme Court disagreed. The court

specifically ruled the insurer was *not* precluded from raising the additional defenses, noting,

"preclusion or estoppel is inappropriate absent either prejudice or bad faith." *Id*. at 61-62.

> ### iii.    The bad faith failure to settle claims must be dismissed because St. Paul has reasonable bases upon which to contest coverage and coverage has not been determined

As the Washington Supreme Court in *Truck Ins. Exch. v. VanPort Homes, Inc., et al.*, 147

Wn.2d 751, 761, 58 P.3d 276 (2002) held:

> If the insurer is unsure of its obligation to defend in a given instance, it may defend under a reservation of rights while seeking a declaratory judgment that it has no duty to defend. A reservation of rights is a means by which the insurer avoids breaching its duty to defend while seeking to avoid waiver and estoppel. 'When that course of action is taken, the insured receives the defense promised and, if coverage is found not to exist, the insurer will not be obligated to pay.'

St. Paul Fire and St. Paul Guardian have followed the course outlined by the *VanPort*

court to avoid waiver and estoppel. After timely agreeing to defend both insureds under a

reservation of rights, including appointing separate counsel for each, St. Paul Fire and St. Paul

Guardian brought this declaratory judgment action to resolve their coverage dispute with the

Meadow Valley defendants. St. Paul Fire and St. Paul Guardian cannot be estopped from

denying coverage because they have refused to pay to settle claims for which they are in good

faith contesting coverage. St. Paul had multiple reasonable bases for not offering amounts

sufficient for a complete cash settlement of the Association's claims and it cannot therefore be

reasonably argued that its position was frivolous.[98]

---

[98]    Under the St. Paul Fire policy, St. Paul's position is that the policy does not apply because MVLLC is not being sued for an association risk. And even if it did apply, the amount of covered property damage under the policy is no more than half a million dollars, an amount St. Paul has always been willing to pay. The rest is for faulty work that did not cause covered damage, or for building code violations such as, squeaky, bouncy or uneven floors; loose carpet or carpet seams; handrail brackets spaced inconsistently; main entry doors incorrectly hung or with insufficient weather stripping; garage

---

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 27
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1    St. Paul also has another reasonable basis for having refused to pay any tendered

2    settlement:  there was never a reasonable offer tendered that it could have been required to pay.

3    The underlying action settled for a $7,200,000 covenant judgment settlement, which the trial

4    court deemed unreasonable and reduced to $6,400,000.  The Meadow Valley defendants will be

5    unable to meet their burden to show St. Paul refused a reasonable settlement, since, at the last

6    mediation before the covenant judgment, the Association's lowest demand was half a million

7    dollars *more* than what the trial court held was reasonable.[99]

8            **b.**    **The Consumer Protection Act claim fails as a matter of law because**
                     **defendants cannot establish the essential elements of that claim**

9    In order to establish a violation of the Washington Consumer Protection Act ("CPA"), the

10   Meadow Valley defendants must prove that an act or practice of St. Paul (1) is unfair and

11   deceptive; (2) occurred in the conduct of trade or commerce; (3) affected the public interest;

12   (4) was the actual cause of injury to plaintiff's business or property; and (5) resulted in actual

13   injury.  *Hangman Ridge v. Safeco*, 105 Wn.2d 778, 784-85, 719 P.2d 531, 535 (1986).

14   In their counterclaim, Meadow Valley defendants allege vaguely that St. Paul's actions

15   violated the CPA and damaged them.[100]  But St. Paul defended the Meadow Valley defendants in

16   good faith and they have made no claim they were unsatisfied with the defense provided.

17   Causation of damages is an essential element of a CPA claim, *Hangman Ridge* at 784-85, and the

18

19

20   _____

21   doors that do not latch; improperly attached garage door openers; shower doors that either do not close or
     are difficult to close; walls that are not straight or are out of plumb; unfinished interior cabinets;
     insufficient attic insulation; no attic access; foggy fireplace glass; gaps in draft stop walls; adding a
22   second floor instead of an open two story living room; and roofline changes.  Andersen Decl. Exh. 26.

