1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, a Minnesota
corporation and ST. PAUL GUARDIAN
INSURANCE COMPANY, a Minnesota
corporation,

               Plaintiffs,

v.

HEBERT CONSTRUCTION, INC., a
Washington corporation; MEADOW
VALLEY, LLC, a Washington limited
liability company; ROGER and SHELLY
HEBERT, individually and the marital
community thereof; HENRY and KAREN
HEBERT, individually and the marital
community thereof; ANDRZEJ and ROMA
LAWSKI, individually and the marital
community thereof; JAMES and ANNE
KOSSERT, individually and the marital
community thereof; and ADMIRAL
INSURANCE COMPANY, a Delaware
Company,

               Defendants.

No.  C05-388Z

ORDER

23

24

25

26

ADMIRAL INSURANCE COMPANY, a
Delaware corporation,

               Third-Party
Plaintiff,

ORDER -  1

1    v.

2    SAFECO INSURANCE COMPANY, a
     Washington corporation, AMERICAN
3    ECONOMY INSURANCE COMPANY, a
     Indiana corporation, and JOHN DOE
4    INSURANCE COMPANIES 1-50,

5                 Third Party
   Defendants.
6

7

8       This matter comes before the Court on Meadow Valley Defendants' ("MV

9 Defendants") Motion for Partial Summary Judgment, docket no. 77, MV Defendants' Second

10 Motion for Partial Summary Judgment, docket no. 84, and Plaintiffs St. Paul Fire and Marine

11 Insurance Company's and St. Paul Guardian Insurance Company's (collectively, "St. Paul")

12 Motion for Partial Summary Judgment, docket no. 99.  Additionally, in opposition to St.

13 Paul's motion, the MV Defendants move to strike Exhibit 15 of the Andersen declaration,

14 docket no. 100, as barred by RCW 48.18.080(1).  Docket no. 110, at 14.

15       Having reviewed the parties' briefs, and having heard the argument of counsel on

16 August 23, 2006, the Court has DENIED St. Paul's motion for partial summary judgment as

17 to the bad faith and CPA claims, docket no. 99, DENIED the MV Defendants motion for

18 partial summary judgment as to the "intended use" of the Meadow Valley Condominium

19 Project buildings, docket no. 84, and GRANTED the MV Defendants' motion to strike,

20 docket no. 100.  At argument, the Court deferred a ruling on the following two issues: (1)

21 whether the St. Paul Fire Policy in effect from 2001-2003 provides coverage for property

22 damage arising out of construction/developer liability, rather than liability coverage for

23 condominium association activities only; and (2) whether the "additional payments"

24 provisions in the St. Paul Fire and St. Paul Guardian policies leave St. Paul responsible for

25 the payment of the attorneys' fees awarded in the state-court action as "costs taxed."  As to

26 those two remaining issues, the Court now enters the following Order.

ORDER - 2

1

2 ## BACKGROUND

3     <u>Underlying State Court Action</u>

4        On September 5, 2003, and November 24, 2004, the Meadow Valley Owners

5 Association ("Association") filed complaints in King County Superior Court against two

6 defendants based on alleged construction defects in a 78-unit condominium project, known

7 as Meadow Valley Condominiums (the "Project").  The Association brought claims against

8 Meadow Valley LLC ("MVLLC"), the developer of the Project, and Roger Hebert, the

9 manager of MVLLC.  In turn, MVLLC brought third-party claims against Hebert

10 Construction, Incorporated ("HCI"), the general contractor for the Project, and several

11 individuals.[1]  On September 19, 2005, the Association entered into a stipulated judgment

12 against the MV Defendants for the sum of $6,400,000.  <u>See</u> Knowles Decl., docket no. 60, at

13 Ex. B (Stipulated Judgment).  The stipulated judgment included $4,800,000 for repair costs

14 and $1,600,000 in attorneys' fees.  <u>Id.</u>

15     <u>Nature of this Case</u>

16        This case was initiated when St. Paul filed a declaratory judgment action seeking a

17 judgment that they have no duty to defend or indemnify any of the MV Defendants, as well

18 as a determination of their rights relative to Admiral Insurance Company ("Admiral"), a

19 separate insurer of the MV Defendants.  Compl., at pp. 8-9.  St. Paul's Complaint was

20 followed by counter-claims on behalf of both the MV Defendants and Admiral, all of which

21 also cross-claimed against one another.  Answers, docket nos. 15, 22.  Admiral also brought

22 a third-party claim for contribution against Safeco and AEIC, which responded with their

23 own counter-claim for a contribution claim-bar order.  Docket nos. 51, 56.  The pending

24

25      [1] The individual Meadow Valley Defendants include Roger and Shelly Hebert, Henry and

26 Karen Hebert, Andrzej and Roma Lawski, and James and Anne Kossert. MVLLC, Hebert Construction, and the individual Meadow Valley Defendants (collectively, the "MV Defendants") are first party Defendants in this action.

1   motions involve only the claims and counter-claims between St. Paul and the MV

2   Defendants.[2]

3          Scope of the St. Paul Fire Policy

4          The parties fundamentally disagree as to the scope and nature of coverage under an

5   insurance policy issued by St. Paul Fire to MVLLC (the "St. Paul Fire Policy").  At the time

6   MVLLC purchased the policy it was the developer for the Project and appeared to be the

7   acting community association for the Project.[3]  The MV Defendants maintain that the policy

8   covers liability for property damage caused by construction defects for which MVLLC

9   would be liable as a developer, as well as any community association activities.  In contrast,

10  St. Paul contends that the policy's coverage is limited exclusively to events arising out of

11  MVLLC's status as a "Community Association."

12               1.    Policy Language

13         The disputed policy was issued for a three year term from April 15, 2000, through

14  April 15, 2003.  First Hobbs Decl., docket no. 78, Ex. D (St. Paul Fire Policy at 1).  The

15  "Introduction" section of the policy states as follows:

16         This policy protects against a variety of losses.  There are also some restrictions.
           We've written this policy in plain, easy-to-understand English.  We encourage
17         you to read it carefully to determine what is and what is not covered, as well as
           the rights and duties of those protected.

18  Id.

19         Page three of the policy is entitled "*Community Association* Package Coverage

20  Summary."  Id. (St. Paul Fire Policy at 3) (emphasis added).  Page four of the policy is

21

22         [2] The MV Defendants also requested partial summary judgment against Admiral.  Docket
    no. 77, at 2.  However, on August 1, 2006, the MV Defendants informed the Court that they had
23  reached a settlement agreement with Admiral.  Additionally, presumably because of the pending
    settlement, Admiral did not respond to the MV Defendants' motion.  The Court STRIKES AS
24  MOOT the MV Defendants' motion as to Admiral.

25         [3] When MVLLC first contacted its broker, Marsh, to obtain coverage for the project in
    October 1999, MVLLC incorrectly stated that the Association had not been formed.  Jacks
26  Decl., docket no. 102, ¶ 8.  In fact, the Association had been formed on February 24, 1999.
    Andersen Decl., docket no. 100, Ex. 5 (Certificate of Incorporation).

ORDER - 4

entitled "Community Association Package Commercial General Liability Protection," which precedes the following text: "This insuring agreement provides *general liability protection for your association activities*." Id. (St. Paul Fire Policy at 4).  Page 5 of the policy provides the coverage clauses in relevant part as follows:

> What this Agreement Covers
>
> **Bodily injury and property damage liability.**  We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that:
>
> • Happens while this agreement is in effect; and
> • is caused by an event
> . . .
>
> *Property damage* means:
>
> • Physical damage to tangible property of others, including all resulting loss of use of that property; or
> • loss of use of tangible property of others that isn't physically damaged.