23       Under the St. Paul Guardian policy, which does provide construction coverage, the evidence
     shows that only four of the sixteen buildings at this condominium were completed when the policy ended,
24   so St. Paul Guardian would be responsible for, at most, one-quarter of otherwise covered property
     damage.  Andersen Decl. Exh. 2.  This, again, is within a range that St. Paul has always offered to pay.

25   [99]       Andersen Decl. Exh. 39.

26   [100]       Answer, Affirmative Defenses, Counterclaims and Crossclaims, p. 19. ¶ 4.4.

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 28
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

Meadow Valley defendants cannot identify any unfair or deceptive act or practice that caused them compensable damages. As a result, this claim also fails as a matter of law.

### 3.    The underlying attorney's fees are not "costs taxed" against the insureds

The $1,600,000 covenant judgment attorney's fees are not "costs taxed" against the Meadow Valley defendants under either St. Paul policy, for the following reasons.

#### a.    Attorney's fees and costs are distinct concepts

Both St. Paul policies provide that, in addition to limits, the insurer will pay "all costs taxed against any protected person in a suit."[101]  "Costs taxed" is not defined in the policies. In Washington, undefined terms are given their plain, ordinary and popular meaning, and courts frequently look to standard English dictionaries to ascertain the meaning of undefined terms. *Boeing v. Aetna*, 113 Wn.2d 869, 877, 784 P.2d 507 (1990) (construing "damages").

When considering words used in a legal context, Washington courts consult Black's or Ballentine's Law Dictionaries for definitions. *Lynott v. National Union*, 123 Wn.2d 678, 689-90, 871 P.2d 146 (1994) (construing "acquisitions"); *Matthews v. Penn-America*, 106 Wn. App. 745, 749, 25 P.3d 451 (2001) (adopting narrow definition of "family" and denying coverage).

Black's Law Dictionary defines "taxation of costs" as:

The process of ascertaining and charging up the amount of costs in an action to which a party is legally entitled, or which are legally chargeable.  See *e.g.* Fed. R. Civ. P. 54(d); 28 U.S.C.A. § 1920.  *See also* Costs.

Black's Law Dictionary defines "costs" as:

A pecuniary allowance, made to the successful party . . . In federal courts, costs are allowed as a matter of course to the prevailing party unless the court otherwise directs; also, specified fees and certain court expenses may be taxed as costs. Fed. R. Civ. P. 54(d) . . . *Generally, "costs" do not include attorney's fee unless such fees are by a statute denominated costs or are by statute allowed to be recovered as costs in the case.*

---

[101]    *Claim* means a demand which seeks damages.

*Suit* means a civil proceeding which seeks damages.  Andersen Decl. Exh. 9 at bates no. SPT00930-SPT00931; Exh. 20 at SPT00782-SPT00783.

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 29
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

Fed. R. Civ. P. 54(d), in turn, defines costs as specifically excluding attorney's fees:

(1)    *Costs Other Than Attorney's Fees*.  Except when express provisions therefore is made either in a statute of the United States or in these rules, *costs other than attorney's fees* shall be allowed as of course to the prevailing party . . . such *costs may be taxed* by the clerk on one day's notice.

(2)    *Attorney's fees.*

    (A)    Claims for *attorney's fees and related nontaxable expenses* shall be made by motion . . . [102]

Washington recognizes the same distinction.  "Costs taxed" in a lawsuit typically refers to modest or symbolic expenses awarded as a matter of course to the prevailing party in litigation.  The clearest expression of Washington law in this regard is *Hall v. Stolte*, 24 Wn. App. 423, 426, 601 P.2d 967 (1979), a decision interpreting CR 41(d).  There, the court stated,

CR 41(d) specifically permits only taxable costs to be recovered.  *Taxable costs do not include the award of reasonable attorney's fees.*

(Emphasis added).  With respect to the word "costs," courts have long made it clear that that term does not include attorney's fees:

The term "costs" may be considered as synonymous with the term "expense."  Costs are allowances to a party for the expense incurred in prosecuting or defending a suit.  15 C.J. 20.  The word "costs" in the absence of statute or agreement does not include counsel fees; in other words, the general rule is that counsel fees are not costs either in suits in equity or actions at law.