Id. (St. Paul Fire Policy at 5) (emphasis in original).  Finally, the St. Paul Fire Policy provides definitions of parties "Protected Under This Agreement" as follows:

> **Association.**  If you are shown in the Introduction as a named insured and an association, you are a protected person.  Your directors and executive officers are protected persons only for the conduct of their duties as directors and officers.
> . . .
>
> **Limited liability company.**  If you are shown in the introduction as a named insured and a limited liability company, you are a protected person.  Your members are protected persons only for the conduct of your business.
> . . .
>
> **Unit owners**.  Any person or organization who owns one of your units is a protected person only for the ownership, maintenance, or repair of your premises.  However, no unit owner is a protected person for any part of your premises that is solely owned or occupied by that unit owner.
> . . .
>
> **Developers**.  Any developer of your premises who owns one of your units, or holds a seller's interest in a contract for deed for part of your premises, is a protected person only for the ownership, maintenance, or repair of that part of your premises which isn't solely owned or occupied by that developer.

Andersen Decl., docket no. 100, Ex. 20 (Policy at Bates ST784).

ORDER - 5

1        2.    Extrinsic Evidence

2      In addition to its reliance on the plain language of the policy itself, St. Paul refers the

3 Court to extrinsic evidence in support of St. Paul's position that the parties intended the St.

4 Paul Fire Policy to cover *only* "community association" events.  First, St. Paul relies on the

5 fact that MVLLC was previously insured against construction liability under a St. Paul

6 Guardian Policy, effective from January 1999 to February 2000.  Andersen Decl., Ex. 9 (St.

7 Paul Guardian Policy).  St. Paul notes that it informed MVLLC's insurance broker, Edith

8 Jacks, that St. Paul would not renew its construction liability coverage because of excessive

9 risk.  Jacks Decl., docket no. 102, ¶ 17, Ex. 1.  There is no evidence that the reason for the

10 non-renewal was relayed by Jacks to MVLLC.  Id. at ¶ 6.[4]  The premium for the St. Paul

11 Guardian Policy was $12,934 per year.  Andersen Decl., Ex. 9 (Bates SPT00837).

12      Second, St. Paul relies on the fact that MVLLC obtained construction liability

13 coverage from Admiral beginning on February 4, 2000, which was the same date the St. Paul

14 Guardian Policy expired.  Andersen Decl., at Ex. 12-13 (Admiral Policies).  The Admiral

15 policy provided construction liability coverage until February 2003 at an annual premium of

16 $18,000 per year.  Id.  In contrast, St. Paul states that the St. Paul Fire Policy premium was

17 $601 per year.  However, the MV Defendants note that the $601 premium was imbedded in a

18 larger payment of $33,435 made for several policies obtained from St. Paul Fire (i.e., auto,

19 umbrella, etc.).  Hobbs Decl., Exs. D39, G71.  The MV Defendants maintain that they were

20 never made aware of the actual cost of the St. Paul Fire Policy, but only of the aggregate cost

21 of all the policies.  St. Paul relies on the Supplemental Jacks declaration, in which she states:

22 "On April 18, 2000, I spoke with Marjorie Syria on the telephone at which time I quoted her

23

24      [4] In her supplemental declaration, Jacks states: "Margie Syria knew and understood that
St. Paul had declined to renew their construction liability coverage before the St. Paul Fire
25 association policy was issued.  They also knew and understood that Marsh had replaced the
construction liability coverage with the Admiral policy identified in paragraph 7, above."
26 Docket no. 119, ¶ 8.  Jacks cannot testify as to the knowledge of another, she may only testify
as to what she personally told MVLLC.  Thus, the Court will not consider this supplemental
declaration evidence that MVLLC understood the reason for the Guardian policy's cancellation.

ORDER - 6

1   a premium payment of $927 per month under the St. Paul Fire bid for condominium

2   association coverage, which included the $622 yearly premium payment for liability

3   coverage for the condominium association." Docket no. 119, ¶ 9. This statement does not

4   make clear whether Jacks specifically informed Syria of the $622 (later reduced to $601)

5   premium for the liability coverage under the St. Paul Fire Policy, or merely quoted the

6   monthly aggregate rate of $927 for all of the policies.

7       Third, St. Paul makes reference to the insurance application for the St. Paul Fire

8   Policy filed with St. Paul by employees of Marsh & McLennan ("Marsh") on behalf of

9   MVLLC.[5] Andersen Decl., Ex. 15 (Insurance Application). Jacks, who worked for Marsh,

10  took the relevant information from MVLLC and gave it to another Marsh employee, Martha

11  Washburn, who then submitted information to various insurance companies, including St.

12  Paul Fire. Id. at ¶ 11-13. The application described the "Nature of Business" as "apartment

13  building operators/condominium association." Id. The application also stated: "Meadow

14  Valley, LLC - GL Exposures: Condominiums - residential - (association risk only)." Id.

15  (Bates SPT 01126). At argument, the Court granted the MV Defendants motion to strike the

16  insurance application itself pursuant to RCW 48.18.080(1).[6]

17      Fourth, St. Paul notes that the prefix on the St. Paul Fire policy "BC" applied to

18  condominium associations and apartments, while a "KK" prefix applied to contractors and

19  developers. Andersen Decl., Ex. 16 (Gilliland Dep. at 104-105). The St. Paul Guardian

20  Policy covering MVLLC for construction liability had a policy number of KK08400026,

21  while the St. Paul Fire Policy had a policy number of BC01900003. St. Paul does not

22

23      [5] Marsh includes an affiliate, Seabury & Smith, who appears to have been a previous

24  employer of Jacks. See Jacks Decl., docket no. 102, ¶ 2.

25      [6] The Court concludes that St. Paul's reliance on Fraser v. Metropolitan Life Insurance
    Company, 165 Wash. 667 (1931) is misplaced, as that case is distinguishable on the grounds that
    the policy in Fraser was lost and the Court admitted the application for the narrow purpose of
26  identifying the policy. Here, there is no dispute which policy was in effect and, therefore, the
    limited exception to RCW 48.18.080 in Fraser is inapplicable.

1   provide evidence indicating that the MV Defendants were aware of the meaning of its

2   internal prefix system for policy numbers.

3          Finally, St. Paul states that responsibility for paying the St. Paul Fire Policy premium

4   passed from MVLLC to the unit owners in 2002.  Andersen Decl., Ex. 21 (email between

5   Susan Cline and Carol Sutton).  St. Paul reasons that it would be illogical for the unit owners

6   to assume premium payments for a policy that MVLLC intended to cover construction

7   liability, but it would be logical for unit owners to assume responsibility for a policy

8   covering only condominium association liability.

9          As the parties have stated, the question of whether MVLLC is charged with

10  knowledge as to virtually all of the extrinsic evidence relied upon by St. Paul is contingent

11  on whether Jacks is an "agent" for MVLLC under Washington State law.  To demonstrate

12  that Jacks was MVLLC's agent, St. Paul first relies on a "Broker's Letter of Authorization"

13  issued by MVLLC.  The letter states in relevant part as follows:

14          This confirms that as of this date, we have appointed Sedgwick of Washington,
        Inc. as our exclusive insurance broker with respect to our insurance program.

15          . . .

16          Sedgwick of Washington, Inc. is hereby authorized to negotiate directly with any
        interested company as respects changes in existing insurance policies and in

17          closing, changing, increasing or cancelling insurance carried under temporary
        binders of coverage notes.  We understand, however, that they will not share

18          responsibility for any deficiencies in the insurance program to which this letter
        applies until they have had a reasonable opportunity to make a review and to

19          provide us with their recommendations.

20          This letter also constitutes your authority to furnish the representatives of
        Sedgwick of Washington Inc. with all information they may request as it pertains

21          to our insurance contracts, rates, rating schedule, surveys, reserves, retentions and
        all other financial data they may wish to obtain for their study of our present and

22          future requirements in connection with the insurance program to which this letter
        applies.  We request that you do not communicate such information to anyone

23          else.