*State ex rel. Macri v. Bremerton*, 8 Wn.2d 93, 102, 111 P.2d 612 (1941).  Unless the statute authorizing their recovery indicates they are costs, courts consider attorney's fees damages:

Similarly, any award of attorney's fees sought under RCW 49.48.030 is *not sought as part of the costs* of this action; rather, Dr. Brown seeks attorney's fees as *additional damages* for defendant's failure to comply with RCW 49.48.010.

*Brown v. Suburban Obstetrics & Gynecology*, 35 Wn. App. 880, 884, 670 P.2d 1077 (1983) (emphasis added).[103]  More recent cases continue to recognize the distinction.  In *Panorama Village v. Allstate*, 144 Wn.2d 130, 26 P.3d 910 (2001), the court stated:

---

[102]    Fed. R. Civ. P. 54(d) (1) and (2) (emphasis added).

[103]    The statute in *Brown* was substantially similar to the attorney's fee provision in the Washington Condominium Act, in that it did not provide for attorney's fee as costs:

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 30
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1
2
3

It must be noted that there is a difference between an entitlement to collect "reasonable attorney's fees" and an entitlement to collect those statutory "costs" enumerated in RCW 4.84. 010.  *Costs have historically been very narrowly defined*, and RCW 4.84.010 limits cost recovery to a narrow range of expenses such as filing fees, witness fees, and service of process expenses.

4

### b.    The Condominium Act does not define attorney's fees as "costs"

5

The Association sued the Meadow Valley defendants under the Condominium Act,

6

RCW 64.34, *et seq.*  RCW 64.34.455 allows for recovery of attorney's fees, but not as costs:

7
8

> If a declarant or any other person . . . fails to comply with any provision hereof . . . any person or class of persons adversely affected by the failure to comply has a claim for appropriate relief.  The court, in an appropriate case, may award reasonable attorney's fees to the prevailing party.

9

In *Park Ave. v. Buchan Devs.*, 117 Wn. App. 369, 388, 71 P.3d 692 (2003), the court,

10

construing this provision, refused to consider attorney's fees litigation expenses:

11
12
13

> The trial court awarded Park Avenue its reasonable attorney's fees under RCW 64.34.455.  Park Avenue contends the court should have construed the term "attorney's fees" liberally to allow for an additional award of litigation expenses in order to make it whole.  *We disagree*.

14

(Emphasis added.)

15

Then, in *Eagle Point v. Coy*, 102 Wn. App. 697, 707, 9 P.3d 898 (2000), the court, citing

16

the well-established rule that attorney's fees are not costs unless a statute defines them as such,

17

refused to consider attorney's fees as costs under the Condominium Act because the statute did

18

not define them that way:

19
20

> Attorney's fees are not included in the "costs" that can be shifted under CR 68, unless the governing statute specifically defines attorney's fees as costs . . . *The condominium statute does not define attorney's fees as costs.*

### c.    A layperson would have no idea what "costs taxed" means

21

A layperson would have no idea what "costs taxed" means.  While the Meadow Valley

22
23

defendants will argue "costs" and "taxed" have a lay, popular meaning because they are found in

24
25

> In any action in which any person is successful in recovering judgment for wages or salary owed to him, reasonable attorney's fees, in an amount to be determined by the court, shall be assessed against said employer or former employer . . . .

RCW 49.48.030.

26

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 31
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1  the dictionary, this argument ignores the fact that words like "habeas corpus," "replevin" and

2  "mandamus" are in the dictionary too, yet they have no popular, lay meaning.  The Meadow

3  Valley defendants rely on *Boeing*, 113 Wn.2d 869.  In that case, however, the court was

4  construing the word "damages," a word that has a legal meaning understandable to a layperson.