24  Supp. Jacks Decl., Ex. A.

25          Next, St. Paul relies on testimony by Roger Hebert, the manager of MVLLC, that

26  Jacks was  MVLLC's "insurance brokers at the time that Meadow Valley, LLC, was being

built" and that Jacks "took care of insurance needs for any project going on." Andersen

Decl., Ex. 7, (Hebert Dep. at 24). Also, when questioned as to who would "have the final

say then on what kind of limits and things that [the MV Defendants] would get," Hebert

answered that "he relied on Edith for that." Id. (Hebert Dep. at 32-33). In addition to

Hebert, St. Paul relies on Jacks' statement that she "was the insurance broker for Hebert

Construction, Inc. ("Hebert Construction") and its related entities, and handled all of Hebert

Construction's accounts from 1996 to mid-2000" and that "Marsh was broker of record for

Hebert Construction and its related entities." Jacks Decl. at ¶ 3. Additionally, Jacks states

that she "understood [Marsh] to be Hebert Construction's (and related entities) agent for the

purpose of securing insurance for it." Id. Finally, St. Paul relies on what it identifies as an

"agreement" between Marsh and MVLLC, dated April 18, 2000. The document is attached

to a fax cover sheet stating: "attached is our proposal for Condo. Association insurance. Per

your request we have bound the coverage effective 4-18-00 for 36 months policy with

Monthly payments of $927." The attachment states as follows: "This proposal, which has

been prepared exclusively for Meadow Valley, LLC by Advantage America, details our

standard risk management services and products as well as the specific coverages you have

selected in consultation with us." St. Paul maintains that, collectively, this evidence

establishes that Marsh was MVLLC's agent.

     <u>The Meaning of "Costs Taxed" under the St. Paul Policies</u>

     The parties disagree as to whether the St. Paul Guardian Policy and St. Paul Fire

Policy provide coverage for attorneys' fees obtained by the Association in the underlying

state-court action. Both policies contain identical provisions for "Additional Payments,"

which state in relevant part as follows:

> **Additional Payments.** We'll have the duty to make only the additional payments
> shown below in connection with any claim or suit under this agreement against
> a protected person when we:
>
> •    investigate or settle a claim or suit; or
> •    defend the protected person against the claim or suit.

ORDER - 9

1    These Payments are in addition to the limits of coverage.

2    . . .

3    *Taxed Costs.*  We'll pay all costs taxed against any protected person in a suit.

4    First Hobbs Decl., Ex C (St. Paul Guardian Policy, C36-37), Ex. D (St. Paul Fire Policy,

5    D50) (emphasis in original).

6    As noted above, the $6.4 million stipulated judgment approved by the state court

7    included $1.6 million for the Association's attorneys' fees.  See Knowles Decl., Ex. B

8    (Stipulated Judgment at 2).  In the state court action, the Superior Court undertook a detailed

9    review of the reasonableness of the attorneys' fees portion of the settlement.  See Hobbs

10   Decl., docket no. 121, Ex. A (Findings and Conclusions at 9-13).  The Superior Court

11   conclude that the parties original settlement for $7.2 million was not reasonable because it

12   included $2.4 million for attorneys' fees; The Superior Court reduced the fees to $1.6

13   million.

14   ## DISCUSSION

15   Summary judgment is appropriate when the movant demonstrates that there is no

16   genuine issue as to any material fact and that the moving party is entitled to judgment as a

17   matter of law.  FED. R. CIV. P. 56(c); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th

18   Cir. 2000).  The party moving for summary judgment "bears the initial responsibility of

19   informing the district court of the basis for its motion, and identifying those portions of 'the

20   pleadings, depositions, answers to interrogatories, and admissions on file, together with the

21   affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

22   fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)).

23   Once the moving party meets its initial responsibility, the burden shifts to the non-moving

24   party to establish that a genuine issue as to any material fact exists.  Matsushita Elec. Indus.

25   Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The non-moving party must

26   present significant probative evidence tending to support its claim or defense.  Intel Corp. v.

1  Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).  Evidence submitted

2  by a party opposing summary judgment is presumed valid, and all reasonable inferences that

3  may be drawn from that evidence must be drawn in favor of the non-moving party.

4  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  In Washington State, the

5  interpretation of an insurance policy is a question of law.  Grange Ins. Co. v. Brosseau, 113

6  Wn.2d 91, 95 (1989).

7      As noted above, the two remaining issues are the parties' cross-motions for partial

8  summary judgment as to: (1) whether the St. Paul Fire Policy covers construction/developer

9  liability, or is limited to condominium association liability; and (2) whether the "costs taxed"

10  clauses in St. Paul Fire and St. Paul Guardian Policies include coverage for the $1.6 million

11  in attorneys' fees obtained by the Association in the state-court action.  Each issue is

12  addressed separately below.

13      1.      Scope of the St. Paul Fire Policy

14      The parties cross-move for summary judgment as to the question of whether the St.

15  Paul Fire Policy covers MVLLC for construction/developer liability or is limited to

16  condominium association liability.  Both St. Paul and the MV Defendants contend that the

17  plain language of the policy establishes the scope of the policy in favor of their respective

18  positions.  Additionally, St. Paul argues that the Court should examine various pieces of

19  extrinsic evidence to aid in the interpretation of the policy, including facts known only to

20  Edith Jacks, under the theory that Jacks was an agent for MVLLC.  The MV Defendants

21  maintain that St. Paul's extrinsic evidence is unnecessary to determine the policy coverage

22  and, therefore, that the Court must not give the evidence any weight.  The MV Defendants

23  also argue that, even were the Court to look to extrinsic evidence, there is little or no

24  admissible evidence that aids in interpreting the policy because Jacks was not MVLLC's

25  agent under Washington State law.

26  //

ORDER -  11

An insurance policy "is construed as a whole, and 'should be given a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'" Grange, 113 Wn.2d at 95 (citation omitted). "In construing the language of an insurance policy, a court must construe the entire contract together so as to give force and effect to each clause." Public Utility Dist. No. 1 of Klickitat County v. Int'l Ins. Co., 124 Wn.2d 789, 797 (1994) (citation omitted). If the language in the contract is clear and unambiguous, it must be enforced as written. Washington Pub. Util. Districts' Utils. Sys. v. Pub. Util. Dist. No. 1, 112 Wn.2d 1, 10, (1989). While extrinsic evidence is "not admissible for the purpose of adding to, modifying, or contradicting the terms of a written contract" it is admissible "to show the situation of the parties and the circumstances under which a written instrument was executed, for the purpose of ascertaining the intention of the parties and properly construing the writing." Lynott v. Nat'l Union Fire Ins. Co., 123 Wn.2d 678, 683 (1994) (citing Berg v. Hudesman, 115 Wn.2d 657 (1990), and applying the Berg "context rule" to insurance contracts). The Court begins its analysis with the plain language of the policy and will only look to the extrinsic evidence to determine whether it aids in the interpretation of the policy and in ascertaining the intentions of the parties.

A.   Plain Language of the St. Paul Fire Policy

The MV Defendants first focus on the coverage provision for physical damage; that provision states as follows:

What this Agreement Covers

**Bodily injury and property damage liability.**  We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that:

• Happens while this agreement is in effect; and
• is caused by an event

. . .

*Property damage* means:

• Physical damage to tangible property of others, including all resulting loss of use of that property; or

ORDER - 12

1        •       loss of use of tangible property of others that isn't physically damaged.

2   First Hobbs Decl., Ex. D (p. D49) (emphasis in original).  The MV Defendants argue that

3   this language is clear in that it does not limit "property damage" coverage to condominium

4   association activities.  Thus, the MV Defendants reason, the St. Paul Fire Policy covered

5   MVLLC for *all* property damage claims, regardless of whether those claims were based on

6   MVLLC's actions as a condominium association or as a developer.

7        In its opposition and cross-motion, St. Paul argues that the MV Defendants fail to

8   "construe the entire contract together so as to give force and effect to each clause," as

9   required under Washington State law.  Public Utility Dist. No. 1, 124 Wn.2d at 797.

10  Specifically, St. Paul relies on the following phrases in, and inferences from, the St. Paul Fire

11  Policy to establish that the "property damage" coverage extends only to association activities:

12  •    Page three of the policy is entitled "**Community Association** Package Coverage
        Summary."  First Hobbs Decl., Ex D (p. D47) (emphasis added).

13
14  •    Page four of the policy is entitled "**Community Association** Package Commercial
        General Liability Protection."  Id. (p. D48) (emphasis added).