5  "Damages" also has an archaic and hyper technical meaning that arguably excludes sums

6  awarded in equity, and it was this meaning that the *Boeing* court rejected.  With its broad

7  construction of the word "damages," the *Boeing*  decision supports St. Paul's position that

8  attorney's fees are damages subject to the limitations of coverage, and not "costs taxed."

9  　　　　To the extent there can be a lay understanding of "costs taxed" in a lawsuit, it is likely not

10  distinguishable from the legal meaning of costs, which is distinct from attorney's fees.  The fee

11  agreement between the Association and its former law firm makes the distinction between

12  attorney's fees and costs innumerable times in the body of the agreement.[104]  And personal injury

13  attorney Yellow Page ads make the distinction when they promise, "no recovery, no fee!" but

14  warn the client must still pay "costs."

15

16

---

17  　　　[104]　　　Andersen Decl. Exh. 40, Amended Levin & Stein Fee Agreement.  Twelve of the 28

18  paragraphs in this agreement discuss either attorney's fees or costs, and the terms are not interchangeable.
　　　Paragraph 2 defines "any recovery" as "attorney's fees, less costs," and defines "total recovery"

19  as "repair costs or other damages," "attorney's fees" and "investigative and litigation costs."

20  　　　Paragraph 6 defines "costs" as:

21  　　　[c]ourt filing fees, arbitration expenses, process server fees, private investigator fees,
　　　messenger fees, copy costs, postage, long distance telephone charges, parking, court

22  　　　reporter fees, jury fees, consultant fees, destructive and non-destructive defect
　　　investigation expenses and fees charged by the mediator if the claims go into mediation,

23  　　　and similar costs incurred in the prosecution, arbitration or mediation of construction
　　　defect claims.

24  　　　Nowhere in this substantial list of what constitutes "costs" is the term attorney's fees.
　　　Finally, paragraph 12 is divided into costs and fees.  It states that attorneys will be entitled to

25  reimbursement of costs advanced for the client, and that attorneys are entitled to a contingent fee.

26  　　　Given this agreement, the Association must have known attorney's fees are not costs.

---

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 32
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

### d.    Idaho's *Harvey* rule does not apply in Washington

The Idaho Supreme Court's reasoning in *Mutual of Enumclaw v. Harvey*, 115 Idaho 1009, 772 P.2d 216 (1989) would be inappropriate in Washington.  The *Harvey* court held that "costs taxed" included attorney's fee awards regardless of an insurer's reservation of rights defense, providing two reasons for its ruling.  First, it held that the ordinary purchaser of insurance would understand "costs taxed" to include attorney's fees.  (For the reasons set forth above, that holding is dubious.)  Second, it held that such an interpretation was necessary in order to prevent opportunism by the insurer who had taken the case all the way through trial:

> Beyond what appears to be the clear term of the policy, it is arguable that since the Company has the right to control the defense, *including the power to refuse settlement*, it should also bear the consequences of its case management decisions, including the consequence that the trial court may tax the opponent's costs against the insured.

*Harvey*, 115 Idaho at 1012 (emphasis added).

The underlying premise of this holding — that the insurer controls the defense and settlement — is not true in Washington.  Here, where an insured is being defended under a reservation of rights, it is the insured, not the insurer, that controls the defense and has the ultimate choice with respect to settlement.  *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 388-89, 715 P.2d 1133 (1986).  There is no clearer example of this than the Meadow Valley defendants' settlement with the Association — undertaken without St. Paul's knowledge or consent.  In fact, it was presented to St. Paul as a done deal.  In Washington, insurer-appointed defense counsel represent only the insured and must understand that the insured is the only client.  *Id*. at 388.  Throughout the underlying action, defense counsel appointed by St. Paul answered only to the Meadow Valley defendants and their personal counsel, Mark Davidson, not to St. Paul or its attorneys.  St. Paul did not control the defense of this matter, which was resolved in such a way as to maximize the insurers' (and minimize the insureds') exposure.