15  •    The first paragraph on page four of the policy states: "This insuring agreement
        provides general liability **protection for your association activities**."  Id. (emphasis
16       added).

17  •    Under the definition of parties "Protected Under This Agreement," developers (for
        which MVLLC claims coverage) are covered "only for the ownership, maintenance,
18       or repair of that part of your premises which isn't solely owned or occupied by that
        developer."  Andersen Decl., Ex. 20 (p. ST 784).

19
20  •    The St. Paul Fire Policy language is typical of insurance that is *required* under the
        Condominium Act, RCW 64.34.352(1)(b).

21       St. Paul contends that the policy is clear and unambiguous as a matter of law because

22  the provisions referring to the "community association" and to "your association activities"

23  limit the coverage.  The MV Defendants acknowledge that the policy refers to a "community

24  association package" in the titles to the introductory summary and table of contents pages,

25  and that an introductory paragraph refers to "general liability protection for your association

26  activities."  See Andersen Decl., Ex. 20 (pp. SPT778-80).  However, the MV Defendants

    contend that it is not clear from the policy that these terms are intended to limit coverage.

    ORDER -  13

1    That is to say, the terms St. Paul relies upon (1) are not in the "coverage" or "limits of

2    coverage" sections of the policy, (2) do not state that the policy covers *only* association

3    activities, and (3) do not define "association activities" in a way that relates to MVLLC's

4    status as developer.

5        Based on the phrasing and structure of the St. Paul Fire Policy, the Court concludes

6    that it is simply not "clear and unambiguous" as to the type of coverage the parties mutually

7    intended to include in the policy.  The few, scattered references to a "community

8    association" and "association activities" do suggest that this type of policy is generally

9    limited to homeowner association settings, but the references fall far short of providing this

10   Court with a means to determine the scope of coverage as a matter of law.  Accordingly, the

11   Court concludes that it must also look to the extrinsic evidence to determine whether such

12   evidence, to the extent available, aids in interpreting policy.  Absent definitive extrinsic

13   evidence, the Court concludes the coverage provisions of the St. Paul Fire Policy are

14   ambiguous and that the ambiguity must be resolved in favor of the insured.  See Ross v. State

15   Farm Mut. Auto Ins. Co., 132 Wn.2d 507, 515-16 (1997) (if there is ambiguity in an

16   inclusionary clause portion of a policy, the ambiguity should be liberally construed to

17   provide coverage whenever possible; a term or provision is "ambiguous" if "on its face [it] is

18   fairly susceptible to two different but reasonable interpretations").

19                    B.    Extrinsic Evidence as to the St. Paul Fire Policy

20       Before determining whether the extrinsic evidence establishes the scope of coverage,

21   the Court must answer the threshold question of whether Edith Jacks was an agent for

22   MVLLC.  Indeed, counsel for MVLLC conceded that, if the Court concludes Jacks was

23   MVLLC's agent (i.e., that MVLLC was charged with her knowledge), the Court must accept

24   St. Paul's interpretation of the parties' mutual intent in forming the contract.  Similarly, if the

25   Court concludes that Jacks was not MVLLC's agent, much of the extrinsic evidence cannot

26   be considered.  See Lynott, 123 Wn.2d at 684 ("Unilateral or subjective purposes and

1   intentions about the meanings of what is written do not constitute evidence of the parties'

2   intentions.").

3                          i.        Whether Jacks was MVLLC's Agent

4         To establish that Jacks and her firm, Marsh, were not agents for MVLLC, the MV

5   Defendants rely on several sections in RCW 48.17.  First, the MV Defendants note that the

6   terms "agent" and "broker," as used in the insurance context, are defined as follows:

7           "Agent" means any person appointed by an insurer to solicit applications for
            insurance on its behalf.  If authorized so to do, an agent may effectuate insurance
8           contracts. An agent may collect premiums on insurances so applied for or
            effectuated.
9
            "Broker" means any person who, on behalf of the insured, for compensation as an
10          independent contractor, for commission, or fee, and not being an agent of the
            insurer, solicits, negotiates, or procures insurance or reinsurance or the renewal
11          or continuance thereof, or in any manner aids therein, for insureds or prospective
            insureds other than himself.
12
    RCW 48.17.010-020.  The MV Defendants appear to concede that Jacks qualified as
13
    MVLLC's "broker" under the definition in RCW 48.17.020.  However, the MV Defendants
14
    contend that the following section of RCW 48.17 provides a definitive answer to the
15
    agent/broker question where a person is acting *both* as an appointed agent for the insurer and
16
    as a broker for the insured (as Jacks was here):
17
            (1) A licensed agent may be licensed as a broker and be a broker as to insurers for
18          which the licensee is not then appointed as agent. A licensed broker may be
            licensed as and be an agent as to insurers appointing such agent. ***The sole
19          relationship between a broker and an insurer as to which the licensee is
            appointed as an agent shall***, *as to transactions arising during the existence of
20          such agency appointment, **be that of insurer and agent***.

21          (2) Unless the agency-insurer agreement provides to the contrary, an insurance
            agent licensed as a broker may, with respect to property and casualty insurance,
22          receive the following compensation:

23          (a) A commission paid by the insurer;

24          (b) A fee paid by the insured; or

25          (c) A combination of commission paid by the insurer and a fee paid by the insured
            from which a broker may offset or reimburse the insured for all or part of the fee.
26
            If the compensation received by an agent who is also licensed as a broker and who
            is dealing directly with the insured includes a fee, the full amount of

    ORDER - 15

1  compensation, including an explanation of any offset or reimbursement, must be
   disclosed in writing, signed by the broker and the insured, and the writing must
2  be retained by the broker for not less than five years.

3  RCW 48.17.270 (emphasis added).  The MV Defendants focus on the emphasized language

4  above, arguing that this section of RCW 48.17.270 is, in effect, a tie-breaker that statutorily

5  limits the relationship of agent/brokers to "that of insurer and agent."

6      The statute in question states less than the MV Defendants suggest.  The critical

7  sentence in question refers to "*[t]he sole relationship between a broker and an insurer*. . . ."

8  RCW 48.17.270(1).  The sentence does not refer to the relationship between a broker and an

9  insured.  The statute does not state that a person or entity acting as an agent for an insurer

10 cannot also be an agent for the insured.  Making this very point, St. Paul argues that case law

11 from Washington State indicates that a broker may well be an agent for an insured and an

12 insurer: "Generally, an insurance broker is the agent of the insured.  Whether the broker is

13 also the agent of the insurer is a question of fact and depends upon what he is doing and for

14 whom when liability arises."  Prosser Commission Co., Inc. v. Guaranty Nat'l Insurance Co.,

15 41 Wn. App. 425, 433 (1985), overruled on other grounds, Olympic Steamship Co., Inc. v.

16 Centennial Ins. Co., 117 Wn.2d 37, 49 (1991).[7]

17     The question remains whether, as a factual matter, Jacks and/or Marsh were acting as

18 agents for MVLLC or whether their role was limited to acting as brokers.  St. Paul argues

19 that there is sufficient evidence in the record to conclude that Jacks was an agent.  St. Paul

20

21     [7] St. Paul also relies on Northwestern National Insurance Company v. Federal
22 Intermediate Credit Bank of Spokane, Washington, 839 F.2d 1366 (9th Cir. 1988), in which the
   issue was whether a broker/agent (RBH) was an agent for the insurer when the insured requested
23 a coverage change.  The Northwestern National Court examined RCW 48.17.270 to determine
   whether, if a broker/agent is an authorized agent for an insurer as to *some* kinds of insurance,
24 it is an authorized agent as to *all* kinds of insurance.  839 F.2d at 1368.  The Northwestern
   National Court concluded that RCW 48.17.270 "does not supersede the parties' consent for
25 determining the scope of the agent's authority"; i.e., that a broker/agent is only an agent under
   RCW 48.17.270 to the extent that the agent has been appointed for specific types of insurance.
26 Contrary to St. Paul's argument, Northwestern National is of no assistance in this case because
   it stands only for the proposition that the scope of an insurer/agent relationship under RCW
   48.17.270 is limited to the type of coverage for which the agent has been authorized.