In Washington, therefore, the shoe is on the other foot with respect to potentially opportunistic behavior.  The insured facing liability for non-covered claims would have an

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 33
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

incentive to offer the claimant an inflated attorney's fee award that is in reality partial

compensation for uncovered damage claims, expanding coverage unilaterally and exculpating

itself from liability.

Washington courts have consistently stated that they "do not propose to discourage

reservation of rights defenses" and that "such a defense usually provides a valuable service to the

insured." *Tank*, 105 Wn.2d at 390. They have also stated that "[i]f the insurer is unsure of its

obligation to defend in a given instance, it may defend under a reservation of rights while

seeking a declaratory judgment that it has no duty to defend." *Truck Ins. Exch. v. VanPort*

*Homes*, 147 Wn.2d 751, 761, 58 P.3d 276 (2002). This unequivocal encouragement to insurers

to defend under a reservation of rights would be jarringly inconsistent with a ruling that

rewarded an insured's attempt to create automatic liability for statutory attorney's fees against

the insurer that had stepped up to defend. Such an interpretation encourages insurers not to

defend under a reservation of rights but instead to deny a defense whenever it has a colorable,

good faith basis for doing so, to avoid potential liability for the plaintiff's attorney's fees.

*Harvey* is inapposite to Washington insurance jurisprudence.

  **e.**  **"Costs taxed . . . in a suit" does not apply to covenant judgment**
      **settlements**

The St. Paul "additional payments" provision states that the insurer will "pay all costs

taxed against any protected person in a suit." A "suit" is distinguished from a "claim," with the

latter defined as a "demand which seeks damages." The Meadow Valley defendants agreed to

the Association's settlement demand at a mediation and the amount of the settlement was not

determined in "suit." Thus, no amount agreed to in response to a demand could be "costs taxed"

in a "suit" within the meaning of the policies.

This interpretation makes sense in light of *Harvey*, 115 Idaho 1009. In *Harvey,* unlike

here, the underlying action proceeded to a full jury trial. The *Harvey* court reasoned that

attorney's fees should be awarded because by taking the case to trial the insurer (who, in Idaho,

unlike here, controls the defense) needed to "bear the consequences of its case management

decisions, including the consequence that the trial court may tax the opponent's costs against the insured." *Harvey* at 1012. The court was saying, in essence, that the "costs taxed" provision protected the insured's policy limits from the risk the insurer took by deciding to try the case instead of settling it. By its own terms this reasoning does not apply to settlements such as the one between the Meadow Valley defendants and the Association. Since the Meadow Valley defendants spared themselves the risk of a real trial by settling a "claim," they cannot at the same time legitimately claim the right to "costs taxed" coverage.

### f.    If St. Paul is liable for the attorney's fees at all, it is as indemnity damages

If St. Paul is liable for the covenant judgment attorney's fee award at all, it should be as "damages" within the policies' coverage grants. If attorney's fees not awarded as costs (as fees under the Condominium Act are not awarded as costs, *Eagle Point v. Coy*, 102 Wn. App. 697, 707, 9 P.3d 898 (2000)), Washington considers them to be an element of damages. *Brown v. Suburban Obstetrics & Gynecology*, 35 Wn. App. 880, 884, 670 P.2d 1077 (1983). Washington courts have given the terms "damages" as used in an insurance policy a broad construction. *Boeing*, *supra*. Other courts have reached similar conclusions.