1  relies on (1) the "Broker's Letter of Authorization," (2) Roger Hebert's testimony that Jacks

2  was MVLLC's broker and would have "the final say" on what kind of limits his companies

3  would get on their insurance coverage, and (3) the fax and insurance proposal sent to

4  MVLLC on April 18, 2000.  However, even when taken collectively, this evidence is

5  insufficient to establish, as a matter of law, that Jacks was an agent for MVLLC.  First, the

6  Broker's Letter establishes only that Jacks was MVLLC's "exclusive insurance broker" and

7  "authorized to negotiate directly with an interested company as respects changes in existing

8  insurance policies and closing, changing, increasing or cancelling insurance carried under

9  temporary binders of coverage notes."  Supp. Jacks Decl., Ex. A.  The statutory definition of

10  an insurance "broker" includes one who "on behalf of the insured, for compensation as an

11  independent contractor. . . solicits, negotiates, or procures insurance . . . or in any manner

12  aids therein."  RCW 48.17.020.  St. Paul provides no authority stating that, when an insured

13  holds someone out as its "exclusive broker," an agency relationship is established as a matter

14  of law.  Second, Roger Hebert's testimony that Jacks was MVLLC's broker and had "the

15  final say" on coverage limit issues establishes only that Jacks was in fact a broker, which

16  MVLLC does not dispute.  Finally, the fax and insurance proposal sent from Jacks to

17  MVLLC is, on its face, "a brief description of the insurance policies [Marsh] propose[d]" to

18  MVLLC, and the "sole purpose of the entire document is to help [MVLLC] identify

19  conveniently the highlights of the proposed coverage."  Supp. Jacks Decl., Ex. E (MM

20  000318).  The proposal is not a contract between Marsh and MVLLC, nor is it an attempt by

21  either of those parties to describe the scope of their ongoing contractual relationship; it is

22  merely a summary of a proposed insurance policy that was ultimately purchased by MVLLC.

23        In sum, neither the statutes cited by the MV Defendants nor the cases and other

24  evidence cited by St. Paul are sufficient to establish that Jacks and/or Marsh were or were

25  not agents for MVLLC at the time the St. Paul Fire Policy was formed.  As the Prosser Court

26  stated, agency is generally "a question of fact and depends upon what [the broker/agent] is

doing and for whom when liability arises."  41 Wn. App. at 433.  Accordingly, the Court

ORDER -  17

1   declines to rule on whether Jacks and/or Marsh was an agent for MVLLC at this time.  The

2   final issue is whether the remaining extrinsic evidence is sufficient to establish the parties'

3   mutual intent in forming the contract as a matter of law.

4                          ii.      The Remaining Extrinsic Evidence

5          Because the record before the Court does not establish whether there was an agency

6   relationship between Jacks and MVLLC, the Court must examine the remaining extrinsic

7   evidence as though no agency relationship exists.  Generally stated, St. Paul relies on four

8   categories of extrinsic evidence to demonstrate that the parties' mutually intended the

9   coverage in the St. Paul Fire Policy to extend *only* to condominium association activities: (1)

10  the initial insurance application sent from Marsh to St. Paul on MVLLC's behalf; (2) the

11  policy number and prefix code on the St. Paul Fire Policy; (3) comparing the coverage and

12  premiums of MVLLC's insurance obtained under St. Paul Guardian and Admiral policies

13  with the coverage and premiums under the St. Paul Fire Policy; and (4) the 2002 change in

14  premium payment responsibility from MVLLC to the Association.

15         First, as discussed above, the MV Defendants' motion to strike the insurance

16  application has been granted.  The Court will not consider the insurance application.

17  Second, St. Paul contends that the "BC" prefix it used for its St. Paul Fire Policy number

18  (BC0190003) demonstrates that the policy was intended to cover association activities only

19  because "BC" *always* refers to association and apartment coverage under St. Paul Fire's

20  numbering system.  Pls.' Opp., docket no. 108, at 11.  Neither the use of the "BC" prefix nor

21  the policy number aid in the interpretation of the parties' mutual intent because there is no

22  evidence that MVLLC was aware of the meaning of St. Paul's prefixes and policy numbers.

23  See Lynott, 123 Wn.2d at 684 ("Unilateral or subjective purposes and intentions about the

24  meanings of what is written do not constitute evidence of the parties' intentions.").

25         St. Paul also contends that the existence of the Admiral and St. Paul Guardian policies

26  indicate that MVLLC intended the St. Paul Fire Policy to cover only condominium

    association activity risks.  Just prior to obtaining the St. Paul Fire Policy, MVLLC was

    ORDER -  18

1   insured against construction/developer liability under a St. Paul Guardian Policy, effective

2   from January 1999 to February 2000.  Andersen Decl., Ex. 9 (St. Paul Guardian Policy).  St.

3   Paul notes that St. Paul Guardian informed Jacks that St. Paul would not renew its

4   construction liability coverage because of excessive risk.  Jacks Decl., docket no. 102, ¶ 17,

5   Ex. 1.  The premium for the St. Paul Guardian Policy was $12,934 per year.  Andersen Decl.,

6   Ex. 9 (Bates SPT00837).  Similarly, MVLLC obtained construction liability coverage from

7   Admiral beginning on February 4, 2000, which was the same date the St. Paul Guardian

8   Policy expired.  Andersen Decl., at Ex. 12-13 (Admiral Policies).  The Admiral policy

9   provided construction liability coverage until February 2003 at an annual premium of

10  $18,000 per year.  Id.

11          The premium disparity evidence cited by St. Paul provides very little assistance in

12  determining the parties' mutual intent.  First, there is no admissible evidence that MVLLC

13  was told why St. Paul Guardian declined to renew its policy as of February 2000.  Similarly,

14  there is no direct evidence that MVLLC knew that the premium for the St. Paul Fire Policy

15  was $601 per year because that premium was imbedded in the $33,435 aggregate quote

16  provided to MVLLC.  Edith Jacks' supplemental declaration does not state that she told

17  MVLLC the specific cost of each policy.  See docket no. 119, at ¶ 9.  At most, the evidence

18  indicates only that MVLLC knew it was purchasing multiple policies at an aggregate cost of

19  approximately $11,000 per year.  Washington State courts do consider gross disparities in

20  premiums as evidence of the parties intent.  See Aetna Ins. Co. of Hartford v. Kent, 85

21  Wn.2d 942, (1975) (gross disparity of approximately 30 to 1 premium ratio between types of

22  policies indicated it was reasonable to believe both parties intended the policies to provide

23  mutually exclusive coverage).  However, this Court cannot conclude that the apparent

24  disparity between the St. Paul Fire Policy (some unknown part of $11,000) and the St. Paul

25  Guardian Policy (approximately $13,000) or Admiral Policy ($18,000) is conclusive

26  evidence that MVLLC intended the policy to cover condominium association risks only

    given the complexity of the circumstances.

ORDER -  19

1      St. Paul's final piece of extrinsic evidence is an October 2002 email exchange

2  between Susan Cline and Carol Sutton.  See Andersen Decl., Ex. 21.  It is not evident from

3  St. Paul's brief or the email itself who these persons represent, though St. Paul seems to

4  suggest that they are representatives of MVLLC and the Association.  St. Paul argues that it

5  would be illogical for the Association to assume payment obligations for insurance covering

6  MVLLC for construction/developer risks.  In response, the MV Defendants note that the

7  Association was not *substituted* for MVLLC when St. Paul became aware that the

8  Association was formed and acting as an association; the Association was merely *added*

9  retroactive to the inception of the policy.  Because both MVLLC and the Association were

10  named as insureds on the policy, the apparent transfer of payment responsibility that

11  occurred after two years of coverage does not demonstrate MVLLC's intent in purchasing

12  the policy.