In *Ypsilanti v. Appalachian Ins. Co.*, 547 F. Supp. 823, 828 (D. Mich. 1982), the court found "a reasonable person in the position of the insured would believe that the words 'all sums which the insured shall become legally obligated to pay as damages' would provide coverage for all forms of civil liability, including attorney's fees." On the other hand, when a statute defines attorney's fee as costs, courts have, commensurately, not considered them to be damages. *See Sullivan County v. Home Indem. Co.*, 925 F.2d 152, 153 (6th Cir. 1991).[105]

---

[105]    The Seventh Circuit, in *United States v. Security Mgmt. Co.*, 96 F.3d 260, 269-270 (7th Cir. 1996) held that attorney's fee under the Fair Housing Act, which separates fees from costs, were neither "damages" nor "costs," but were instead as separate statutory remedy and thus the insurer had no duty to pay them under any circumstances.

---

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 35
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

Attorney's fees, like other forms of damages, are subject to discretionary evaluation, while the small, fixed costs typically taxed in suits such as filing and service of process fees are not.  If a portion of this claim is covered (and St. Paul has always maintained that a portion is), liability for the attorney's fees should be allocated proportionately to covered damages.  *State Farm v. English Cove Ass'n*, 121 Wn. App. 358, 371, 88 P.3d 986 (2004).

**C.    Conclusion**

For all of the above reasons, St. Paul requests this Court enter an order declaring that St. Paul is entitled to summary judgment as a matter of law (1) dismissing MVLLC's breach of contract claim against St. Paul Fire with prejudice; (2) dismissing the Meadow Valley defendants' bad faith and CPA claims against St. Paul Fire and St. Paul Guardian with prejudice; and (3) dismissing the Meadow Valley defendants' "costs taxed" claim against St. Paul Fire and St. Paul Guardian with prejudice.  A proposed order is attached.

Dated this 29th day of June, 2006.

GORDON & POLSCER, L.L.C.


By:_____/s Stephanie Andersen_____
    Stephanie S. Andersen, WSBA No. 22250
    William C. Gibson, WSBA No. 26472
    Attorneys for St. Paul Fire and Marine
    Insurance Company and St. Paul Guardian
    Insurance Company
    1000 Second Avenue, Suite 1500
    Seattle, WA  98104
    Telephone:  (206) 223-4226
    Facsimile:  (206) 223-5459
    E-mail: usdc-wd-wa@gordon-polscer.com

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 36
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

**GORDON & POLSCER, L.L.C.**
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

**CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2006, I electronically filed the following:

- **Plaintiffs St. Paul Fire And Marine Insurance Company And St. Paul Guardian Insurance Company's Motion For Partial Summary Judgment; and**

- **Certificate of Service;**

with the Court using the CM/ECF system which will send notification of such filing to the following:

*Attorneys for Admiral Insurance Company*
Daniel F. Mullin
Tracy Duany
Jackson & Wallace
Bank of America Tower
701 Fifth Avenue, Suite 2850
Seattle, WA 98104-7047

*Attorneys for Meadow Valley, LLC, et al.*
Kenneth Hobbs
A Richard Dykstra
Stafford Frey Cooper
601 Union Street, Suite 3100
Seattle, WA 98101-1374

*Attorneys for Third Party Defendants Safeco/American Economy*
William F. Knowles
Thomas J. Braun
Cozen O'Connor
1201 Third Avenue, Suite 5200
Seattle, WA 98101-3071

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 37
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc

GORDON & POLSCER, L.L.C.
1000 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 223-4225

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

GORDON & POLSCER, L.L.C.


By:_____/s Stephanie Andersen_____
     Stephanie Andersen, WSBA No. 22250
     William C. Gibson, WSBA No. 26472
     Attorneys for St. Paul Fire and Marine
     Insurance Company and St. Paul Guardian
     Insurance Company
     1000 Second Avenue, Suite 1500
     Seattle, WA  98104
     Telephone: (206) 223-4226
     Facsimile:  (206) 223-5459
     E-mail: usdc-wd-wa@gordon-polscer.com

ST. PAUL FIRE AND ST. PAUL GUARDIAN'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (C05-0388TSZ) - 38
N:\Active Cases\01375\WesternDistrict\Pleadings\MSJ-Combined\motion.revised.doc