13      St. Paul's reliance on extrinsic evidence (absent a showing that Jacks was MVLLC's

14  agent) is insufficient to demonstrate that the parties mutually intended the St. Paul Fire

15  Policy to cover only condominium association activity risks.  St. Paul's evidence is either

16  inadmissible because it establishes only St. Paul's subjective intent or, to the extent it is

17  admissible, the evidence fails to conclusively prove MVLLC's intent.  The Court cannot

18  conclude from the admissible evidence that MVLLC intended to purchase a policy with

19  coverage limited to condominium association risks.  As written, the St. Paul Fire policy is

20  ambiguous as to whether it covers only condominium association risk or

21  construction/developers risk.  Extrinsic evidence may aid in clarifying this ambiguity only if

22  St. Paul is able to establish that Jacks and/or Marsh were agents for MVLLC at the time the

23  policy incepted.  Absent such a showing, the Court must resolve the ambiguity in favor of

24  MVLLC.  The "agency" issue must be resolved at trial.  Accordingly, the Court DENIES St.

25  Paul's motion for partial summary judgment as to the breach of contract counterclaim against

26  St. Paul Fire, docket no. 99, and DENIES the MV Defendants' motion for partial summary

judgment as to the scope of coverage under the St. Paul Fire Policy, docket no. 77.

ORDER -  20

1          2.      The Meaning of "Costs Taxed" under the St. Paul Policies

2          St. Paul and the MV Defendants filed cross-motions for a partial summary judgment

3    determination as to the meaning of the phrase "costs taxed" under the St. Paul Guardian

4    Policy and St. Paul Fire Policy.  Both policies contain identical provisions for "Additional

5    Payments," which state in relevant part as follows:

6          **Additional Payments.**  We'll have the duty to make only the additional
           payments shown below in connection with any claim or suit under this
7          agreement against a protected person when we:

8              •    investigate or settle a claim or suit; or
               •    defend the protected person against the claim or suit.
9
           These Payments are in addition to the limits of coverage.
10         . . .

11         *Taxed Costs.*  We'll pay all costs taxed against any protected person in a suit.

12   First Hobbs Decl., Ex C (St. Paul Guardian Policy, C36-37), Ex. D (St. Paul Fire Policy,

13   D50) (emphasis in original).  The $6.4 million stipulated judgment approved by the state

14   court included $1.6 million for the Association's attorneys' fees.  See Knowles Decl., Ex. B

15   (Stipulated Judgment at 2).

16         The parties' dispute centers on whether "costs taxed" does or does not include the

17   attorneys' fees approved by the state court.[8]  The "costs taxed" phrase is undefined in the St.

18   Paul policies.  Under Washington State law, "[u]ndefined terms in an insurance contract

19   must be given their 'plain, ordinary, and popular' meaning."  Boeing Co. v. Aetna Cas. &

20   Sur. Co., 113 Wn.2d 869, 877 (1990) (citation omitted).  "To determine the ordinary

21   meaning of an undefined term, [Washington State] courts look to standard English language

22   dictionaries."  Id.  In Boeing, the insurer argued that the undefined term "damages" should

23   have been given its legal meaning.  Id. at 881-82.  The Washington State Supreme Court

24   _____

25         [8] Additionally, the MV Defendants moved for a partial summary judgment determination
     that, assuming "costs taxed" does include attorneys' fees, St. Paul and Admiral would be jointly
26   and severally liable for those fees under Washington State law.  Because the MV Defendants'
     reached a settlement with Admiral, that aspect of the motion is MOOT.

ORDER - 21

1   rejected that argument, stating that "before an insurance company can avail itself of a legal,

2   technical meaning of a word or words, it must be clear that both parties to the contract

3   intended that the language have a legal or technical meaning."  Id.

4          Additionally, where a clause in an insurance policy is ambiguous, Washington State

5   courts have held that "if the portion of the policy being considered is an inclusionary clause

6   in the insurance policy, the ambiguity should be liberally construed to provide coverage

7   whenever possible."  Ross, 132 Wn.2d at 515-16.  A term or provision is "ambiguous" if "on

8   its face [it] is fairly susceptible to two different but reasonable interpretations."  Id. at 515.

9   There is no dispute that the "taxed costs" clause is inclusionary as to coverage.  Thus, to the

10  extent the clause is ambiguous, it must be "liberally construed to provide coverage whenever

11  possible."

12                 A.     The MV Defendants Proposed Interpretation

13         The MV Defendants first rely on the dictionary definitions for "costs" and "taxed."

14  "Costs" is defined as:

15         **Cost 1.** the amount or equivalent paid or given or charged or engaged to be paid
           or given for anything bought or taken in barter or for service rendered; whatever
16         must be given, sacrificed, suffered, or forgone to secure a benefit or accomplish
           a result.  **2.** loss, deprivation, or suffering as the necessary price of something
17         gained or as the unavoidable result or penalty of an action.  **3.** the expenditure or
           outlay of money, time, or labor.  **4. Costs:** *the expenses incurred in litigation as*
18         ***a:*** *those payable to the attorney or counsel by his client esp. when fixed by law*
           ***b:*** *those given by law or the court to the prevailing party against the losing party*
19         *in equity and frequently by statute.*

20  Webster's Third New International Dictionary 515 (Unabridged 1981) (emphasis added).

21  "Taxed" is defined as the past of "tax," which is defined in relevant part as follows: "**1a** to

22  place a value upon: estimate the worth of or fix the price of  **b:** to assess, fix, or determine

23  judicially the amount of <~ the costs of an action in court>."  Id. at 2345.  Based on these

24  definitions, the MV Defendants argue that the plain, ordinary meaning of "costs taxed" (in

25  the context of the clause "costs taxed against any protected person in a suit") would be:

26  "expenses incurred in litigation as those payable to the attorney . . . [or] those given by law

1    or the court to the prevailing party against the losing party" that are "assess[ed], fix[ed], or

2    determine[d] judicially."

3         The MV Defendants also rely on <u>Mutual of Enumclaw v. Harvey</u>, in which the Idaho

4    Supreme Court analyzed an insurance clause that provided coverage for "all costs taxed

5    against the insured in any suit defended by the Company."  772 P.2d 216, 218 (Idaho 1989).

6    Looking to the Webster's definition of "costs" cited above, the <u>Harvey</u> Court stated as

7    follows:

8         Though the word "costs" as a legal term of art may be ambiguous, it is not so
          from the perspective of the ordinary person unfamiliar with the jargon of the
9         legal and insurance professions standing in the position of the insured. An
          insurance policy must be interpreted from that perspective.

10   772 P.2d at 220.  The <u>Harvey</u> Court held that "the plain, ordinary and popular meaning of

11   'costs' is the expense of litigation which includes attorney fees."  <u>Id.</u>  Analyzing a separate

12   but related issue, the <u>Harvey</u> Court also noted that, in Idaho, the insurance company has the

13   right to control the defense, including the power to refuse settlement, meaning it should bear

14   the consequences of case management decisions that might result in a trial court taxing the

15   opponent's costs against the insured.  <u>Id.</u> at 219.  Relying on the <u>Harvey</u> Court's discussion

16   of the meaning of "costs," the MV Defendants argue that <u>Harvey</u> directly supports their

17   interpretation of the "costs taxed" clause in this case.[9]

18             B.    St. Paul's Proposed Interpretation

19        In their opposition to the MV Defendants' motion and their separate motion for partial

20   summary judgment, St. Paul raises no less than seven separate arguments in support of their

21   position that the "costs taxed" clause was not intended to include attorneys' fees.  St. Paul

22

23
     ─────────────────

24        [9] The Ninth Circuit has also held that "costs," under an "additional payments" clause in
     an insurance contract, include attorneys' fees under Alaska law, though with less analysis than
25   the <u>Harvey</u> Court provided.  <u>See</u> <u>R.W. Beck & Assocs. v. City & Borough of Sitka</u>, 27 F.3d
     1475, 1484 n.13 (9th Cir. 1994).  <u>See also</u> <u>Littlefield v. McGuffey</u>, 979 F.2d 101, 105 (7th Cir.
26   1992) (holding that "costs taxed" included attorney's fees under Illinois law because insurer was
     in a position to include exclusionary language such as "exclusive of attorney's fees" if it wanted
     to limit its coverage).

ORDER - 23

1  also raised an additional argument at oral argument based on a case discussing the term

2  "taxed." For the reasons that follow, each of these arguments is without merit.

3      First, St. Paul contends that the Court should apply the Black's Law Dictionary

4  definitions of "costs" and "taxed" in interpreting the policy and that these definitions clearly

5  preclude the inclusion of attorneys' fees. St. Paul relies on the Sixth Edition of Black's Law

6  Dictionary, which defines "taxation of costs" and "costs" as follows:

7      **Costs.**  A pecuniary allowance, made to the successful party (and recoverable
       from the losing party), for his expenses in prosecuting or defending an action or
8      a distinct proceeding within an action. In federal courts, costs are allowed as a
       matter of course to the prevailing party unless the court otherwise directs; also,
9      specified fees and certain court expenses may be taxed as costs . . . Generally,
       "costs" do not include attorney fees unless such fees are by a statute denominated
10     costs or are by statute allowed to be recovered as costs in the case.

11     *Taxation of Costs.*  The process of ascertaining and charging up the amount of
       costs and fees in an action to which a party is legally entitled, or which are legally
12     chargeable.

13 Black's Law Dictionary 346, 1460 (6th Ed. 1991).[10]  The <u>Boeing</u> Court specifically rejected

14 the imposition of legalistic and technical definitions into insurance contracts held by lay-

15 people. 113 Wn.2d at 881-82 (improper to apply technical/legal definitions unless it is clear

16 both parties intended to use those definitions). Additionally, in <u>Lyonett</u>, the Washington

17 Supreme Court was required to interpret the term "acquisition" in the context of a "merger,

18 acquisition or divestiture" clause in an insurance policy. 123 Wn.2d at 692. The Court first

19 looked to the Webster's definition, but went on to also consult two legal dictionaries for

20 guidance. <u>Id.</u>  The Court did not state that legal dictionaries should control. Thus,

21  _____

22      [10] St. Paul did not include in its briefing similar definitions from the Seventh Edition of
    Black's Law Dictionary, which states as follows:

23     **Cost,** n. **1.**  The amount paid or charged for something; price or expenditure. **2.**
       (pl.)  The charges or fees taxed by the court, such as filing fees, jury fees,
24     courthouse fees, and reporter fees. **3.**  The expenses of litigation, prosecution, or
       other legal transaction, esp. those allowed in favor of one party against the other.

25
26 Black's Law Dictionary 349-350 (7th Ed. 1999).  Given the dates of the policies, it is not clear
    whether the Seventh Edition was operative during the St. Paul Guardian policy (January 4,
    1999), but it was operative during the St. Paul Fire Policy (April 15, 2000).

ORDER - 24

1   Washington State case law indicates that courts should use non-legal dictionaries to define

2   insurance policy terms where possible.  Finally, even were this Court to give weight to St.

3   Paul's proposed use of Black's Law Dictionary, that definition does not clearly limit the

4   definition of "costs" to the exclusion of attorneys' fees; it merely notes that *generally*

5   attorneys' fees are not considered costs unless an exception applies.

6        Second, St. Paul relies on Park Avenue Condominium Owners Association v. Buchan

7   Developers, LLC, 117 Wn. App. 369, 388 (2003), in which the Washington State Court of

8   Appeals addressed the question of whether the "attorney's fees" provision in the Washington

9   Condominium Act ("WCA"), RCW 64.34.455, includes litigation expenses.  The WCA gives

10  courts the discretion to award attorney's fees to a prevailing party.  The Park Avenue

11  plaintiffs argued that "attorney's fees" should be construed broadly to include other

12  "litigation expenses."  Id.  The Park Avenue Court rejected the argument, holding that the

13  statute is limited to what it says, and does not apply to other costs.  Id.  The Park Avenue

14  opinion does not address the plain meaning of a "costs taxed" clause in an insurance policy,

15  could not have affected the "intent" of the parties in entering into the policies in question (as

16  it was decided over three years later), and generally has no application to the issue before

17  this Court.

18       Third, St. Paul notes that the attorneys' fees agreement between the Association and

19  their counsel makes a distinction between costs and attorneys' fees.  See Andersen Decl., Ex.

20  40.  This completely separate and unrelated agreement has no bearing on the intent of St.

21  Paul and the MV Defendants in entering into the policies at issue and does nothing to help

22  define the "costs taxed" clause.  If the agreement has any use, it demonstrates that

23  sophisticated parties can, if they wish, contractually distinguish attorneys' fees from other

24  litigation-related costs with ease, which St. Paul failed to do in this case.  See Littlefield, 979

25  F.2d at 105 (insurer was in a position to include exclusionary language such as "exclusive of

26  attorney's fees" if it wanted to limit its coverage).

1    Fourth, St. Paul relies on rules of civil procedure under Federal and Washington State

2    law that distinguish costs from fees.  For example, Federal Rule of Civil Procedure 54(d)(1)

3    is entitled "Costs Other Than Attorney's Fees" and Civil Rule 41 states that "[t]axable costs

4    do not include the award of reasonable attorney's fees."  Again, technical and legalistic

5    definitions are not to be used in the interpretation of a contract unless there is evidence *both*

6    *parties* intended to use those definitions; looking to court rules of procedure is even farther

7    afield of this rule of interpretation than the use of legal dictionaries.  Thus, this argument is

8    not well taken.

9    Fifth, St. Paul contends that, in addition to looking to "costs" and "taxed" in an

10   ordinary dictionary, the court should also look to the term "fee."  In relevant part, "fee" is

11   defined as "compensation often in the form of a fixed charge for professional service or for

12   special and requested exercise of talent or of skill (as by an artist) (a doctor's) (a lawyer's

13   retainer)."  Webster's at 833.  St. Paul appears to reason that in interpreting its policy, one of

14   its policy holders would, in addition to looking to the definitions of "costs taxed," also look

15   to definitions of myriad words not stated in the policy in an effort to further define the policy

16   language.  St. Paul provides no support for this argument, and it appears clear that courts do

17   not engage in an effort to pick and choose non-contract terms hoping to define the scope of

18   terms actually stated in the contract.  This Court limits its enquiry to the terms used in the

19   policy.

20   Sixth, St. Paul argues that Harvey is not useful in this analysis because that court

21   relied on more than the policy language itself in concluding that "costs taxed" include

22   attorneys' fees.  Specifically, St. Paul notes that in analyzing a separate but related issue, the

23   Harvey court relied on the fact that Idaho allows insurers to "control the defense" and "refuse

24   settlement."  772 P.2d at 219.[11]  The Harvey court reasoned that this control over the case

25   _____

26   [11]   The separate issue was whether the insurer could be liable under the additional payments provisions (including for "costs taxed") even if it was not liable for indemnification coverage as to the underlying policy.  Harvey, 772 P.2d at 218-19.

ORDER - 26

1  suggests that insurers should bear the consequences of their case-management decisions,

2  including the possibility that the trial court will tax the opponent's costs against the insured

3  (i.e., award attorneys' fees).  St. Paul contends that Harvey is, therefore, distinguishable

4  because Washington State does not allow the insurer to control the defense or refuse

5  settlement.  Unfortunately for St. Paul, this argument ignores the direct, unequivocal holding

6  by the Harvey court that the ordinary and popular meaning of "costs" includes attorneys'

7  fees.  St. Paul also relies too heavily on the portion of the Harvey opinion that does not

8  directly address the interpretation of "costs taxed," and appears to be dicta in that regard.

9  Thus, although it is not controlling because it was decided outside this jurisdiction, the

10  Harvey opinion is directly on point and provides a persuasive analysis of this issue.[12]

11         Seventh, St. Paul contends that the "costs taxed" clause does not apply because the

12  $1.6 million in attorneys' fees was the result of a settlement reached during mediation and

13  was later entered as a stipulated judgment in the underlying lawsuit.  The clause states that

14  St. Paul will "pay all costs taxed against any protected person in a *suit*."  St. Paul argues that

15  a "suit" is distinguishable from a "claim," and that a "claim" is simply a demand that seeks

16  damages.  St. Paul seems to suggest that "costs" must be imposed solely as an act of the court

17  or they are not "in a suit."  In response, the MV Defendants note that (1) a suit was ongoing

18  when the parties settled after a successful mediation, (2) the settlement was approved and

19  entered as a judgment by the court that was hearing the suit, and (3) the settlement

20  terminated the suit.  In other words, without the pending suit, there would not have been a

21  settlement, and the attorneys' fees at issue were made a part of the judgment *in the suit*.

22  Thus, the MV Defendants are correct that the "costs" were taxed against them in a "suit."

23

24

_____

25         [12] At oral argument, St. Paul also raised an argument that an Idaho procedural rule
   includes attorneys' fees within the definition of costs; thus, further distinguishing Harvey.  In
26  ruling on the meaning of "costs taxed," there is no indication the Harvey Court did not take the
   rule cited by St. Paul into account.

1    Finally, at oral argument, St. Paul argued that the attorneys' fees in this case were not

2    "taxed" because the fees were not awarded upon a motion for fees by the prevailing party or

3    after a verdict at trial but, rather, were approved as part of a settlement.  St. Paul relies on

4    Elwood v. Ruud, 815 F.2d 1016, 1017 (5th Cir. 1987), in which the Fifth Circuit reviewed a

5    dispute between a primary and excess insurer over the payment of a settlement by the

6    insurers' mutual insured.  In Elwood, the insured settled for a lump sum of $4.5 million.  Id.

7    The primary insurer contributed $1 million (the policy limit) and the excess insurers

8    contributed the remaining $3.5 million.  However, an excess insurer brought an action

9    against the primary insurer for the pro-rata share of attorneys' fees that the excess insurer

10   argued were a part of the settlement.  Id. at 1018.  The primary insurer's policy included a

11   provision for payment of "all costs taxed against the insured in any suit defended by the

12   [primary insurer]."  Id. at 1019.  The excess insurer argued that this "costs taxed" clause

13   imposed liability for the unidentified attorneys' fees in the settlement judgment.  Id.  The

14   Elwood Court rejected the excess insurer's argument, holding that no fees were assessed

15   against the insured because the settlement was for a lump sum of $4.5 million and no

16   attorneys' fees were "assessed" against the insured.  The Elwood Court noted: "Whatever

17   arrangement Elwood made with regard to the distribution of the $4,500,000 lump sum

18   settlement is not incorporated into the judgment, nor does the judgment reflect any

19   prejudgment agreement among the insurers regarding allocation of the $4,500,000."  Id. at

20   1020.

21   The Elwood decision is distinguishable because there was no basis in that case to

22   conclude that the insured had paid attorneys' fees or, even if there was, what the amount of

23   those attorneys' fees might have been.  Unlike the lump sum settlement in Elwood, this case

24   involves a specific allocation of attorneys' fees in the settlement and an adjustment of the

25   award of these fees by the Superior Court after a careful analysis of the reasonableness of the

26   settlement.  As discussed above, the Court must examine the meaning of the term "taxed"

from the perspective of its "plain, ordinary, and popular meaning."  Boeing, 113 Wn.2d at

ORDER - 28

877.  At most, St. Paul's arguments as to whether the attorneys' fees fall under the definition of "taxed" in this case might create some ambiguity as to the meaning of the term "taxed." For example, "taxed" could include every cost approved of, or entered into the judgment of, the trial court, or it might arguably be limited to rulings on formal motions by a party for an award of costs.  A term or provision is "ambiguous" if "on its face [it] is fairly susceptible to two different but reasonable interpretations." Ross, 132 Wn.2d at 515.  Even if the Court were to conclude that St. Paul's interpretation creates an ambiguity, that ambiguity must be resolved against the insurer. Id. at 515-516.  Accordingly, the Court concludes that the "costs taxed" provision includes the attorneys' fees made a part of the judgment in the state-court action.

In addition to arguing that attorneys' fees do not qualify as "costs taxed," St. Paul also appears to move for a partial summary judgment order stating that, if it is liable for such fees, they qualify as "damages" within the policy's general coverage provisions. See Pls.' Mot. for Partial Summ. J., docket no. 99, at 35.  St. Paul contends that Washington Courts "consider [attorneys' fees] to be an element of damages" where they are not specified as "costs" under an applicable statute.  St. Paul cites Brown v. Suburban Obstetrics & Gynecology, 35 Wn. App. 880, 884 (1983), and Ypsilanti v. Appalachian Insurance Company, 547 F. Supp. 823, 828 (D. Mich. 1982), in support of this argument.  In Brown, the Court of Appeals held that "any award of attorney's fees sought under RCW 49.48.030 is not sought as part of the costs of this action; rather [the plaintiff] seeks fees as additional damages for defendant's failure to comply with 49.48.010." Brown does not discuss the distinction between types of coverage under an insurance policy similar to the policies at issue here.  Nor does Brown hold, as St. Paul suggests, that Washington State courts uniformly consider attorneys' fees to be "an element of damages" unless they are identified as costs.  In Ypsilanti, the district court examined an insurance policy with a clause providing coverage for "all sums which the Insured shall become legally obligated to pay as damages." 547 F. Supp. at 828.  Giving the words their plain, ordinary meaning, the district court

ORDER -  29

1   concluded that "a reasonable person in the position of the Insured" would believe that this

2   clause provided coverage "for all forms of civil liability, including attorney fees." Id.

3   Ypsilanti does not support St. Paul's position.  First, St. Paul does not contend that the

4   coverage clause in Ypsilanti is the same as the property damage coverage clause in this

5   case—St. Paul does not discuss the language in its own polices to any extent.  Second, even

6   if the attorneys' fees could be considered "damages" under the general coverage provision in

7   this case, which is not evident from the language in the policy, St. Paul makes no effort to

8   explain why such coverage would necessarily preclude the fees from otherwise being

9   covered as "costs taxed."  Accordingly, St. Paul is not entitled to a summary judgment order

10  stating that any attorneys' fees awarded against the MV Defendants' in the state-court

11  judgment constitute indemnity "damages."

12        In sum, the plain, ordinary meaning of the "costs taxed" clause in the St. Paul policies

13  includes attorneys' fees.  Webster's defines costs as "the expenses incurred in litigation as **a:**

14  those payable to the attorney or counsel by his client esp. when fixed by law **b:** those given

15  by law or the court to the prevailing party against the losing party in equity and frequently by

16  statute."  As the Harvey Court concluded, "this definition represents the common

17  understanding of the term 'costs.'"  The term "taxed" simply means assessed, fixed, or

18  determined.  Moreover, to the extent St. Paul's reliance on legal and technical definitions of

19  costs might be given any weight, those definitions would, at most, create ambiguity with the

20  common definition.  Washington State law requires courts resolve ambiguity in favor of

21  liberally construing the policy to provide coverage whenever possible.  Ross, 132 Wn.2d at

22  515-16.  For the reasons stated, the Court GRANTS the MV Defendants' motion for a partial

23  summary judgment order that the "costs taxed" clause in the St. Paul policies includes

24  attorneys' fees.  Docket no. 77.  The Court DENIES St. Paul's motion for partial summary

25  judgment as to the "costs taxed" issue and as to the question of whether attorneys' fees fall

26  under the category of indemnity damages.  Docket no. 99.

## CONCLUSION

For the reasons discussed above, the Court DENIES St. Paul's motion for partial summary judgment as to the breach of contract counterclaim against St. Paul Fire, docket no. 99, and DENIES the MV Defendants' motion for partial summary judgment as to the scope of coverage under the St. Paul Fire Policy, docket no. 77.  Additionally, the Court GRANTS the MV Defendants' motion for a partial summary judgment order that the "costs taxed" clause in the St. Paul policies includes attorneys' fees, docket no. 77, and DENIES St. Paul's motion for partial summary judgment as to the "costs taxed" issue and as to the question of whether attorneys' fees fall under the category of indemnity damages, docket no. 99.

IT IS SO ORDERED.

DATED this 7th day of September, 2006.

_____
Thomas S. Zilly
United States District Judge

ORDER - 31