```
 1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
 2

 3   ST. PAUL FIRE,                    )
                                       )
 4                      Plaintiff, )  No. C 05-388 Z
                                       )
 5              v.                     )  Seattle, Washington
                                       )
 6   HEBERT CONSTRUCTION,              )
                                       )
 7                      Defendant. )
                                       )
 8

 9       BEFORE THE HONORABLE THOMAS S. ZILLY, DISTRICT JUDGE

10              REPORTER'S TRANSCRIPT OF PROCEEDINGS

11                      DECEMBER 18, 2006

12

13

14   APPEARANCES:

15   For Admiral Insurance:              DAN MULLIN
                                         TRACY DUANY
16

17   For American Economy:              WILLIAM KNOWLES

18

19

20

21

22   Court Reporter:            Laurene Kelly, RDR, CRR
                                700 Stewart Ave. #17207
23                              Seattle, WA  98101
                                206.370.8506
24                              Laurene_Kelly@wawd.uscourts.gov

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
```

```
 1    SEATTLE, WASHINGTON                    MONDAY, DECEMBER 18, 2006
 2    HON. THOMAS S. ZILLY, DISTRICT JUDGE                  9:00 A.M.
 3                           PROCEEDINGS:
 4           THE CLERK:  Case number C 05-388 Z, St. Paul Fire, et
 5    al. versus Hebert Construction, et al.
 6           For the record, counsel, will you please stand and
 7    make your appearances.
 8           MR. MULLIN:  Dan Mullin representing Admiral
 9    Insurance; and Tracy Duany.
10           MR. KNOWLES:  Good morning, Your Honor.  William
11    Knowles for American Economy.
12           I'm joined by Tamara Dragseth, company
13    representative.
14           THE COURT:  Good morning.  This is the time we've
15    scheduled for this reasonableness hearing.
16           I read your briefs.  Do you wish to each make -- and
17    we've kind of allocated this morning to try and sort through
18    this issue and hear whatever testimony you're going to present,
19    and if I can decide it, I will.  If not, I'll take it under
20    advisement.
21           Do you wish to make an opening statement at this
22    point, either side?
23           MR. MULLIN:  Not me, Your Honor.
24           MR. KNOWLES:  Your Honor, I'd rather sum it up at the
25    end.
```

1          THE COURT:  All right.  So who's going to proceed now

2    first with a witness?

3          MR. KNOWLES:  I assumed that we would go first, Your

4    Honor, since it's our settlement that we're trying to prove is

5    reasonable.

6          THE COURT:  All right.

7          MR. KNOWLES:  We have one witness, Your Honor.  We'd

8    like to call Tamara Dragseth to the stand.

9          THE CLERK:  Step forward, please.  Raise your right

10   hand.

11          TAMARA DRAGSETH, PLAINTIFF'S WITNESS, SWORN

12          THE WITNESS:  I do.

13          THE CLERK:  Thank you.  Please take the stand.

14          For the record will you state your full name,

15   spelling both your first and your last name.

16          THE WITNESS:  Tamara Dragseth, T-A-M-A-R-A

17   D-R-A-G-S-E-T-H.

18          THE COURT:  Just a moment.  Let me get your spelling

19   of your name.  Is it D-R-A-G-S-E-T-H?

20          THE WITNESS:  Correct.

21          THE COURT:  Thank you.

22          THE WITNESS:  You're welcome.

23          THE COURT:  You may inquire.

24          MR. KNOWLES:  Thank you, Your Honor.

25   \\                                                          \\

1                    DIRECT EXAMINATION

2    BY MR. KNOWLES:

3    Q    Miss Dragseth, are you employed?

4    A    Yes, I am.

5    Q    By whom?

6    A    Safeco Corporation.

7    Q    Where is your office located?

8    A    Redmond, Washington.

9    Q    How long have you been by Safeco Corporation?

10   A    Since 1988.

11   Q    What's your present position with the company?

12   A    Claims specialist.

13   Q    In that position do you handle construction defect claims?

14   A    Yes, I do.

15   Q    How long have you handled construction defect claims?

16   A    Approximately three years.

17   Q    As a claims specialist what do you do when you receive a

18   construction defect claim?

19   A    I investigate coverage for the claim.  I investigate the

20   nature of the claim, the alleged defects, the insured's work,

21   whether or not there's potential liability exposure against the

22   insured, and attempt resolution of the claim in the best

23   interest of my insured.

24   Q    And can you explain to the Court the relationship -- you

25   understand the relationship to be between Safeco Corporation

1    and American Economy Insurance Company.

2    A    Yes, I do.

3    Q    What is that relationship?

4    A    Safeco Corporation doesn't actually write any insurance.

5    Rather they are a -- pardon the term -- conglomeration, if you

6    will, of various companies that do write insurance, including

7    Safeco Insurance Company of America, First National Insurance

8    Company of America, the original which was General Insurance

9    Company of America, American States Insurance Company, American

10   Economy Insurance Company, which they purchased about ten years

11   ago, and some others that I don't know the full names of off

12   the top of my head.

13   Q    During the course of your employment have you handled

14   claims that involved American Economy insureds?

15   A    Yes.

16   Q    Have you ever handled additional insured claims?

17   A    Yes.

18   Q    When and what types of claims?

19   A    Well, throughout the years I've handled claims for other

20   types of other lines of business, and additional insured issues

21   are pertinent to other areas of insurance as well, and so

22   throughout the years whenever it comes up one has to address

23   it.

24   Q    Have you ever addressed additional insured claims in the

25   context of a construction defect allegation?

1  A    Yes, on a regular basis.

2  Q    Now, Miss Dragseth, are you familiar with Interior

3  Motives?

4  A    Yes, I am.

5  Q    Can you describe how it is that you became familiar with

6  Interior Motives?

7  A    A first lawsuit arrived on my desk as a new claim for the

8  insured, and in my investigation of the claim I became familiar

9  with their work as it pertained to the particular claim.

10  Q    How did you build that familiarity?

11  A    Several interviews with the insured and with their staff

12  that worked on the project, review of their job file, their

13  invoices, their bid proposals.

14  Q    During the course of your investigation did you determine

15  that Interior Motives was an insured under certain American

16  Economy policies?

17  A    Yes, I did.

18  Q    Did you handle any additional insured claims that came in

19  as a result of Interior Motives' involvement in the project?

20  A    Yes.

21  Q    And who submitted those claims?

22  A    The first claim was submitted on -- against Interior

23  Motives by Meadow Valley, L L C, that came in approximately a

24  month after the lawsuit initiated the claim; and then a few

25  months later I received a tender from Hebert Construction.

1    Q    Let's take a step back and help put this in context for

2    the Court.  In your course of your investigation did you

3    determine what Interior Motives generally had done at this

4    project?

5    A    Yes.  Interior Motives is a store that provides interior

6    products such as tile, carpeting, floor tile, countertops, et

7    cetera.  They don't actually do the work; rather they have

8    subcontractors that will actually perform the work for the

9    project, whether it be a single-family home or a larger project

10   as well.

11   Q    Did you gain an understanding of Interior Motives'

12   relationship to either Hebert Construction or Meadow Valley,

13   L L C?

14   A    Yes.  They were a subcontractor.  By the review of the

15   invoices it appeared that they did all of their work either for

16   Hebert Construction or one of the entities for Hebert

17   Construction.  The bids were actually to Shell Homes, and I

18   didn't actually see that there was direct relationship between

19   Interior Motives and Meadow Valley, L L C.

20   Q    And why do you say that?

21   A    Because the invoices were not to Meadow Valley, L L C.

22   Rather they were to Hebert Construction and, like I said, the

23   invoice -- the bid proposal was to Shell Homes.

24   Q    I want to at this point kind of educate the judge as to

25   what happened with respect to Interior Motives' tender to you.

1   Could you tell the judge -- you explained that you did an

2   investigation.  What did you do for Interior Motives, if

3   anything at all?

4   A     For Interior Motives?

5   Q     Correct.

6   A     Or for Meadow Valley?

7   Q     Interior Motives.

8   A     For Interior Motives.  Well, the tender by Meadow Valley,

9   L L C was for the defense of the lawsuit, and the lawsuit was,

10  of course, the Meadow Valley Condominium Association versus

11  Meadow Valley, L L C and Hebert Construction, et cetera.

12         I investigated policy and found that three of the

13  policy years had included Meadow Valley, L L C and Hebert

14  Construction as additional insureds but the policy that we

15  provided or rather the policy endorsement that provided this

16  coverage specified that it was excess only.  Let me restate

17  that.  The policy specified that it was excess only.  The

18  endorsement did not.

19  Q     I appreciate that explanation, but I want you to tell the

20  judge what you did with Interior Motives first.  Then we'll

21  talk about --

22  A     Okay.

23  Q     -- L L C.

24  A     What I did with Interior Motives first was I discussed

25  with them about the scope of their work and to identify what

1    problems they may be potentially criticized for, what sort of

2    work they did, what the potential allegations were against them

3    so that I could identify where their potential liabilities were

4    and how that was involved in the lawsuit.  I investigated

5    their -- the coverages that we had afforded to them and who

6    might be potential additional insureds and to what extent

7    underneath the policy.

8    Q    Interior Motives been sued?

9    A    No.  I'm sorry?

10   Q    Was Interior Motives named as a party to litigation

11   involving the Meadow --

12   A    Yes.  They were a fourth party defendant.

13   Q    Did you retain defense counsel to represent Interior

14   Motives?

15   A    Yes, I did.

16   Q    And did that defense counsel defend Interior Motives to

17   the conclusion?

18   A    Yes; to the conclusion of Interior Motives liability

19   exposure, yes.  And defense counsel had already retained a

20   defense expert.

21   Q    Who was the defense counsel you retained?

22   A    Susan Fuller.

23   Q    And do you remember the name of the expert that had been

24   retained?

25   A    Jeff Harris of I believe it's Shafer Engineering.

1   Q    Did Mr. Harris do an investigation?

2   A    Yes.  He attended the site inspections and he also

3   attended at least one of the intrusive, destructive testing

4   investigations.

5   Q    How was the claim against Interior Motives resolved?

6   A    Against Interior Motives Susan Fuller obtained a granting

7   of a motion for summary judgment on the statute of limitations.

8   Q    Was Interior Motives dismissed from the case?

9   A    Yes, they were.

10  Q    Did anyone ever appeal that ruling?

11  A    No.

12  Q    Now let's shift to the additional insured tenders that you

13  referenced.  You first referenced a tender from Meadow Valley,

14  L L C.  Do you recall who it was that tendered that to you on

15  behalf of Meadow Valley, L L C?

16  A    That was Doug Weigel.

17  Q    And what did you understand Mr. Weigel's relationship to

18  be to Meadow Valley, L L C?

19  A    He was defense counsel.

20  Q    What did exactly what did Mr. Weigel tender to American

21  Economy?

22  A    The defense of Meadow Valley, L L C.

23  Q    Did you respond to that tender?

24  A    Yes, I did.

25  Q    What did you say in response to the tender?

1    A    Well, I acknowledged it, and I explained the coverages
2    that were available.  I spelled out which policy years had the
3    additional insured endorsement on it, which policy years did
4    not.  I expressed that under two policy years -- I believe it
5    was the '99 through 2000 and the 2000 through 2001 -- there
6    were no endorsements to the policy and thus his client would
7    not be an additional insured underneath those policies.
8         The 2001 through 2004 policy periods did list them as
9    an additional insured under the policy, and thus they would
10   qualify as an additional insured but, since there was already
11   another carrier providing a defense under the terms of the
12   policy, we did not owe a defense, and thus I declined to
13   provide a defense to his client.
14   Q    Do you recall when Mr. Weibel [sic] first tendered the
15   defense to your company?
16   A    It was in October of 2004.
17   Q    Do you recall when it was that you responded to that
18   tender?
19   A    October of 2004.
20   Q    Did Mr. Weibel or Meadow Valley, L L C take exception to
21   that denial of coverage anytime later in 2004?
22   A    Yes.  They retendered the defense later, disputing that my
23   position was an accurate one, and they provided me with copies
24   of their reservation of rights letters that their client had
25   received from both St. Paul and from Admiral Insurance, both of

1    those letters which confirmed Admiral and St. Paul were

2    providing a defense and Admiral had disclaimed coverage

3    underneath two policy periods.

4    Q    What did you do in response to that in essence second

5    letter from Mr. Weibel?

6    A    Well, I evaluated the information that he provided to me

7    and reaffirmed that my prior position had been unchanged --

8    given that there was already a full defense being provided to

9    his client under the terms of our policy we did not owe a

10   defense -- and reasserted that we're excess only and that we

11   cannot provide his client with a defense.

12   Q    Did you ever receive any tenders from Hebert Construction?

13   A    Yes, I did.

14   Q    Who sent those to you?

15   A    Steve Jager sent a tender of the defense and indemnity for

16   Hebert Construction, Inc. in -- I believe it was dated

17   December 31st, and I believe I received it on January the 3rd

18   or 4th.

19            THE COURT:  Give us the years.

20            THE WITNESS:  I'm sorry.  2004.  And I received it

21   January of 2005.

22   Q    BY MR. KNOWLES:  What did you understand Mr. Jager's role

23   to be with respect to this claim?

24   A    The defense counsel for Hebert Construction, Inc.

25   Q    What exactly did Mr. Jager tender to your company?

1    A    Both the defense and indemnity of Hebert Construction.

2    Q    Did you respond to that tender?

3    A    Yes, I did.  In -- verbally the next day when we met at

4    mediation, and then subsequently after I had retained coverage

5    counsel.

6    Q    Let's take that apart a little bit so the judge

7    understands the chronology.  You've referenced that you

8    received a letter from Mr. Jager in early January and you said

9    the next day you were at a mediation.  What mediation were you

10   at?

11   A    This was the mediation of the case, Meadow Valley, L L C

12   or -- excuse me -- Meadow Valley Homeowners Association versus

13   Meadow Valley, L L C.  And if my memory serves me it was on

14   January the 4th of 2005.

15   Q    Why did you attend that mediation?

16   A    We were trying to settle the claim.  Interior Motives was

17   still a defendant in the claim, and it was the second mediation

18   of the case, and we were trying to reach a resolution to

19   dismiss my insured in exchange for settlement monies.

20           THE COURT:  The motion for summary judgment had not

21   been granted at that point?

22           THE WITNESS:  Correct.  It was pending.

23   Q    BY MR. KNOWLES:  Now, did you -- you indicated, too, that

24   you had communication with Mr. Jager at the mediation

25   concerning his tender.

Dragseth Direct                            14

1    A    In part, yes.  The -- first and foremost the discussion

2    dealt with the claims against my insureds and settlement

3    discussions, but the acknowledgement of the tender was part of

4    it.

5    Q    Did you ever receive a demand at that particular

6    mediation?

7    A    Yes.

8    Q    From whom?

9    A    From Steve Jager for the amount of $225,000.

10   Q    Did you make an offer in response to that demand?

11   A    Yes.  We offered $35,000, and that was based in part upon

12   the allocation that Mr. Jager had sent prior to the mediation

13   wherein he had allocated $50,000 for the bathroom tile issues

14   to my insured.  And I felt that $35,000 was a good opening

15   offer in exchange to his 225,000-dollar demand.

16   Q    Did Interior Motives' portion of this case settle at that

17   mediation?

18   A    No.  It didn't.  I never got a response to my demand, and

19   no one seemed to have any settlement authority to counter my

20   demand.  Excuse me.  My offer.

21   Q    What happened next with respect to the defense of Interior

22   Motives?

23   A    The summary judgment motion was heard on, I believe,

24   January 28th of 2005, and it was granted.  And Interior Motives

25   was then dismissed from the action.  It left our A I

1    obligations to both Meadow Valley, L L C and Hebert

2    Construction unresolved, however.

3    Q    Let's take it, then, from January 28, 2005 to -- forward

4    in time.  Were you ever contacted by a lawyer representing

5    Meadow Valley, L L C or Hebert Construction with respect to

6    their coverage claim?

7    A    Yes.  William Salazar called me prior to the -- prior to

8    the hearing for the summary judgment motion.  It was subsequent

9    to the mediation, however, because we did discuss that no one

10   had countered my settlement offer, and he addressed that I had

11   never responded to their tender of indemnity.  I clarified that

12   there was no tender of indemnity for Meadow Valley at that

13   point in time.

14            And he responded that more letters would need to be

15   written and that he would assist in the preparation of a

16   response to me, and I clarified also that our A I obligations

17   to Meadow Valley, L L C would be only to the extent of our

18   insured's work, that we were not responsible for, our A I

19   obligations did not extend to the work of others, only to the

20   work of our named insured.

21   Q    Did you ever deal with an attorney by the name of Mark

22   Davidson?

23   A    Yes.  That was after the motion for summary judgment was

24   granted, and he wrote me a letter and expressed that he

25   represented both Meadow Valley, L L C and Hebert Construction

Dragseth Direct                    16

1    and at that time retendered the defense and indemnity of both

2    Meadow Valley, L L C and Hebert Construction.

3    Q    Did you understand Mr. Davidson to be personal coverage

4    counsel for Meadow Valley, L L C?

5    A    That was implied in the tender.  He didn't express in the

6    letter that he was coverage counsel but, since he is addressing

7    retender of A I, that was a given.  I interpreted it as such.

8    Q    And similar question as to Mr. Davidson's relationship

9    with Hebert Construction.  Did you understand that he was

10   personal coverage counsel for Hebert Construction?

11   A    Yes.

12   Q    What did you do in response to Mr. Davidson's letter?

13   A    Well, I had -- I was in the process of retaining coverage

14   counsel at that point in time, and I wrote letters to both

15   Mr. Jager and Mr. Davidson, actually same letter addressed to

16   both, expressed that I had retained coverage counsel and that

17   coverage counsel would be responding to the tenders of A I

18   coverage.

19   Q    During the course of this time period, Miss Dragseth, did

20   you become aware that there was another mediation scheduled?

21   A    Yes.  That would be the third mediation, set for April the

22   5th of 2005.

23   Q    Did you attend that mediation?

24   A    Yes, I did.

25   Q    Why?

1    A    Because the A I obligation still had not been resolved and

2    there had been communication -- excuse me.  There had been

3    information that indicated that the total settlement between

4    Meadow Valley, L L C, Hebert Construction, and the homeowners

5    association was going to be in excess of the potential

6    available policy, underlying policy limits.  We still had the

7    A I obligation that hadn't -- the scope of that obligation had

8    not yet been defined, and I needed to settle.  I needed to

9    define the terms of what my obligations were as an additional

10   insured and discharge those obligations.

11   Q    Do you recall who the mediator was for that particular

12   session?

13   A    That was Chris Soling.

14   Q    Did you meet individually with Mr. Soling?

15   A    Yes, I did.

16   Q    Did you discuss the issues, the concerns you had

17   concerning coverage?

18   A    Yes.

19   Q    And at any point in time did Mr. Soling ask you to

20   contribute money to a settlement?

21   A    Yes, he did.

22   Q    And did you commit to providing funds for the settlement?

23   A    Yes.  I offered a hundred thousand dollars.

24   Q    Do you know if that was ever conveyed by Mr. Soling to

25   anybody else?

1   A    It was my understanding that he did convey it.  It was

2   also my understanding that they were having a difficult time

3   obtaining enough money to interest the homeowners association,

4   so our specific offer may not have been communicated to the

5   homeowners association.

6   Q    Do you recall what happened, then, following the

7   mediation, that April mediation session?

8   A    The homeowners association did reach an agreement with

9   Meadow Valley, L L C and with Hebert Construction for a

10  stipulated judgment with covenant not to execute.  The

11  homeowners association as part of the settlement was assigned

12  the rights of Meadow Valley, L L C and Hebert Construction as

13  to available insurance coverage, and we then attempted to

14  reopen negotiations directly with the homeowners association,

15  who now owned the A I obligations.

16  Q    And did those negotiations take place?

17  A    Yes, they did, through Chris Soling.

18  Q    Did you receive an initial demand through Mr. Soling from

19  the A T O?

20  A    Yes, I did, a hundred fifty thousand dollars.

21  Q    Did that -- did the negotiations lead to a settlement?

22  A    Yes, they did.

23  Q    Do you recall the amount of the settlement?

24  A    Yes.  It was $115,000.

25  Q    What factors did you consider prior to accepting

1    150,000-dollar [sic] settlement?

2    A    Well, the total allocation to Interior Motives really

3    hadn't changed from the initial allocation that Mr. Jager had

4    provided.  The cost associated with the repair of the bathrooms

5    had always been in the 500- to 600-thousand-dollar range,

6    depending upon which estimate bid you looked at, and the

7    allocation that Randy Hart had provided allocated

8    approximately -- initially approximately $50,000 to Interior

9    Motives.  He had also allocated about the same amount to

10   another subcontractor under the mistaken understanding that

11   that subcontractor had also worked on the bathrooms.

12        So that hundred thousand dollars was then reallocated

13   in its entirety to Interior Motives.  I used that as the main

14   basis for the settlement.  There was no contract, so there was

15   no indemnity obligation that Interior Motives owed to Hebert

16   Construction or whomever they entered into the contract with.

17   Q    You mentioned, Miss Dragseth, the amount allocated to the

18   bathrooms was 500- to 600,000.  Why is it, then, that when you

19   determined this amount to pay that you paid so much less than -

20   to 600,000?

21   A    Well, there was other trades that received an allocation

22   based upon presumably Randy Hart's assessment of liability

23   exposure.  There was -- there were the drywaller, the plumber,

24   the insulater.  Each of these had contributed to the condition

25   of the bathroom.  And then, of course, the general contractor

1   generally is responsible for a portion of those damages as

2   well.

3           And the expert reports had indicated that the

4   drywaller who installed the greenboard had in most instances

5   installed the greenboard vertically rather than horizontally,

6   that there were cut edges found at the bath drywall join,

7   rather than a paper-bound, sealed edge, which is required.

8           There was some instances where the drywall extended

9   beyond the base of the bathtub as though the plumber had simply

10  pushed the tub up against the drywall rather than doing the

11  usual configuration.

12          There was a Visqueen barrier found behind most of the

13  drywall -- most of the tubs; thus the drywall never had the

14  opportunity to dry out if there was any moisture that was

15  found.

16          And additionally there was the issue of whether

17  sealant was part of the scope of the work of our insured.  It's

18  an add-on.  It's not something that is part and parcel of their

19  usual scope of work and had never been requested in this case.

20  Q    Could you describe for the Court what you understand to be

21  the sealant, where it was to be applied.

22  A    It's in the grout.  The grout that is used is a Portland

23  cement grout and, according to my insured, by its very nature

24  it is porous.  It doesn't prevent water from transferring

25  through --

1              MR. MULLIN:  Your Honor, I'd object to this line of

2      questioning.  She's never been identified as an expert, and I

3      don't think she would --

4              THE COURT:  Your objection's noted and overruled.  I

5      think she's just reporting on what people told her so she

6      arrived at whatever decision she arrived at.  Whether that's

7      true or false, we'll have to sort out.

8              You can finish your answer.

9              THE WITNESS:  Okay.  My insured had explained to me

10     that the grout used is a Portland cement product and by its

11     very nature it is porous and water will get through it.  It's

12     always recommended that grout be sealed to prevent water

13     transmission.

14              That is an additional cost that is not part of their

15     base bid.  It always has to be added on, whether the homeowner

16     does it themselves on a regular basis, and apparently it's

17     something that we have to reapply after a period of time, and

18     in this instance sealant was not purchased, was not requested,

19     and it was not -- the expert reports that I read indicated that

20     it was not found in either the entryway tile or in the bathtub

21     tile surrounds.

22     Q     BY MR. KNOWLES:  If you could also describe for the Court

23     the presence of this Visqueen barrier.  Where was it relative

24     to the tile and the wall?

25     A     Well, the tile is the face that one would see when they

Dragseth Direct                        22

1    enter the bathroom naturally.  Directly behind it, it's mounted
2    through a grout -- not a grout but rather a mortar that
3    attaches it to the greenboard, and then behind the greenboard
4    was this Visqueen that was on the other side of the studs, so
5    there's a Visqueen that's directly behind these bathtubs, so
6    anytime any water -- as was expressed to me, anytime any
7    moisture did make it through, because the Visqueen was there it
8    prevented the moisture from continuing to transfer out and
9    dissipate, so it just sat there and that poor greenboard never
10   had a chance.  It would wick -- because the edges, many of the
11   edges were cut, it would wick the water up and never dry out.
12   Q    What do you mean by a cut edge on the greenboard?
13   Describe what your understanding was there.
14   A    According to the expert reports, plaintiff's expert
15   reports, there were -- the greenboard was install vertically
16   rather than horizontally, and the cut edge was placed closest
17   to the bathtub rather than the sealed edge.  The sealed edge
18   would have added an additional layer of barrier between any
19   moisture that did make it through and the interior of the
20   greenboard from wicking it up.
21           What was found was the cut edge -- when the drywaller
22   had an area that he had to fill, he would cut it, put it in
23   there to create the configuration.
24   Q    Now, you also mentioned that this settled for 115,000.  Of
25   that amount how much did American Economy pay?

1    A    $86,250.

2    Q    That left a balance between the amount that was agreed to

3    and the amount that your company paid.  Where did the other

4    money come from?

5    A    The prior insurance carrier Bally Insurance decided that

6    they had an exposure because of the possibility that the

7    insured's work was complete on some buildings during their

8    policy period, and they wanted to preclude any exposure that

9    they may have underneath the policy, so they agreed to

10   participate and actually fund part of the settlement.

11   Q    As part of this settlement process did you enter into a

12   settlement agreement?

13   A    Yes.

14             MR. KNOWLES:  Your Honor, just for reference it's

15   docket number 60, exhibit C.  It's already been made a part of

16   the record.

17             THE COURT:  Give me the docket number again.

18             MR. KNOWLES:  60.  Six zero.  It's exhibit C to the

19   docket number.

20             THE COURT:  What is docket number 60?

21             MR. KNOWLES:  It would not -- Your Honor, if it helps

22   clarify, it's not part of what we're dealing with today.  It's

23   a motion that preceded this that brings us here today, the

24   motion for summary judgment.

25             THE COURT:  All right.

Dragseth Direct                    24

1    Q    BY MR. KNOWLES:  Miss Dragseth, what was the primary
2    reason that American Economy settled with the homeowners
3    association?
4    A    Because they owned Meadow Valley, L L C and Hebert
5    Construction, Inc.'s rights against American Economy for the
6    A I obligations that we owed, and I had to discharge those
7    obligations.
8    Q    And you agreed to pay the $86,250.  Has that actually been
9    paid?
10   A    Yes, it was.
11   Q    When was it that you negotiated this agreement or at least
12   American Economy negotiated the agreement with the H O A?
13   A    It was subsequent to the third mediation after the
14   homeowners association had entered into settlement agreement
15   with the -- with the Meadow Valley, L L C and Hebert
16   Construction and prior to the entry of judgment.
17   Q    At the point that you settled with the H O A had Judge
18   White ruled on or entered the judgment in the underlying case?
19   A    No.
20   Q    Had he made a determination as to the reasonableness of
21   the amount of the big settlement between the H O A and the
22   L L C?
23   A    No.
24        MR. KNOWLES:  That's all the questions I have.  Thank
25   you.

 1              THE COURT:  Cross of the witness.
 2                          CROSS-EXAMINATION
 3    BY MR. MULLIN:
 4    Q    Good morning, Mrs. Dragseth.  My name is Dan Mullin.  I
 5    represent Admiral Insurance.  I haven't had the chance to
 6    depose you or talk to you yet, so got a couple of questions for
 7    you.
 8              You mentioned that you've been working in the
 9    construction defect unit at Safeco Insurance.  Is that right?
10    A    Correct.
11    Q    And that's been about three years?
12    A    Yes.
13    Q    When did you start?
14    A    Start what?  The construction --
15    Q    In the construction defect.
16    A    June of 2003.  Is that correct?  Yes.
17    Q    So when you received the claim from Interior Motives and
18    then the tenders from the L L C and H C I, you had been working
19    in the construction defect for just about a year.
20    A    Yes.
21    Q    Now, you mentioned that the -- when Interior Motives
22    tendered the suit to you, you did some things.  One of them was
23    investigate.  Is that right?
24    A    Yes.
25    Q    Is one of the other things you did was assign counsel?

1    A    Yes.

2    Q    Were you the person responsible for that?

3    A    For assigning counsel?  Yes.

4    Q    So you chose Susan Fuller.

5    A    Yes.

6    Q    And she is with Safeco Insurance as well, is she not?

7    A    Yes, she is.

8    Q    And do you know that Susan Fuller attended the deposition

9    of Art Schroeder in the underlying case?

10   A    Very likely.

11   Q    It was November 30 of 2004.  Did Susan Fuller report to

12   you what took place in that deposition?

13   A    I haven't reviewed that particular document, but that is

14   usual and customary.

15   Q    You would expect her to.

16   A    Yes.

17   Q    Would you have also expected her to ask questions of Art

18   Schroeder in that deposition?

19   A    Yes, I would.

20   Q    Do you know if she did?

21   A    Again I haven't resued that particular document, but my

22   recollection is that she generally would, yes.

23   Q    And it would have been the custom and practice between you

24   and Miss Fuller that she would have reported to you the

25   contents of Art Schroeder's testimony, specifically in

1    reference to any criticisms of Interior Motives.  Is that

2    right?

3    A    Correct.

4    Q    Did she tell you at that time in the fall of 2004 that Art

5    Schroeder -- do you know -- strike that.  Do you know who Art

6    Schroeder is?

7    A    He is an expert.  I don't know -- I don't recall who he

8    was the expert for in this matter.

9    Q    Okay.  Let's keep his name out of it for a minute.  Do you

10   know if Susan Fuller provided you with any reports that were

11   provided by the association's experts in the underlying case?

12   A    Yes.

13   Q    Were you given the Charter Construction cost for the scope

14   of repair?

15   A    Yes.

16   Q    So you knew that the association would be looking for over

17   four million dollars to repair the -- for repairing the Meadow

18   Valley condominiums?

19   A    Yes.

20   Q    And you would have also known that the numbers associated

21   with your client, Interior Motives, would have exceeded a

22   million dollars.  Isn't that true?

23   A    I don't recall the bathrooms ever exceeding -- ever

24   exceeding 600,000.

25   Q    Do you know in your mind whether the $600,000 is a

1    burdened or unburdened number?

2    A    Unburdened.

3              THE COURT:  What does that mean?

4              THE WITNESS:  There's general costs associated with

5    the construction in general.  They're generally listed

6    separately, things like scaffolding, general conditions.

7    Usually there's a charge for insurance, profit, overhead.  All

8    of the ancillary costs with doing business are listed, are

9    considered to be general conditions, and it's referred to in

10   the industry as the burdened costs.

11             THE COURT:  So you would -- so I understand your

12   testimony, you said you didn't think the number ever exceeded

13   $600,000 but that would be $600,000 together with all these

14   additional burdens?

15             THE WITNESS:  600,000 before the burdens, before the

16   general conditions are part of it.

17             THE COURT:  So if you looked at everything it would

18   be substantially more than 600,000.

19             THE WITNESS:  It could, yes.

20             THE COURT:  Thank you.

21   Q    BY MR. MULLIN:  And in fact you knew that it was

22   substantially more than 600,000.  You knew that in the fall of

23   2004, did you not?

24   A    For the bathrooms?

25   Q    For the work associated with Interior Motives.

1    A    The cost to repair the bathrooms, the maximum that I saw

2    was 605,000.

3    Q    Was Interior Motives' work criticized for anything else

4    beside the bathrooms?

5    A    Interior Motives' work was involved in other aspects.

6    Q    And what was that?

7    A    Well, they did the interior tile and the -- excuse me --

8    the entryway tile, and the entryway tile had some defects, but

9    I don't recall Interior Motives actually being criticized for

10   that.  There were other issues that were criticized as causing

11   damage to the Interior Motives work.

12   Q    So Miss Fuller didn't report to you Art Schroeder's

13   opinions in the fall of 2004 that he believed Interior Motives'

14   installation of the ceramic tile was improper and led to

15   damage?

16            MR. KNOWLES:  Objection.  Can we be specific as to

17   where?

18   Q    BY MR. MULLIN:  In the -- as to their work on the ceramic

19   floor tile.

20   A    The entryway?  I don't have a specific recollection.  I

21   can recall the various allegations against the -- against the

22   interior -- the entryway tile, but I can't recall what

23   Mr. Schroeder's allegations were.

24   Q    Okay.  And then the Charter Construction bid, do you

25   recall if they had a number in there to fix Interior Motives'

1   work on the ceramic tile?

2   A    On the entryway tile?

3   Q    The floors, correct.

4   A    Yes, they did.

5   Q    And how much was that?

6   A    I don't recall.  I'm sorry.

7   Q    Was it in the hundreds of thousands?

8   A    It may well have been.

9   Q    And that would have been an unburdened number?

10  A    Yes.

11  Q    Miss Fuller received a letter from Steve Jager on

12  January -- dated January 26th, 2005.  And it references a

13  35,000-dollar offer you made.

14        If I may, Your Honor, this is an exhibit to Steve

15  Jager's declaration, and I just want to see if the witness is

16  familiar with this.

17        Do you know if you got this letter?  You are not a

18  copy recipient on it, but it was sent to your counsel.

19        THE COURT:  What exhibit is it, counsel?

20        MR. MULLIN:  Exhibit number 4 under Steve Jager's

21  declaration.

22        THE COURT:  Thank you.

23        THE WITNESS:  I don't recognize the letter.

24  Q    BY MR. MULLIN:  Okay.  If Steve Jager had communicated

25  settlement numbers to Miss Fuller, would you have expected her

1    to inform you of what that was?

2    A    Yes.

3    Q    And do you believe that in this case that, if she received

4    a letter with settlement and exposure information regarding

5    Interior Motives from Steve Jager, that she would have passed

6    that on to you?

7    A    The letter or the content?

8    Q    The content.

9    A    Yes.

10   Q    So if the letter reflected the fact that the association

11   had a burdened cost on the bathrooms of $800,000, that would

12   have been communicated to you back in January of 2005, most

13   likely.

14   A    It may have been.  I couldn't say for certain.

15   Q    And, if there was going to be a settlement between

16   Interior Motives and Hebert Construction, Miss Fuller would

17   have made it clear to you that Steve Jager did not include

18   additional insured issues in those numbers.

19   A    Well, that was very clear.  His 225,000-dollar demand to

20   me just prior to the January mediation stated specifically that

21   it was exclusive of any A I obligations.

22   Q    So no matter how much you paid for Interior Motives to get

23   them out, Safeco would still be on the hook for any costs of

24   defense or indemnity attached to Hebert Construction or the

25   L L C.

Dragseth Cross                                    32

1    A    Correct.  That's why I went to that mediation, the third

2    mediation after my insured was dismissed and found to be not

3    legally responsible.  I went to that third mediation

4    specifically to address how much was owed and reach a

5    resolution.

6    Q    Now, you said that you met with Interior Motives

7    personnel?

8    A    Yes.

9    Q    Who did you meet with?

10   A    Kelly and George and Mr. Cane.  For the life of me -- Dave

11   Cane, I believe.

12   Q    And when you say George, it's George Calbom?

13   A    Yes.

14   Q    And he was deposed in the underlying action?

15   A    Yes.

16   Q    And so you knew, for example, that Interior Motives' work

17   at the Meadow Valley condominium project was done by

18   subcontractors.

19   A    Oh, yes.

20   Q    Therefore that your work exclusion and your policy would

21   not apply.

22   A    Yes.  I was aware of that.

23   Q    And in fact, because it didn't apply, you would also have

24   to pick up the costs of tile and grout and any other cost of

25   Interior Motives' work.

1    A    Correct.

2    Q    Did you tell H C I, Hebert Construction, or their counsel

3    or the L L C that your work exclusion would not apply?

4    A    No.  I don't believe that I did.

5    Q    In fact you quoted it in your letter to them as a basis

6    for not providing coverage.  Isn't that right?

7    A    No.  I was providing specific exclusions that might apply.

8    I was not stating for certain which exclusion would or would

9    not apply.  I was simply trying to provide them with all of the

10   information about the policy and warn them of some exclusions

11   that may apply.

12   Q    But you knew that that particular exclusion would not

13   apply.

14   A    When I wrote that letter I did not yet have all of the

15   information with regard to who did what and whether or not all

16   of the work was performed by subcontractors.

17   Q    Now let's -- your -- you mentioned in your direct

18   testimony that Mr. Weigel tendered the defense to you of this

19   claim in October of 2004.  Correct?

20   A    Yes.

21   Q    That was before Art Schroeder's deposition of

22   November 30th, 2004?

23   A    Yes.

24   Q    Correct?

25            And then you responded to his letter, did you not?

1    A    Yes, I did.

2    Q    And this is your letter --

3    A    Yes.

4    Q    -- is it not?  And at the end -- pardon me -- the end of

5    the letter -- it's a seven-page letter -- that's your name.

6    Correct?

7    A    Yes, it is.

8              THE COURT:  Is that an exhibit that's already in

9    evidence, counsel?

10             MR. MULLIN:  It's exhibit 7 to Mr. Weigel's

11   declaration.

12             THE COURT:  Thank you.

13   Q    BY MR. MULLIN:  So this letter that you sent to Mr. Weigel

14   in response to his tender acknowledges -- the very first line

15   acknowledges that you received his letter on October 14th.

16   Correct?

17   A    Yes.

18   Q    Within ten days what investigation did you do into the

19   coverage for the L L C's tender?

20   A    I had already received the first notice lawsuit from my

21   insured, and I had already had some communication with my

22   insured with regard to the scope of the work, and I had policy

23   information available to me.

24   Q    Enough to determine that in fact the L L C was an insured

25   under Safeco's policies with American Economy.  Correct?

1    A     That some of the policies had additional insured

2    endorsements naming them as an additional insured, yes.

3    Q     And you determined that three policies applied.

4    A     Yes.

5    Q     And you determined that the L L C was insured under those

6    three policies.

7    A     Correct.

8    Q     And those three policies, each had a million-dollar limit.

9    Correct?

10   A     Yes.

11   Q     That's three million dollars of coverage that could have

12   been afforded to the L L C in this case if there was coverage?

13   A     Arising out of my insured's work.

14          THE COURT:  Just to clarify that so I understand,

15   when you say your insured's work, that would be Interior

16   Motives but it would pick up, would it, on all of the subs that

17   it hired?

18          THE WITNESS:  Yes.  Yes, it would.

19          THE COURT:  So -- all right.  Thank you.  Just want

20   to confirm.

21          THE WITNESS:  But, if I may, it does not pick up

22   exposure from other contractors' work such as, for instance, if

23   there were allegations that a sewer pipe was improperly

24   connected; this policy would not extend to that exposure.

25          THE COURT:  I understand.  Thank you.

1              THE WITNESS:  You're welcome.

2      Q    BY MR. MULLIN:  Now, in part or maybe in whole -- I don't

3      know -- when you made a determination that the L L C was

4      insured under the Safeco policies, was it because of this

5      document I have here from your policy?

6              THE COURT:  You want to refer to it so that we know

7      what you're looking at?

8              MR. MULLIN:  We're looking at the 2001 to 2002

9      insurance policy.  And it doesn't have a very good

10     identification as to what exactly this is.

11             THE WITNESS:  It does not.  This doesn't specify what

12     policy period this endorsement addresses.

13     Q    BY MR. MULLIN:  Okay.

14     A    So I couldn't answer your question.  I'm sorry.

15     Q    How did you -- don't use this.  How did you determine that

16     the L L C was insured under your policies?

17     A    Because I have policy information and I requested

18     copies -- I requested copies of the policy, and so I had each

19     policy year separate that I could review.

20     Q    And is this the type of thing that you found or something

21     different?

22     A    Can you scroll to the bottom so that I might see.  Can you

23     scroll to the top now, please.

24             This may well be an endorsement that was issued

25     directly from H B T.  The policy forms that I used to address

1    that they were an additional insured was not this one.

2    Q    If you didn't have this to determine the L L C was

3    insured, an additional insured under the policy, what would you

4    have used to determine that?

5    A    There were a list of additional insureds named underneath

6    the policy for each policy period, and there were specific

7    endorsements that addressed it, and I utilized those.

8              MR. MULLIN:   Your Honor, I have what has been

9    submitted as a complete copy in the record of the 2001-2002

10   policy, and if I could I'd like to approach the witness and

11   allow her to look at it.

12             THE COURT:   You may.

13   Q    BY MR. MULLIN:   Just as a foundational matter, in your

14   letter you reference that the L L C is insured under the

15   2001-2002 policy.  Is that correct?

16   A    Yes.

17   Q    And the page that I was showing you just a moment ago was

18   stamped A S 00780, which I think you will find in that policy

19   material.

20   A    And on the declarations page it states clearly, additional

21   insured, designated person Hebert Construction, Inc., Meadow

22   Valley, L L C.

23   Q    Is that the same -- which page are you looking at?  Down

24   at the bottom --

25   A    The amended declarations.  It is page number 6 of 57.

1    Q    Does that amendment refer to any limitations to their

2    coverage as additional insureds?

3    A    This amendment includes the following forms that would be

4    applicable.  One form that would be applicable is B P 7032,

5    revision date 12-99, additional insured owner's lessees.

6    Potentially additionally applicable would be policy form

7    B P 7057, revision date 10-97, additional insured designated

8    person.

9             And then the main policy form, which is B P --

10   there's also a business owner's ultra plus liability P B 7635,

11   revision 05-98, that might be applicable, and the main policy

12   form which on this one should be -- here it is B P 006,

13   revision date 01-97, business owner's liability coverage.

14   Q    Okay.  And if Hebert Construction or the L L C qualifies

15   as an additional insured under the policy -- I'm sorry.  The

16   endorsements that you were talking about that might be

17   applicable amend the definition of insured in your policy, do

18   they not?

19   A    I'd have to read the endorsement to determine what it

20   would amend.  Each endorsement amends, generally amends a

21   particular portion of the policy.

22   Q    Is there anything in the policy itself, the actual jacket

23   form, coverage form, that would limit Hebert Construction or

24   L L C's coverage?

25   A    I have to review that to answer your question.  When you

1   say jacket form, what are you referring to?  Are you referring

2   to the main policy form that addresses coverage --

3   Q    The main policy form relating to liability coverage.

4   A    Okay.

5   Q    And that was one of the things you mentioned, B P -- up at

6   the top in the corner it says B P 0006?

7   A    Correct.

8   Q    0197.  Looks like it starts at page 832.

9   A    Yes.

10  Q    And under the coverages that would be available to an

11  insured under the policy we have coverage A?

12  A    Yes.

13  Q    Under business liability.  And it provides coverage to an

14  insured for property damage.  Correct?

15  A    Yes.  To which the insurance applies.

16  Q    Is there any limitation that it's only going to be to

17  Interior Motives' work?

18  A    That would come underneath the definition of who is an

19  insured.  I'm naturally not going to pay for coverage that we

20  do not owe to someone who was not an insured underneath the

21  policy.  We will pay those sums that the insured becomes

22  legally obligated to pay as damages because of bodily injury,

23  property damage, or personal injury or advertising injury to

24  which this insurance applies.

25  Q    I understand.  And you've already told us that the L L C

1    and Hebert Construction qualify as additional insureds under

2    your policy.

3    A    Yes.  But, if I may, the endorsements that address the

4    additional insured would also rule, govern this insuring

5    agreement.

6            THE COURT:  What does that mean?

7            THE WITNESS:  Well, the endorsements change the main

8    policy form, and we've identified that there are potentially

9    three endorsements that would address what duties would be owed

10   to an additional insured and who would be determined to fit the

11   definition of an additional insured B P 7032.

12           B P 7032, 12-99:  Who is an insured is amended to

13   include as an insured the person or organization shown in the

14   schedule but only with respect to liability arising out of your

15   work for that insured by that -- excuse me -- for that insured

16   by or for you.

17           Another endorsement which might apply is B P 7057,

18   10-97:  Who is an insured is amended to include as an insured

19   the person or organization shown in the schedule as an insured,

20   but only with respect to liability arising out of your

21   operations or premises owned or rented to you.

22   Q    BY MR. MULLIN:  Right.  And that's how one qualifies as an

23   insured under your policy.

24   A    Yes.

25   Q    So for the L L C to qualify as an insured there had to be

1  some damage that it would be liable for, related to or arising

2  out of Interior Motives' work.  Right?

3  A    Yes.

4  Q    And you determined in your investigation that there was

5  liability that the L L C or Hebert Construction could be held

6  liable for arising out of Interior Motives' work.

7  A    Yes.

8  Q    And because of that they qualified as an insured under

9  your policy.  Correct?

10  A    Yes.

11  Q    And you didn't provide them a defense, did you?

12  A    I didn't owe them a defense.

13  Q    You -- and the reason you didn't owe them a defense, the

14  only reason that you expressed to them, was because you

15  believed you were excess?

16  A    Yes.

17  Q    And as part of your investigation did you ever get the

18  Admiral policy or the St. Paul policy to determine if in fact

19  you were excess?

20  A    No.  Those were not provided to me.  I did, however, have

21  letters that -- from St. Paul and Admiral wherein they

22  explained their coverages and they expressed that they were

23  providing a defense to both -- excuse me -- to both Meadow

24  Valley, L L C and to Hebert Construction.

25  Q    You didn't have those letters when you wrote the letter

1    back in October 24 to Doug Weigel, did you?

2    A    That is correct.

3    Q    Now, after you wrote Doug Weigel, Steve Jager writes you a

4    letter, and it's dated December 30th, 2004, tendering defense

5    of this case.  Right?

6    A    Yes.

7              MR. MULLIN:  And just -- Your Honor, just to clean

8    things up I'm going to go backwards for just a minute.

9    Q    The letter you sent to Doug Weigel, you understood that

10   when you received the tender, whether it was from Weigel or

11   Jager, that it was both defense and indemnity.

12   A    No, I didn't.  His tender specifically said defense, and I

13   have to respond very literally to the -- to coverage issues.

14   Q    And how did you respond?  Can you read the first line of

15   your letter?

16             THE COURT:  What are you reading from, counsel?

17             MR. MULLIN:  The October 24th letter --

18             THE COURT:  Well, I understand.  But where am I going

19   to find it?  It's not helpful if you're referring to these

20   exhibits and you don't get them into the record.

21             MR. MULLIN:  Exhibit 7 to Doug Weigel.

22             THE COURT:  All right.  I have the letter now.

23             MR. MULLIN:  Okay.  And I've asked her to read the

24   first line of her letter.

25             THE WITNESS:  Response to tender of defense,

1    confidential, privileged, and protected pursuant to E.R. 408.

2              Dear Mr. Weigel, we are in receipt of your letter

3    dated October 14th, 2004 tendering the defense and indemnity of

4    your client to our insured Interior Motives, period.

5    Q    BY MR. MULLIN:  So you understood that it was both defense

6    and indemnity.

7    A    No.  That was an error on my part, and thank you for

8    pointing it out to me.  It was a tender of defense, which is

9    why I named the letter response to tender of defense.

10   Q    And then when Mr. Jager --

11             THE COURT:  Let's pursue that just a moment.  What

12   you're saying is that, although you are acknowledging his

13   letter tendering defense and indemnity, you're claiming that

14   his letter to you of October 14th only tendered what?

15             THE WITNESS:  Defense.

16             THE COURT:  Defense.  And do we have that letter so

17   that we can look at it?

18             MR. MULLIN:  Yes.

19             THE COURT:  Where is that?

20             MR. MULLIN:  Exhibit 6 to Doug Weigel, his letter.

21             THE COURT:  Do you have that letter?

22             THE WITNESS:  It hasn't --

23             THE COURT:  Can we give the witness a copy of the

24   Weigel declaration with all its exhibits so she can respond?

25             MR. KNOWLES:  I have the letter, Your Honor, if you

1    want to just put it up on the screen.

2            MR. MULLIN:  I was going to move on from there,

3    unless Your Honor has questions about that.

4            THE COURT:  Well, let's just clarify.

5            MR. MULLIN:  I have the letter if she wants the

6    letter.

7            THE COURT:  Is this the letter?

8            MR. KNOWLES:  I just put it up there.

9            MR. MULLIN:  Oh, I'm sorry.

10           THE WITNESS:  Yes, it is.  It's dated October 14,

11   states tender of defense, and begins, this letter constitutes

12   Meadow Valley, L L C's formal tender for -- excuse me -- formal

13   tender of defense to Safeco Insurance pursuant to the A I

14   endorsements naming my client developer declarant Meadow

15   Valley, L L C as an additional insured under Safeco Insurance

16   C G L policies, et cetera.

17   Q    BY MR. MULLIN:  Going to move down just a little bit on

18   the letter.

19   A    Okay.

20   Q    And that was back in October 14.  So it's apparently your

21   first communication from him.

22   A    Correct.

23   Q    And he asked you at the end, he says -- at the last

24   paragraph he says, please provide me with a written response to

25   this tender along with a copy of the policy.

Dragseth Cross                          45

1              Did you ever send him a copy of the policy?

2    A     No, I did not.

3    Q     The same with Steve Jager.  You didn't send him one

4    either.

5    A     No.

6              If I may, I did respond to that letter before the

7    deadline that he imposed.

8    Q     Now, Steve Jager's letter -- this is exhibit 6 to Steve

9    Jager's declaration.  Mr. Jager's letter is dated

10   December 30th.  Did you receive that letter?

11   A     Yes.  One day before the mediation.

12   Q     In early January.

13   A     Yes.  2005.

14   Q     He talks about the project.  What I'm going to do is turn

15   to the second page of that letter.  And right in the middle can

16   you see that okay?

17   A     Yes, I can.

18   Q     It says, by this letter Hebert notifies you of and

19   requests the following:  This letter tenders the defense and

20   indemnity.  Do you see that?

21   A     Yes, I do.

22   Q     So you understood that Steve Jager was tendering to Safeco

23   the defense and indemnification of Hebert Construction?

24   A     Yes.

25   Q     And you never responded to this letter in writing, did

1    you?

2    A    I had retained defense counsel -- excuse me.  Not defense

3    counsel.  I retained coverage counsel and -- to address this,

4    and I advised Mr. Jager that I had retained coverage counsel,

5    who would be addressing his tender.

6    Q    The coverage counsel that you retained is a couple of

7    months later, isn't it?

8    A    Yes.  No.  Not a couple of months later.  I retained

9    coverage counsel in February, early February.

10   Q    Want to show exhibit 8 from Mr. Weigel's declaration.

11   This is a letter sent to you January 7, 2005 by Mr. Weigel.

12   Does that look familiar?

13   A    Yes, it does.

14   Q    And in the middle of it is -- he's telling you that he

15   serves notice to Safeco that there's no coverage available to

16   the L L C for 2001 or 2002.  Isn't that right?  That first line

17   right in the middle.

18   A    Yes.

19   Q    And his letter goes on to disagree, if you will, with your

20   position that you don't -- that you are excess.

21   A    That paragraph goes on to recap St. Paul's and Admiral's

22   coverage position.

23   Q    To let you know that there's no coverage in the years 2002

24   and 2003.  Right?

25   A    Yes.

1    Q    And then on the second page he sort of highlights that to

2    bring it home, at least his opinion, that the L L C doesn't

3    have insurance unless Safeco steps in for those years.  Right?

4             MR. KNOWLES:  I'm going to object, Your Honor.  Just

5    he characterizes Mr. Weigel's opinion.  I think Mr. Weigel is

6    simply stating his understanding of what the situation is.

7             THE COURT:  Overruled.  You may answer.

8             THE WITNESS:  Yes.  He summarizes that Meadow Valley,

9    L L C does not have any primary coverage for the period between

10   2001 and -- excuse me -- between February 4th, 2001 and

11   September the 5th, 2003.

12            MR. MULLIN:  Going to show exhibit number 9 from

13   Mr. Weigel's declaration.

14   Q    You responded to Mr. Weigel's letter with a letter of your

15   own dated January 20, 2005.  Do you recognize that?

16   A    Yes, I do.

17   Q    And you acknowledge that he's retendered to you again.

18   A    Yes.  He retendered the defense.

19   Q    I'm going to turn to the second page.  First full

20   paragraph at the top, which begins, in as much.  Could you read

21   that for us.

22   A    Inasmuch as your client is receiving a full defense from

23   St. Paul, Travelers, and Admiral, there is no duty under our

24   named insured's policy to also provide a defense.

25   Q    But your policy does provide a defense obligation, does it

1    not?

2    A    Yes.

3    Q    Were you hoping that Safeco could get by, by just allowing

4    St. Paul and Admiral to pick up the defense?

5    A    Of whom?  Of Meadow Valley, L L C?

6    Q    And Hebert Construction.

7    A    I was providing a -- I was providing the terms of the

8    coverage afforded pursuant to the terms of my policy that also

9    specifies whether you can collect on it or not with regard to

10   other insurance.  When other insurance is providing a defense,

11   we do not owe a defense.

12   Q    And you received a call from Admiral's counsel, did you

13   not, coverage counsel?

14   A    Yes.

15   Q    A Mr. Schwartz?

16   A    I don't recall Mr. Schwartz, no.  William Salazar.

17   Q    I'm sorry.  Bill Salazar.

18   A    Yes.

19   Q    And he tried to discuss with you the fact that you in fact

20   were not excess, did he not?

21   A    Briefly.

22   Q    Did he also talk to you about the -- trying to distinguish

23   and separate the difference between Interior Motives as your

24   named insured and Hebert L L C as your additional insureds?

25   A    Not as such that I recall.  That would be part of the

1    general allocation of who you represent and who I represent

2    sort of, introductories to our conversation.

3    Q    Do you still have that policy form --

4    A    Yes, I do.

5    Q    -- in front of you?

6         Can you turn to page 841.

7         THE COURT:  Is that policy an exhibit to one of these

8    declarations?

9         MR. MULLIN:  It's not -- it's part of Mr. Knowles'

10   declaration that was submitted earlier, was part of the

11   document but not --

12        THE COURT:  And that docket number is what?

13        MR. KNOWLES:  I think it's 60, Your Honor.

14        THE COURT:  Thank you.

15   Q    BY MR. MULLIN:  And at the bottom of 841 is a provision of

16   your insurance policy which deals with separation of insureds.

17   Correct?

18   A    Yes.

19   Q    Okay.  And it says, other than the limits of liability any

20   rights or duties specifically assigned --

21   A    There's the word "and" which must be read as part of it.

22   Except with respect to the limits of insurance and any rights

23   or duties specifically assigned in this policy to the first

24   named insured.

25   Q    Okay.  This insurance applies, A, as if each named insured

Dragseth Cross                    50

1    were the only named insured and, B, separately to each insured

2    against whom claim is made or suit is brought.

3    A    Correct.

4    Q    Which means that Safeco would have an obligation separate

5    and distinct to the L L C than it would to Interior Motives,

6    than it would to Hebert Construction.

7    A    Yes.  This is why I entered into that settlement

8    negotiations during the third mediation after my named insured

9    was legally dismissed from the action.  There was a duty that

10   had not been defined and had not been addressed and had not

11   been settled.

12   Q    Because the real exposure that Safeco faced was the

13   additional insured exposure for Interior Motives' work?

14   A    The real exposure that American Economy faced was the

15   exposure arising out of my insured's work.  It didn't totally

16   dissolve when my insured, named insured was dismissed from the

17   action.  I still had the additional insured obligation to

18   resolve.

19   Q    In fact it wouldn't have made any difference whether

20   Interior Motives was actually sued in the case or not.

21   Correct?

22   A    Yes, it would.

23   Q    You wouldn't defend L L C or Hebert Construction if there

24   was allegations arising out of Interior Motives' work?

25   A    If Interior Motives had not -- was not a defendant in the

Dragseth Cross                              51

1    action, then litigation against Hebert Construction and Meadow

2    Valley, L L C wouldn't arise out of my insured's work.

3    Q    You don't think -- well, if that's true, then what risk

4    was there, once Interior Motives received the summary judgment?

5    They were out.  So wouldn't Hebert Construction and L L C not

6    have any exposure for Interior Motives' work?

7    A    No.  Because my insured's work was part of the litigation,

8    even though my named insured was legally dismissed from the

9    action I still had that A I obligation to discharge.

10   Q    That's right.  My point is the A I obligation applies

11   whether Interior Motives is in the case or not.  It is really

12   just a question of whether their work is involved.  Correct?

13   A    Yes.

14   Q    And there's no question in this case that Interior

15   Motives' work was what was giving rise to liability to the

16   L L C and Hebert Construction.

17   A    In part.

18   Q    And that's why you would agree that they were additional

19   insureds under your policy?

20   A    Yes.  And that's why I entered into the settlement

21   negotiations.

22            MR. MULLIN:  Now, Your Honor, we have one letter.

23            This has not been submitted to the Court?  That was

24   not part of the declarations?

25            THE COURT:  Let's mark it, give it a number, and

 1   we'll deal with it.

 2              THE CLERK:  A 1, Your Honor.

 3              MR. KNOWLES:  Your Honor, is there any chance I can

 4   see it at some point?

 5              MISS DUANY:  Sorry.

 6              THE COURT:  That's reasonable.  How much longer are

 7   you going to be with the witness?

 8              MR. MULLIN:  I'll try to be 15 or 20 minutes.

 9              THE COURT:  Well, I think we'll take our morning

10   recess at this time.  You'll have a chance to look at the

11   letter while we take our recess.

12        (Recess at 10:27 a.m.)

13   Q    BY MR. MULLIN:  We're showing you what's been marked as

14   exhibit A 1.  Do you recognize that?

15   A    Yes, I do.

16   Q    It's a letter from Mark Davidson to you.  Correct?

17   A    Correct.

18   Q    And that is dated January 31st, 2005?

19   A    Correct.

20   Q    Now, my understanding is that Interior Motives was awarded

21   summary judgment on January 28th, 2005.  Is that consistent

22   with your memory?

23   A    Yes.

24   Q    So this letter's coming to you after Interior Motives is

25   essentially out of the case.  Right?

1    A    Correct.

2    Q    And Mr. Davidson is writing on behalf of both the L L C

3    and Hebert Construction, is he not?

4    A    He is.

5    Q    And in the first page of that letter he is disputing your

6    denial of coverage to both Hebert and the L L C.  Correct?

7    A    I have not denied coverage.  I denied a duty to defend.

8    Q    And he's disputing that, is he not?

9    A    He is.

10   Q    On page 2 of that letter -- I believe it's the last line

11   of the first paragraph up there -- Mr. Davidson points out to

12   you that there's no coverage in the 2002 and 2003 years and

13   argues that your policy is triggered.  He uses those words,

14   does he not?

15   A    He does not argue that there's no coverage.  He says,

16   thus -- the last line is thus American Economy's policy's

17   coverage has been triggered.

18   Q    So you've now received letters from Doug Weigel and Mark

19   Davidson telling you that both the L L C and Hebert

20   Construction don't agree with your position.

21   A    Correct.

22   Q    And you've also had or will shortly have a telephone call

23   with Bill Salter?

24   A    I had already had the telephone call with Bill Salzer, if

25   I recall correctly.

1    Q    And he expressed the same dispute, that he did not agree

2    with your position that you were excess.

3    A    Yes.

4    Q    And in that letter on page 2 Mr. Davidson goes on to

5    question why you have not sent insurance policies to them,

6    although it's been requested.  Do you see that?

7    A    Yes.

8    Q    And he points out that in your letter you state that you

9    have reviewed the policies in arriving at your decision but for

10   some reason can't get them policy information.  Do you see

11   that?

12   A    I'm sorry.  Can you restate that question.

13   Q    In the letter Mr. Davidson is saying that in your earlier

14   letters to Mr. Weigel you point out that you have reviewed the

15   A E I C policies?

16   A    Yes.

17   Q    And you did.

18   A    Yes.

19   Q    Did you not?

20   A    Yes.

21   Q    And if you've had the opportunity to review them here in

22   Redmond, Washington he was wondering why they couldn't get

23   copies of those policies.  Doesn't he question you about that?

24   A    Yes, he does.

25   Q    And they were first requested by you in the middle of

1   October 2004.  Correct?

2   A    They were first requested by me?  He has requested them,

3   yes.

4   Q    And Mr. Weigel sent you a letter in 2004, October of 2004,

5   and requested copies of the policies.

6   A    Yes.

7   Q    Why don't these people get copies of your policies?

8   A    I did send them with my letters.  I sent them copies of

9   the applicable endorsements.  They're specimen copies.  They

10  are the same endorsements that would -- that are part of the

11  policy.  I simply had not sent them a complete copy of the

12  policy with all of the endorsements that were not applicable to

13  my coverage analysis.

14  Q    But they obviously wanted an opportunity to review your

15  entire policy, do they not?

16  A    Yes.

17  Q    And months have gone by now and -- can you tell us why you

18  didn't send them the whole policy when they asked for it?

19  A    I sent them the policies -- the copies of the policy that

20  were applicable to my coverage analysis.

21          THE COURT:  Don't they get to do their own coverage

22  analysis?  How are they going to do that if you don't send them

23  the whole policy?

24          THE WITNESS:  And we eventually did.

25          THE COURT:  But why didn't you do it originally?

1          THE WITNESS:  Because I didn't believe that they were

2    entitled to a complete copy of the policy that was not -- was

3    not applicable to their analysis.  They weren't entitled to

4    copies of policies, for instance, a copy of the policy form

5    that addressed business and property coverage.  They are not an

6    additional insured underneath that aspect of it.

7          THE COURT:  All right.  I understand.  Go ahead.

8    Q    BY MR. MULLIN:  All right.  And then a little further in

9    that letter Mr. Davidson points out that you have not provided

10   a written response to Hebert Construction's tender.

11   A    Correct.

12   Q    And demands one, does he not?

13   A    Yes, he does.

14   Q    And you never gave him one, did you?

15   A    Prior to this letter or after it?  After it I did respond,

16   yes.

17   Q    You wrote a letter to Hebert Construction?

18   A    No.  I never wrote a letter to Hebert Construction.  I

19   wrote a letter to counsel for Hebert Construction.

20   Q    Okay.  I'm going to show you what's attached to

21   Mr. Jager's declaration, exhibit 7.  I'm done with that exhibit

22   for the time being.  I'll show you this on the screen.

23          In that earlier letter Mr. Davidson had asked you to

24   respond to Hebert's tender and asked that you do it within ten

25   days, did he not?

1   A     He does not ask -- yes, actually he does ask for a

2   definitive, written report on our defense and indemnity

3   obligations within the next ten days.

4   Q     And that did not happen.

5   A     No, that did not.

6   Q     And you hired or retained Mr. Knowles, and Mr. Knowles

7   sent this letter to Steve Jager.

8   A     Yes.

9   Q     And you were copied on it.  You may not see it, but you

10  were copied recipient.  And he's asking for a little additional

11  time; he's going to get back to them.  Right?

12  A     Yes.

13  Q     In fact it's going to be in the next few days.

14  A     Yes.

15  Q     Going to show you what is attached as exhibit number 8 to

16  the Jager declaration.  This is a letter dated March 23rd,

17  almost six weeks after that last letter I showed you, from Mark

18  Davidson to your counsel Mr. Knowles.  And just for your --

19  I'll show you the last page -- it shows you were copied.  Do

20  you see that?

21  A     Yes.

22  Q     You have no reason to doubt that you would have received

23  this letter?

24  A     No.

25  Q     Certainly your counsel wouldn't.

1              It mentions that there will be a mediation on
2    April 5th.   Correct?
3    A     Yes.
4    Q     That's the third and final mediation in this case.   Right?
5    A     Yes.
6    Q     So we're down to 10, not even 14 days, between this letter
7    and the mediation.   Right?
8    A     Yes.
9    Q     This letter notes that no response has been given to
10   Hebert Construction.   Can you explain that?
11   A     No, I can't.
12   Q     It should have been done by this time.
13   A     Presumably, if Mr. Knowles had all the information that he
14   needed to respond to them in written form.
15   Q     You were able to respond to the L L C in ten days back in
16   October.   Is there a reason that you couldn't respond to the --
17   to Hebert Construction in four months?
18   A     I responded to Hebert Construction and advised them that I
19   had retained coverage counsel.
20   Q     At the bottom of that page I'm showing you, the first
21   concern that Mr. Davidson alerts us to in this letter is the
22   fact that these policies have been requested since October.
23   We're now at the end of March with the mediation only a few
24   days away.
25              Can you explain why those policies were not provided

1    to these counsel?

2    A    I've already addressed that, I believe.

3    Q    Subparagraph 3, Mr. Davidson is taking issue with your

4    position as being excess, and in the middle of that paragraph

5    he says, it is absolutely essential that American Economy

6    acknowledge that the other policies are also excess and stop

7    relying on its excess position as a complete defense to its

8    indemnity obligation.

9            Do you see that?

10   A    Yes.

11   Q    So once again you've got another letter coming to you

12   complaining about your position that you are somehow excess and

13   not going to contribute.  Do you see that?

14   A    This states, a complete defense to indemnity obligation

15   coverage.  My prior letters addressed defense obligations.

16   Q    So you don't believe you were excess for indemnity.

17   A    I do believe we were excess for indemnity.  However, at

18   that point in time no indemnification had taken place, and so

19   consequently no indemnity obligation had arisen yet.

20   Q    So you in representing Safeco would not pay any money on

21   behalf of the L L C or Hebert Construction until there was a

22   judgment against them.

23   A    No.  I indeed -- I offered money.  I had been trying to

24   settle this case for a good, long while.

25           What I'm saying is with regard to indemnity,

1    indemnity arises once judgment has been entered or monies have

2    been paid.  In this instance neither Meadow Valley, L L C nor

3    Hebert Construction had paid any indemnity, so I'm saying, I'm

4    clarifying that we had been talking about defense up to date.

5    Indemnity was part of it, but a minor part with regard to our

6    coverage position.  In case in point we were an excess for

7    indemnity as well, but they hadn't paid any money so there was

8    no indemnification owed as wet.

9    Q    You said that you offered money.  You did offer money

10   earlier in January, perhaps, or February, in the neighborhood

11   of $35,000.  Is that right?

12   A    And we had offered a hundred thousand dollars as well.  No

13   one ever responded to either offer.

14   Q    Let's take 'm one at a time.

15   A    Okay.

16   Q    The $35,000 is something you offered to get Interior

17   Motives out of the case.  Right?

18   A    Yes.

19   Q    And then that was no longer necessary once they were

20   dismissed.  Correct?

21   A    Correct.

22   Q    And if somebody had taken the $35,000 to get rid of

23   Interior Motives, it would not have resolved your additional

24   insured obligations to the L L C or Hebert Construction.

25   A    Correct.

1    Q    Now, the hundred thousand dollars is news to me here.

2    I've never heard that there was such an offer.  But we do have

3    a declaration from Doug Weigel, and he states, I attended each

4    of the three underlying mediations on behalf --

5              THE COURT:  What paragraph are you looking at?

6              MR. MULLIN:  16 of Doug Weigel's declaration.

7              THE COURT:  Just a moment.  All right.  Go ahead.

8    Q    BY MR. MULLIN:  I attended each of the three underlying

9    mediations on behalf of the Meadow Valley, L L C.  During the

10   third and final mediation the association demanded in excess of

11   8.5 million dollars.

12             We stop there.

13             You were at that mediation.  Correct?

14   A    Yes.

15   Q    And is that correct, that there was a demand in excess of

16   8.5 million dollars from the association?

17   A    That would be towards Meadow Valley, L L C and Hebert

18   Construction, not necessarily to me.  I would not be privy to

19   the demands necessarily made against Meadow Valley, L L C and

20   Hebert Construction unless counsel communicated them to me.

21   Q    But they were your insured.

22   A    Again I was not privy, no one invited me into the

23   negotiations between Meadow Valley, L L C -- excuse me --

24   between the homeowners association and Meadow Valley.  Meadow

25   Valley, L L C and Hebert had a lot of other allegations being

1    made against them aside from Interior Motives' work.

2              THE COURT:  Well, the question is did you understand

3    that Meadow Valley Association, L L C was demanding in excess

4    of 85.million dollars?

5    A    No, I was not.

6              THE COURT:  What did you understand that they were

7    demanding at that third mediation?

8              THE WITNESS:  That there -- what I understood was

9    that they were contemplating a settlement of approximately 7.2

10   million.

11             THE COURT:  So they were demanding something

12   approximating that amount or more.  Is that right?

13             THE WITNESS:  Yes.

14             THE COURT:  All right.

15             THE WITNESS:  In excess of the underlying policy

16   limits, definitely.

17             THE COURT:  Go ahead.

18             MR. MULLIN:  Okay.

19   Q    It goes on to say, it is my recollection that as of

20   April 5th, 2003 -- probably a typo.  Should be 2005 -- A D I C

21   had not accepted the L L C's tender.  That's correct.  Right?

22   A    Of defense?

23   Q    Yes.

24   A    Yes.

25   Q    And did not offer to contribute any money on behalf of the

1    L L C.

2    A      That's incorrect.  I offered a hundred grand.

3    Q      To whom?

4    A      To the mediator with whom we were negotiating.  He was

5    conducting the settlement negotiations between American Economy

6    as additional insureds -- additional insurers of Meadow Valley,

7    L L C and H C I.

8    Q      You testified earlier that following this mediation or as

9    a result of this mediation Hebert Construction and the L L C

10   entered into a stipulated judgment.

11   A      It's my understanding that following the mediation they

12   entered into a stipulated judgment.  I don't believe that one

13   was entered at the time of mediation.  If it was, I was not

14   made aware of it.

15   Q      And you knew that the stipulated judgment -- let me ask

16   you this.  Were you provided a copy from your counsel or other

17   attorneys in the case of the stipulated judgment?

18   A      More likely than not it has come -- has been part of the

19   documents that I have received.

20   Q      And you knew, for example, that the 7.2 stipulated

21   judgment was going to be subject to a reasonableness hearing.

22   A      Yes.

23   Q      You did not intervene, Safeco did not intervene on that --

24   A      American Economy intervened through coverage counsel.

25   Q      We'll let the record speak for that.

1          You entered into a settlement the night before that
2     reasonableness hearing.
3     A     The settlement actually did take place the night.
4     However, the negotiations had been ongoing.
5     Q     And knowing that the reasonable -- you knew about the
6     reasonableness hearing.  Right?
7     A     Yes.
8     Q     And you knew it would be before Judge White, who had had
9     the underlying case?
10    A     Yes.
11    Q     And you knew he was going to be passing on at least a
12    couple of things.  One would be whether -- one would be the
13    stipulated damages of 4.8 million dollars.  Correct?
14    A     I knew that he would be ruling on the reasonableness of
15    the settlement.
16    Q     And the settlement, the 7.2, was made up of 4.8 million
17    dollars of damages and 2.4 million dollars in attorney fees.
18    A     I was not aware of the distribution that was taking place.
19    Q     If you received -- if you had received the stipulated
20    judgment, you would have reviewed it.
21    A     I don't believe that I received it prior to our settlement
22    negotiations and prior to our settlement.
23    Q     No doubt your counsel did.
24    A     Coverage counsel?  Yes.  No doubt.
25          THE COURT:  You knew before you settled that they

1    were talking about a 7.2 million-dollar global settlement.

2              THE WITNESS:  Correct.

3              THE COURT:  And you knew that some large portion

4    would be attorney's fees.

5              THE WITNESS:  Yes.

6              THE COURT:  So I think we've established that,

7    counsel.

8              MR. MULLIN:  Okay.

9    Q    As to the attorney fees portion, if there's attorney fees

10   awarded in a construction defect claim like this, your policy

11   would cover those attorney fees.

12   A    Well, the Washington Condominium Act considers plaintiff's

13   attorney fees as damages.

14             THE COURT:  So is that a yes?

15             THE WITNESS:  Yes.

16   Q    BY MR. MULLIN:  And your policy -- and you have the policy

17   form in front of you?

18   A    Yes.

19   Q    Can I turn you or ask you to turn to page 832.  That's the

20   first page of the liability coverage form.

21   A    Yes, it is.

22   Q    And that's the coverage form that would apply to insurance

23   coverage for the L L C and Hebert Construction.  Correct?

24   A    Yes.

25   Q    Under subprovision small d dealing with supplementary

1    payments --

2    A    Uh-huh.

3    Q    -- it states that -- in addition to the limits of

4    insurance that Safeco will pay with respect to any claim we

5    investigate or settle or any suit against an insured we

6    defend --

7    A    Yes.

8    Q    -- no question that this matter was in suit.  Correct?

9    A    No question.

10   Q    And a defense obligation is owed by Safeco in this matter,

11   was it not?

12   A    Correct.

13   Q    And once the defense obligation is triggered, one of the

14   things that Safeco's policy will provide is coverage for -- I'm

15   showing you this following page under supplementary payment,

16   subdivision number 5, all costs taxed against the insured in

17   the suit.

18   A    Correct.

19   Q    When you entered into your settlement, the stipulated

20   judgment provided for 2.4 million dollars in attorney fees.

21   Were you aware of that?

22   A    When I entered into the settlement the judgment hadn't

23   been entered.

24   Q    The insured had already entered into an agreement for a

25   stipulated judgment in the amount of -- that included 2.4

Dragseth Cross                    67

1    million dollars in attorney fees.  Isn't that right?

2    A    You have stated.

3    Q    And those kinds of attorney fees are the types of fees

4    that Safeco's supplementary payments provision would cover.

5              THE COURT:  I think that was a question.

6              THE WITNESS:  Okay.  I wasn't certain.

7              MR. MULLIN:  I'm sorry.  Question mark.

8              THE COURT:  You agree with that?

9              THE WITNESS:  It's costs that are taxed against the

10   insured in the suit.  Whatever the Court deems are costs that

11   are taxed, because these are -- the terms of this coverage are

12   any costs that are taxed against the insured, the costs that

13   are taxed would be determined by the Court.  When I entered

14   into the settlement, no tax had been -- no costs had been taxed

15   against the insured.

16             THE COURT:  Well, you knew that a large -- a

17   percentage of the total 7.2 they were talking about was going

18   to be attorney's fees.  Right?

19             THE WITNESS:  Yes.

20             THE COURT:  And would you then know that there's a

21   good likelihood that those would be taxed --

22             THE WITNESS:  It honestly doesn't happen all that

23   often.  This is one of the first times that I have seen a court

24   specifically section out a portion to be named as costs taxed.

25   Generally speaking it is part of a settlement and it is part of

1    what we negotiate to resolve.

2            THE COURT:  So, putting it in lay terms, you knew

3    that whatever that attorney's fee amount was was something you

4    were potentially liable for.  Is that right?

5            THE WITNESS:  And that I was attempting to resolve.

6            THE COURT:  I understand.  So at least we're

7    quantifying the risk.  That's what we're doing here today.

8            MR. MULLIN:  Right.

9            THE COURT:  Go ahead.

10   Q    BY MR. MULLIN:  Okay.  And as you entered into the

11   settlement, the one where you paid $86,000, you were

12   considering as part of the exposure through the additional

13   insured attorney fees that could be awarded.

14   A    Yes.

15   Q    And could be as much as 2.4 million dollars?

16   A    Yes.

17   Q    And one of the other things you were taking a look at was

18   the defense costs that you might have to reimburse to the

19   carriers if you were wrong on your position.

20   A    No.  I was trying to resolve my additional insured

21   obligations that now were owned by the homeowners association.

22   I couldn't -- I was not able to resolve them directly with

23   Meadow Valley, L L C and Hebert Construction.  The homeowners

24   association now owned all of those obligations, including the

25   defense obligations, if any, that were owed, and I was still

1    trying to resolve them with whoever would negotiate with me.

2    Q    So one of the issues that you were grappling with and

3    negotiating with at that time was the potential defense fees

4    that you might be called on to reimburse --

5    A    I was grappling with the -- with the A I obligation, which

6    includes the defense obligation.

7    Q    And that -- did you know how much -- did you know that

8    Admiral and St. Paul had paid $800,000 in defense of the case,

9    of those two insureds?

10   A    When I entered into the settlement negotiations?

11   Q    Right.

12   A    I honestly can't recall.

13           THE COURT:  Did you make any attempt to find out what

14   that potential risk was?

15           THE WITNESS:  Honestly I couldn't recall.

16           THE COURT:  You knew it was substantial litigation.

17           THE WITNESS:  All of these are, yes.

18           THE COURT:  And you knew that the attorney's fees

19   would be a high number.

20           THE WITNESS:  Yes.  But they're also in excess and,

21   with all due respect, the Court had not yet ruled that --

22           THE COURT:  I understand.

23           THE WITNESS:  Yes.  And so consequently --

24           THE COURT:  But this is a risk.  You seem to be

25   saying, well, there was no risk there.  Can't you tell us

1    candidly that yes, that was a risk you knew was out there?

2           THE WITNESS:  I felt very comfortable with my

3    position that we were in excess, and the duty to defend is an

4    excess duty.  I mean it's in addition to the policy limits.

5           THE COURT:  So your testimony is you didn't think

6    there was any risk there.

7           THE WITNESS:  Very small risk.

8           THE COURT:  All right.  Go ahead, counsel.

9           MR. MULLIN:  Okay.

10   Q    And another risk that you had was that the insured now had

11   entered into a stipulated judgment for 7.2 million dollars and

12   if there was -- and had assigned the rights for all insurance,

13   that might be applicable.

14   A    Yes.

15   Q    And if they had come after all the carriers, including

16   Safeco, you were at risk for breach of contract allegations.

17   Correct?  Did you -- you didn't defend Hebert or L L C, did

18   you?

19   A    No, I did not defend them.

20   Q    And if you had an obligation under the contract to do so,

21   you would have breached it.

22   A    I was an excess carrier.

23   Q    That was your view.

24   A    Yes.

25   Q    But everybody else we've shown you so far disagreed with

1    that.

2    A    Correct.

3    Q    So there was a risk that you were wrong.  And, if you are

4    wrong in your duty to defend, do you know what the consequences

5    are?

6    A    I can potentially be estopped from asserting any coverage

7    defense.

8    Q    So you would owe 7.2 million dollars, if that were the

9    consequence.

10   A    I wouldn't characterize it as that, no.

11             THE COURT:  How would you characterize it?  Are

12   you -- do you understand the law of Washington to be that if

13   you're in bad faith the judgment is the amount of damages?  Is

14   that your understanding?

15             THE WITNESS:  Yes.  But I would still expect that it

16   would arise out of my insured's work; and the majority of the

17   risk, the majority of the exposure to Hebert Construction and

18   Meadow Valley, L L C were the other aspects of the building

19   that were giving rise to this litigation.  It was not my

20   insured's work that caused this litigation.  It was the

21   building envelope and the roof, et cetera, that were driving

22   this litigation.

23             THE COURT:  Well, but if you -- all right.  Go ahead.

24   You're doing fine, counsel.

25   Q    BY MR. MULLIN:  You knew when you entered into the

1   settlement, putting the roofers aside, the plumbers aside, the

2   landscaper aside, H C I was looking at at least a million

3   dollars related to Interior Motives.  You knew that.

4   A     No.  They were looking at maybe 600,000 unburdened for all

5   of the interior bathrooms, not because of Interior Motives.

6               MR. MULLIN:  We'll deal with that, Your Honor, with

7   our case, I think.

8               THE COURT:  Well, we got to move this thing along,

9   counsel.  I'd indicated we had this morning to proceed.

10              MR. MULLIN:  I'm just about done.

11              THE COURT:  Well, I understand, but I'm going to want

12  to hear some argument as well from the lawyers at the end of

13  all this; so I think you've made your points here with this

14  witness.

15              MR. MULLIN:  Okay.  I'm done, then.

16              THE COURT:  All right.  Redirect, counsel?

17              MR. KNOWLES:  I'll try to be brief, Your Honor.

18                       REDIRECT EXAMINATION

19  BY MR. KNOWLES:

20  Q    Miss Dragseth, you identified 600,000 as being the

21  unburdened cost for the bathrooms?

22  A    Yes.

23  Q    And then you take it up to some larger number because of

24  the burdened expenses.  Is that right?

25  A    The general conditions, yes.

Dragseth Redirect                          73

1   Q    And when you look at that bathroom number, that bathroom
2   number applied to the entire part -- that part of the
3   structure.  Is that correct?
4   A    I'm not --
5   Q    In other words, let me take a step back.  When you looked
6   at a $600,000, did you look at that as being related to
7   Interior Motives' work or --
8   A    No.  It's because of the conditions that were found in the
9   bathroom, the conditions that needed to be repaired.  They had
10  to -- in order to remove this vapor barrier that was found
11  behind it, all of the Interior Motives work would have to be
12  pulled out.  The drywall, the greenboard was going to have to
13  be pulled out.  There were questions as to whether or not any
14  of the framing members needed to be replaced.  All of the tile
15  work was coming out, and it's not because -- solely because of
16  Interior Motives' work.
17  Q    Let's get specific.  Is it your understanding that
18  Interior Motives installed that vapor barrier?
19  A    No, not at all.  It's my understanding that the insulator
20  contractor installed the vapor barrier.
21  Q    Is it your understanding that Interior Motives installed
22  that wallboard or the greenboard that you've described?
23  A    No.  That was the drywall contractor, who incidentally was
24  never made part of the defense of this case.
25  Q    In your review of the documents that you related to your

1    named insured's work on this project, did you see anything that

2    would indicate that Meadow Valley, L L C or Hebert Construction

3    ever paid Interior Motives to seal any of the grout work in any

4    of the bathrooms?

5    A    There was one invoice for sealant, specifically for

6    sealant work in the men's restroom, and I believe that was of

7    the cabana, the main house, the common house, if you will.

8    Q    I'd like to show you what's been attached to the

9    declaration of George Calbom that was submitted by Admiral

10   Insurance Company, document number 228.  And attached to that

11   are a series of invoices for Interior Motives.  And I'm showing

12   you page M V L L C 090595 or document number page 16 of 39.

13   Can you see that?

14   A    Yes.

15   Q    And does that refer to sealing grout at the men's bathroom

16   in the Meadow Valley clubhouse?

17   A    Yeah.  It's issued to -- it's invoiced to Shell Homes, and

18   the due date is February 10th of 2001.  The description is for

19   seal grout at men's bathroom.

20            THE COURT:  What's the Bates stamp number?

21            MR. KNOWLES:  It's M V L L C 090595.

22            THE COURT:  Thank you.

23   Q    BY MR. KNOWLES:  And in your investigation did you

24   determine that in fact Interior Motives had done some seal work

25   at this project?

1    A    This was the only evidence that they had done the seal

2    work and added to my insured's communication to me that sealant

3    was specifically not part of their scope of work.  This helped

4    to support that prior statement of his.

5    Q    Thank you.  That's all the questions I have.  Thank you.

6              THE COURT:  Anything further?

7              MR. MULLIN:  No.

8              THE COURT:  Thank you very much.  You may step down.

9    Have a nice day.

10             THE WITNESS:  Thank you.

11             THE COURT:  All right.  Mr. Mullin, do you wish to

12   call a witness?

13             MR. MULLIN:  Art Schroeder.

14             THE CLERK:  Step forward, please.  Will you raise

15   your right hand.

16        ARTHUR B. SCHROEDER, DEFENDANT'S WITNESS, SWORN

17             THE WITNESS:  I do.

18             THE CLERK:  Thank you.  Please take the stand.

19             For the record will you state your full name,

20   spelling both your first and your last name.

21             THE WITNESS:  My name is Arthur B. Schroeder.  Arthur

22   is A-R-T-H-U-R.  Schroeder is S-C-H-R-O-E-D-E-R.

23             THE COURT:  You may inquire.

24   \\                                                            \\

25   \\                                                            \\

1                        DIRECT EXAMINATION

2    BY MR. MULLIN:

3    Q    Good morning, Mr. Schroeder.  I'm going to try to move

4    quickly through this, because I know that you testified in the

5    trial in September.

6             Could you tell the Court what your role was with

7    regard to the Meadow Valley litigation.

8    A    I was hired to do an investigation of -- originally of the

9    building envelope issues on the complex, which involved looking

10   at things like exterior siding, roofing, crawl space issues.

11            Eventually that scope increased over time as

12   additional problems were found and included investigations of

13   showers and bathtub surround construction, as well as ceramic

14   tile in entryways, how floor sheathing was installed within

15   units.

16   Q    And did you have a chance to personally investigate issues

17   dealing with the ceramic tiles and grout that was utilized in

18   both the bathrooms and entryways?

19   A    Yes.

20            THE COURT:  He testified about that at trial, and we

21   now have his declaration.

22            Everything true and correct in this declaration as

23   you signed and dated December 9, 2006?

24            THE WITNESS:  Is that --

25            THE COURT:  That was a question to you.  Is

1    everything true and correct in this declaration, sir?

2                    THE WITNESS:  Yes.

3                    THE COURT:  I don't know that you need to go through

4    what he's already said in the declaration.  You might want to

5    highlight one or two things, but bottom line is he's telling us

6    that, his opinion, the total costs of repairs to correct the

7    Interior Motives work was 882,000.

8                    MR. MULLIN:  That's correct.

9                    THE COURT:  All right.  Well --

10                   MR. MULLIN:  I got just two quick ones.

11                   THE COURT:  Go ahead.

12   Q    BY MR. MULLIN:  In terms of the bathroom issues, what

13   findings did you have, and what was the repair you recommended?

14   A    We found that the grout had been improperly installed.  It

15   was way too shallow.  It didn't go far enough into the

16   joints --

17                   MR. KNOWLES:  Excuse me.  Objection, Your Honor.

18   This is beyond the scope of this gentleman's disclosure.  He's

19   referring to work that was not disclosed in this case.

20                   THE COURT:  I think it was part of his trial

21   testimony.

22                   MR. KNOWLES:  It may have been part of his trial

23   testimony, but the reality is, one, I never received notice of

24   his deposition.  I've asked Mr. Mullin to tell me that -- show

25   me that I have.  It may be that I had a communication breakdown

1    in my office.

2            But, two, he's referring to work he did in August of,

3    I believe, 2004 report that was never made a part of the

4    disclosure in this case.

5            THE COURT:  Well, all right.  Mr. Mullin, I think we

6    need to deal with what's been disclosed in this case.

7            MR. MULLIN:  We have the -- did we bring it?  We have

8    the disclosures, and they include the August 9th, 2004.

9            I'd like to start with Mr. Knowles' representation

10   that he was not made aware of the deposition of Mr. Schroeder.

11   There was an email sent -- he has both --

12           THE COURT:  You know, I'd rather spend the time on

13   the merits of what this witness is going to be able to tell us.

14           MR. MULLIN:  There's nothing new that we're offering

15   him for outside of his 2004 reports.

16           THE COURT:  Let's proceed along those lines, then.

17   Q    BY MR. MULLIN:  I was asking you what your findings and

18   scope of repair was in terms of the ceramic tile work found in

19   the bathrooms.

20   A    Okay.  We found that on a consistent basis the grout did

21   not extend between the joints and the tile in the bathtub and

22   the shower surrounds, and that was allowing water to get behind

23   the tile system and it was causing damage to the gypsum

24   sheathing.

25           We also found some problems with how they had

1    installed the gypsum sheathing behind there that was probably
2    exacerbating the damage.
3    Q    And what was the repair that you recommended?
4    A    That you had to remove the tile.  You'd also have to
5    remove the sheathing behind it, because the sheathing is
6    damaged when you pull off the tile.  Then essentially you'd
7    have to remove any mold that was found, correct any decay that
8    was found, and then put it back the way it should have been.
9    Q    What was the main problem that you found in the bathrooms?
10   A    With regard to the showers and the tub surrounds, it was
11   the lack of depth of the grout into the joints.  The grout just
12   barely went into the joints at many locations.
13   Q    And what problem did that cause?
14   A    It allowed water to go through the grout.
15   Q    Were there -- if the grout had been done properly, would
16   there have been a water intrusion problem?
17   A    I don't think so.
18   Q    There was mention in earlier testimony here today about a
19   sealant.  Was a sealant something that was required or should
20   have been installed along with this grout tile work?
21   A    I'm not quite sure what you're referring to.  Typically
22   there is a caulk sealant provided along the base of the tile
23   where it meets the lip of the shower base.  And typically such
24   caulking is done and was observed, I believe, at this
25   particular project.

1    Q    Is there any sealer that the -- that Interior Motives was

2    supposed to add to the grout or tile work?

3                MR. KNOWLES:  Objection.  Foundation.

4                THE COURT:  Overruled.  You may answer.

5                THE WITNESS:  A sealer can be added over grout

6    joints.  It's not a typical requirement.  It's something that

7    can be done periodically, but the Tile Council of America

8    basically in their maintenance book says you may do it if you

9    wish.

10   Q    In your opinion would a sealer have overcome the problems

11   with the grout installation?

12   A    No.

13   Q    Are the problems that you observed in the bathrooms --

14   does that arise out of Interior Motives' work in performing

15   installation of the tile and grout?

16   A    The damage that we found arose out of Interior Motives'

17   work, yes.

18   Q    And then just in terms of the ceramic tile floors, can you

19   tell us what, if any, issues there were with Interior Motives'

20   work in installing those ceramic tiles.

21               MR. KNOWLES:  Objection.  Foundation.

22               THE COURT:  Overruled.  You may answer.

23               MR. KNOWLES:  Your Honor, I'd like to be heard on

24   this.

25               THE COURT:  Then stand up and make your objection.

1          MR. KNOWLES:  This gentleman has not testified that

2     he knew the scope of work performed by my client, and he's

3     going to start criticizing somebody's work, but we don't know

4     where my client's work starts and the other trades stop.  It's

5     a significant issue in particular at the locations he's about

6     ready to offer his testimony.

7          THE COURT:  I think you should perhaps create a

8     foundation, then.

9          MR. MULLIN:  Well, two things.  George Calbom

10    declaration establishes the work that they did, and I think

11    Mister -- whether he names them as Interior Motives, I think he

12    can tell us what the scope of the work was involved for the

13    tile in the entryway.

14         THE COURT:  I'll permit him to answer.

15         Go ahead.

16         THE WITNESS:  At the locations we looked at entryways

17    where we removed tiles.  The installations were different at

18    the two locations we saw.  At both locations there were

19    problems in how they had installed the system.

20         The system consisted of the tiles themself.  On one

21    of them they had a mortar -- well, no, it was a layer of

22    adhesive placed on top of a cementatious backer board, and then

23    it in turn was on a layer of mortar on top of the sheathing.

24    And the backer board was stapled down.  The use of adhesive

25    isn't approved by the Tile Council of America.

Schroeder Direct                          82

1    Q    BY MR. MULLIN:  Is the adhesive something that would have

2    been put there by the tile installer?

3    A    Normally I would expect that the tile installer would have

4    done the tile, the adhesive, the backer board, and the mortar

5    that's underneath it.

6    Q    And with that scope of work that you just defined, what

7    issues did you see with it?

8    A    First was the use of an adhesive versus a mortar on the

9    top layer.  That particular substitution didn't appear to be

10   something that was approved by the Tile Council of America, but

11   on the other hand it didn't look like it would cause any

12   serious problem with that substitution.

13          The second part was that the use of staples to fasten

14   down the cementatious backer boards, instead of using nails

15   with large heads on them as specified by the Tile Council.

16   That makes a large difference, because the staples that were

17   used had very poor holding power -- actually they held fairly

18   well, but because they didn't have much of a head when we

19   picked up the edge of the backer board we simply could lift it

20   very easily and the staples would pull right through it.  So it

21   wasn't attaching the backer boards firmly to the floor

22   sheathing below.

23   Q    Why does that make a difference?

24   A    Well, because the floor sheathing below had problems in

25   how it was nailed down.  Often there were only a few nails.

1    Sometimes -- some locations we found, in other areas away from
2    the tile, almost no nails.  But that allows the floor sheathing
3    to move a little bit when you walk across it, and that in turn
4    in a situation where there was tile could cause movement in
5    this backer board, because it wasn't well-secured, and generate
6    a crack up through the tile or the grout.
7    Q    So if Interior Motives had used screws instead of staples
8    or -- I'm sorry.  By using -- by using staples instead of
9    screws, what damage did that work cause, if any?
10   A    Well, the problem -- large part of the problem was
11   movement of the floor sheathing.  And it had generated cracks
12   up through the tile system and the grout system because the
13   sheathing or this backer board was not well-attached down.
14           Now, the lack of nailing in the sheathing itself is a
15   defect.  However, had the backer board been well-attached down
16   using either nails with large heads or screws, it would
17   essentially have held that floor sheathing in place so that I
18   think it would have probably eliminated most of the cracks that
19   occurred.
20   Q    And because they didn't use nails, part of your scope of
21   repair was to go in and remove all of that type work and redo
22   it?
23   A    Yes.
24   Q    And would you be able to reuse that tile, or would it be
25   damaged?

1   A    It was typically broken when we took out samples.

2   Q    That's all I have.  Thank you.

3        THE COURT:  Cross of the witness.

4                    CROSS-EXAMINATION

5   BY MR. KNOWLES:

6   Q    Let's start with -- by the way, I'm William Knowles.  I

7   represent American Economy.  Nice to meet you.

8        You speculated that Interior Motives had installed

9   the backer board.  Is that right?

10  A    That would -- yes.

11  Q    That's speculation on your part.  Right?

12  A    Because it would be normally part of that trade's work.

13  Q    Normally part of that trade, and normally that trade would

14  charge for the installation of that board.  Isn't that right?

15  A    I would assume they would.

16  Q    Not only charge for the board itself but also charge for

17  their time to put the nails in, put the screws in to attach it

18  to whatever it was going to be attached to.  Isn't that

19  correct?

20  A    I would assume they would charge for their work, yes.

21  Q    And if they -- if that contractor wasn't going to charge

22  for their work they just charge for the material.  Right?

23  A    Well, if they only provided material, then they would

24  charge for the material.

25  Q    I've put up on the board here -- this is again attached to

1   the declaration of George Calbom submitted by Admiral Insurance

2   Company.  This is page 32 of 39 of document 228.

3           Has Admiral Insurance showed this to you?

4   A    No.

5   Q    What's that say there on this invoice from Interior

6   Motives to Hebert Construction?

7   A    It's a bill for Hardy backer.  It's addressed to Herbert

8   [sic] Construction.

9   Q    What's it say in "ship to," sir?

10  A    Pardon?

11  Q    What does it say in the section "ship to"?

12  A    Material only.

13  Q    So Interior Motives sold the backer board but didn't

14  charge for the installation?

15  A    This is an invoice for material.  You're correct about

16  that.

17  Q    Have you reviewed the declaration of George Calbom?

18  A    I did read it.

19  Q    Do you recall what he said as to what work Interior

20  Motives did at the entryway?

21  A    No, I don't.

22  Q    I have now up on the board for you page 2 of the

23  declaration of George Calbom.  This again is document 228.

24  Mr. Schroeder, do you see paragraph 5?

25  A    Yes, I do.

1    Q     And that reads, when Interior Motives initially bid the

2    project, the work included installation of carpet, vinyl, and

3    laminate flooring for the entire project.  It also included

4    ceramic tile and grout installation at all entryways,

5    fireplaces, and countertop backsplashes.  Do you see that?

6    A     Yes.

7    Q     Do you see any reference to installation of backer board?

8    A     No, but that would be part of the system.

9    Q     Do you see anything in there regarding the installation of

10   the subflooring?

11   A     No, I don't see anything --

12   Q     Do you have any evidence that Interior Motives installed

13   the subfloor that was largely a part of the problem at the

14   entryway?

15   A     When you were referring to subfloor, to me the subfloor is

16   the floor sheathing below the backer board units.  So I would

17   expect the floor sheathing to have been placed by the framer.

18   Q     And the defect, isn't it true, when you went and looked at

19   this defect -- the defects in the floor sheathing, there was

20   feet and feet and feet where there was no fastener to the

21   actual floor joists?

22   A     There was one location that we looked at that there was --

23   I think we said 22 lineal feet along joints that hadn't had

24   fasteners of the floor sheathing down to the tops of the

25   joists.

1    Q    And that was done by somebody else other than Interior

2    Motives.  Even you would agree with me on that.  Right?

3    A    As I just said, I think the framer would have been

4    responsible for that.

5    Q    And you considered that condition to be a large part of

6    the problem at the entryway.

7    A    I think that is part of the problem, yes.

8    Q    And you also considered the installation of the backer

9    board to be a large part of the problem at the entryway.

10   A    Yes.

11   Q    And the information I just showed you shows that -- that

12   was a materials only purchase from Interior Motives.  Isn't

13   that correct?

14   A    It showed that the delivery of the materials -- well, it

15   was an invoice for the materials.  It doesn't say who was to

16   install the materials.

17   Q    In fact you've looked at all the other Interior Motives

18   invoices attached to Mr. George Calbom's declaration.  Isn't

19   that right?

20   A    No.  That's not correct.

21   Q    Did you see the other invoices attached to there were --

22   there were other work charged by Interior Motives?

23   A    I was only provided with the declaration itself and not

24   any exhibits that went with it.

25   Q    Admiral didn't show you the exhibits?

1          THE COURT:  He just told you that he didn't see

2    those.  You don't have to ask again.

3          MR. KNOWLES:  All right.

4    Q    Let me show you -- did you see anything such as this?

5    This is page 37 of 39, document 229 [sic] M V L L C 090617.  Do

6    you see that?

7    A    I do see it.

8    Q    Do you recall reviewing anything like that before coming

9    in today?

10   A    No.  I haven't seen this document.

11   Q    Now, you indicated you were originally retained by the

12   H O A.  Is that right?

13   A    That's correct.

14   Q    The homeowners association.  And you were retained to

15   identify issues or problems with the building.  Is that right?

16   A    The original contract was to look at what are referred to

17   as building envelope issues, which deal with the exterior of

18   the building.  Things that let water in, typically.

19   Q    And you were identified to not only identify the problem

20   but try to identify the cause.

21   A    Oh, absolutely, yes.

22   Q    And you were there to provide guidance to the homeowners

23   association from the beginning of your retention to the end of

24   your retention.  Is that right?

25   A    As asked for, yes.

1    Q    And you did provide that advice to them, did you not?

2    A    When they asked for it, yes.

3    Q    And you issued reports at their request.

4    A    Yes.

5    Q    And in those reports you identified the problems that you

6    perceived with the buildings.  Correct?

7    A    That's correct.

8    Q    And also made recommendations regarding the remediation of

9    those problems.  Isn't that right?

10   A    That is correct.

11   Q    Was there at any point in time where you were concerned

12   that the H O A or the representative was not understanding your

13   description of the problem?

14   A    Most of my discussions were with their legal counsel.  And

15   if there was any misunderstandings I certainly didn't perceive

16   anything like that.

17   Q    You provided to the H O A's counsel the scope of repair,

18   your scope of repair.

19   A    Yes.

20   Q    And did you -- you were left with an impression that they

21   did not understand what you were telling them?

22   A    I did not have an -- I thought they understood it.

23   Q    And did you have -- ever left with the impression that

24   they misunderstood your estimated cost of repair?

25   A    Charter developed an estimated cost of repair for the

1   scope I developed on issues like the showers.

2   Q    And at any point in time were you left with the impression

3   that the homeowners association did not understand the scope of

4   repair and the cost of repair?

5   A    Well, I don't know about the homeowners board per se.  As

6   I said, I only dealt with their legal counsel, and I think they

7   understood what the repair costs were.

8   Q    Now, when you reviewed Interior Motives' work, did you

9   ever review a written contract between Interior Motives and

10  Hebert Construction?

11  A    No.

12  Q    Did you ever review any document in which Hebert

13  Construction said to Interior Motives the standards by which

14  they were to build their part of the bathroom?

15  A    No.

16  Q    Did you ever interview anybody from Hebert Construction

17  regarding what they negotiated with Interior Motives?

18  A    No.

19  Q    Did you ever interview anyone from Interior Motives

20  regarding the scope of their work or what the requirements were

21  for their work?

22  A    No.

23  Q    Now, when you took -- you went in and did your

24  investigation of the bathrooms themselves, did you -- you found

25  the tiles.  Is that right?  Basically working from inside

1   you're standing inside the shower and you're looking at the

2   wall.  There's the tiles.  Right?

3   A    That's correct.

4   Q    And there's the grout around the tiles.  Right?

5   A    That's correct.

6   Q    And then underneath you found a drywall product.

7   A    That is correct.

8   Q    That was greenboard.

9   A    Typically it was greenboard in the showers that we looked

10  at.  There were a couple of spots where there was so much

11  damage we couldn't confirm that it was greenboard.

12  Q    Tell the judge what greenboard is.

13  A    Greenboard is a moisture-resistant type of gypsum

14  wallboard.  It's called greenboard because it has a green paper

15  facing on it.

16  Q    And is it -- why would you use greenboard in a bathroom?

17  A    Greenboard is used as a last-stop effort to protect

18  against moisture damage.

19  Q    On the other side of the greenboard, Mr. Schroeder, what

20  did you find?

21  A    On the other side -- you mean the exterior side?

22  Q    So it would be the tile, the greenboard, and then what did

23  you find between the face of the interior studs and the

24  greenboard?

25  A    Oh.  In many locations we found that there was a vapor

1  retarder, which consisted of a piece of Visqueen.

2  Q    And did that meet industry standards?

3  A    It does not meet industry standards.  You're not supposed

4  to put a vapor retarder behind the greenboard.

5  Q    And why is that, Mr. Schroeder?

6  A    I believe, but I'm not certain, that it's because it can

7  trap moisture.  The tile surround itself creates a vapor

8  barrier, so if you've got moisture between those two elements

9  it would be literally trapped.

10 Q    And when it's trapped it's -- with no place to go, you

11 have a condition where mold can form.  Is that correct?

12 A    Well, if you get moisture behind the tile and into the

13 gypsum sheathing, you already have that, but it can make it

14 worse.

15 Q    And the presence of the vapor, that vapor barrier you've

16 described, that was noncode-compliant.  Correct?

17 A    That is correct.

18 Q    It violated the universal -- the U B C, whatever it's --

19 universal building code.

20 A    It does violate the Uniform Building Code that was in

21 effect at the time.

22 Q    And in fact, in order to correct that situation, isn't it

23 true, Mr. Schroeder, that you would have had to take the tile

24 off, the greenboard off, and remove the vapor barrier in order

25 to make the building code-compliant?

Schroeder Cross                          93

1    A    You would have to do that.

2    Q    And that was going to happen, regardless of the condition

3    of the tile.

4    A    Well, if we had gone through and we had opened up these

5    showers and found absolutely no damage, we would have pointed

6    out the things that were done incorrect with the greenboard and

7    there were some problems in how it was installed, and we would

8    have also pointed out that the vapor retarder behind it was

9    done or placed where it shouldn't have been in the first place.

10            However, if there had been no damage, yes, I would

11   have told them that to correct the defect such a thing should

12   be done, but whether anybody would have actually considered

13   doing it in the light of no damage, I don't know.

14   Q    But the presence -- would you agree with me that the way

15   the system is supposed to work, if the water does get to the

16   greenboard it's supposed to evaporate or shed, following

17   gravity to the bottom?

18   A    If there's a way out at the bottom.  Hopefully there is a

19   way out if it gets behind the tile, that it can run down the

20   greenboard and out, and that didn't seem to be happening.

21            But as far as evaporation goes, if you get moisture

22   into the wall cavity behind the greenboard, it doesn't really

23   have a good avenue to evaporate within that cavity, whether

24   there's a vapor barrier there or not.

25   Q    But the vapor barrier certainly inhibits the process of

1    evaporation.  Correct?

2    A    I think it makes it worse, yes.

3    Q    And you said there were problems with the installation of

4    greenboard.  Could you tell the Court what that was.

5    A    The greenboard is supposed to be installed so that the

6    bottom edge has a paper-bound edge.  The greenboard the way

7    it's manufactured have two edges that don't have paper on it

8    and two that do, and what was done is they rotated the boards

9    90 degrees from what they should have been so that the bottom

10   edge didn't have that paper-bound edge on it.

11   Q    And as a result can water wick or enter the base of that

12   greenboard?

13   A    If water got behind the tile at those locations, I believe

14   it can wick and it makes the area more susceptible to damage.

15   Q    You also offered an opinion in your declaration regarding

16   the depth and width of the -- where the grout was installed

17   between the tiles.  Is that right?

18   A    Yes.

19   Q    And in coming to that conclusion, the conclusions you set

20   forth in that declaration, you rely upon the -- what you called

21   the Tile Council of America's standards?

22   A    Their standards.  And they have basically site standards

23   from a national standards organization referred to as ANSI.

24   Q    A N S I?

25   A    Yes.

1    Q    And is it the standard, then, that you were referring to

2    as A 108 10, .10, A 108.10?

3    A    Yes.  I believe it was.

4    Q    And in forming your opinions as to whether or not Interior

5    Motives had done their work correctly with respect to this

6    particular aspect of the project, you relied upon the standard

7    that was applicable at the time of the build.  Correct?

8    A    I did.

9    Q    The 1999 standard, Mr. Schroeder?

10   A    Oh, the -- on that -- with regard to which?  The ANSI or

11   to the Tile Council?

12   Q    Here.  Let me put this up for you.

13          If I could, Your Honor, have this marked.  I don't

14   intend to move to have it admitted, but just for purposes of

15   reference.

16              THE COURT:  You may.

17              THE CLERK:  Exhibit 1.

18   Q    BY MR. KNOWLES:  You have exhibit 1 in front of you?  Do

19   you recognize that?

20   A    I do have it in front of me.

21   Q    And this is the A N S I cover page for sections 108118 and

22   136 for 1999.  Is that right?

23   A    Let's see.  It says 1999, copyright, 2000.

24   Q    And it says a secretariat was the Tile Council of America,

25   Incorporated.  Is that right?

1    A    Yes.

2    Q    These are the standards you were referring to when you

3    offered your opinions in this case?

4    A    I believe it was the 1999 version of the Tile Council of

5    America's handbook.  I believe if we're looking at ANSI we

6    decided to go with the 1992 specification because it was more

7    lenient.

8    Q    Excuse me.  1992?

9    A    Yes.

10   Q    Why did you use 1992 instead of 1999, if this work was

11   done in 1999 or at least commenced in '99?

12   A    Because the 1992 document as far as grout depths go

13   required that the grout extend a minimum of two-thirds into the

14   grout joints.  The following document, the updated document

15   that was issued actually had deleted that portion and basically

16   said you had -- maybe I can find the wordage here --

17   Q    You're referring to Section A dash 4 decimal 7 decimal 6

18   decimal 3?

19   A    Okay.  And that section it says to force a maximum amount

20   of grout into the joints.  That simply means that you have to

21   fill the joints completely.  Under -- I thought that was too

22   harsh a standard.  So I went by the previous standard, which

23   would have probably been more readily available to the people

24   doing the job in 1999 and 2000.

25   Q    This does not require a certain amount of depth, does it?

1   Just says maximum amount of grout that can be put into the
2   joint.
3   A    It says force a maximum amount of grout into the joints.
4   Q    And do you know as you sit here today whether in fact
5   Interior Motives did not force the maximum amount of grout that
6   they could get into the joint at the time they constructed
7   this?
8   A    Oh, it's obvious they didn't do that.
9   Q    Were you there when it was built?
10  A    No.  I wasn't.  But the grout barely went into the joints
11  in many of the locations.
12  Q    And isn't it true that when you went and looked at all
13  these locations that you did not find a uniform condition of
14  wet greenboard behind the tile?
15  A    I believe that that is true.  There were places where it
16  was wet and there was places where it was dry.
17  Q    And there was places where you found what you believed to
18  be deficient amount of grout in the crack and it was still dry.
19  Correct?
20  A    I don't necessarily remember that.  It may well be true.
21  Q    Now, in your declaration itself you attached a table, did
22  you not, of your -- kind of a summary of your findings?
23  A    Yes.
24  Q    And in that table was your attempt to identify or try to
25  categorize certain conditions that you felt were relevant in

1    the bathrooms.  Is that right?

2    A    I did.

3    Q    Including the presence of a vapor barrier.  You felt that

4    was important.  Correct?

5    A    Yes.

6    Q    Including the condition of the greenboard.  You felt that

7    was important.  Correct?

8    A    Yes.

9    Q    And how it was originally installed.  Correct?  With

10   respect to the cut end versus the sealed end.

11   A    Let me find the chart.  I don't remember all the

12   parameters I put into it.

13             Yes.  I did put this into the chart.

14   Q    And you also considered whether the bottom edge of the

15   greenboard hung over or overhangs a lip.  Isn't that right?

16             THE COURT:  What page of your chart are you --

17             MR. KNOWLES:  I'm sorry, Your Honor.  It's 7 of 47,

18   exhibit 2 to Mr. Schroeder's declaration.

19             THE WITNESS:  I see reference where gypsum board

20   extends behind bathtubs instead of stopping at the top lip.  Am

21   I missing something on the chart or am I on the right chart?

22   Q    BY MR. KNOWLES:  I hope you're on the right chart.  That's

23   the one I have.  It's the one that reference at the top of the

24   analysis, bottom edge G W B overhangs lip.

25   A    I see it now.  Thank you.

1   Q    What were you trying to describe there?

2   A    I was trying to describe how the bottom edge was

3   terminated.

4   Q    And why was that important?

5   A    Well, first of all if you run the sheet rock down behind

6   that top lip of either the shower or of the bathtub, any water

7   that would run down the face could run behind that.

8   Q    And if it hits -- if it runs behind, it hits the board

9   there, there's a potential for mold growth.  Correct?

10  A    Well, it certainly -- if water runs down the sheathing

11  behind the bathtub or the shower base, then it could get

12  trapped below and it certainly could form mold.

13  Q    Okay.  Now, in this table you tried to summarize --

14          THE COURT:  Counsel, it's 12 o'clock.  How much

15  more --

16          MR. KNOWLES:  I got two questions.  I'm at the end of

17  this.

18          THE COURT:  All right.

19  Q    BY MR. KNOWLES:  At the last page of this table you

20  attempted to summarize or to calculate the percentages of

21  relationships of these conditions to other conditions.  Is that

22  right?  You've got percentages, total number of enclosures

23  reviewed, and how many -- what percentage of those have this

24  certain condition?

25  A    Yes.  But it's not done on a shower-by-shower basis.  It's

1    done on an overall opening basis.

2    Q    And you found that -- 77 percent of the time you found

3    that the greenboard was wet?

4    A    Looking at those particular openings.  In some showers we

5    looked at more than one opening.  If you look at it just on the

6    basis of what we found at the 11 showers, there were actually

7    nine out of the 11 showers we found elevated moisture contents,

8    so it would have been a little bit higher than the 77.

9    Q    But you also -- in terms of these percentages, whatever

10   this percentage means, 77 percent you found condition where it

11   was set, 77 percent you found the condition where the vapor

12   barrier was present.  Correct?

13   A    At the total number of openings made, yes.  Or in this

14   case it looks like we reviewed it at 10 and it was present at

15   77 percent of that.

16   Q    And 89 percent you found where the bottom edge of the

17   greenboard was hanging over the lip.

18   A    Let's see.

19         No.  In that case it means that the gypsum sheathing

20   stopped at the top of the lip 89 percent of the time.

21   Q    All right.  I think I understand that now.

22         Thank you for your time.

23         THE COURT:  Questions of the witness?

24         MR. MULLIN:  Couple quick ones.

25   \\                                                          \\

1                        REDIRECT EXAMINATION

2    BY MR. MULLIN:

3    Q    In your investigation of the bathroom surrounds did you

4    find property damage?

5    A    Yes.

6    Q    And what was it caused by?

7    A    Water getting through the grout.

8    Q    Did you find water from any other source?

9    A    No.

10   Q    If the grout and tile work had been done properly, would

11   there have been water intrusion resulting in property damage?

12   A    No.

13            MR. MULLIN:  That's all I have.

14            THE COURT:  Anything further of the witness?

15            MR. KNOWLES:  One question.

16                        RECROSS-EXAMINATION

17   BY MR. KNOWLES:

18   Q    Did you see any proof that Interior Motives was retained

19   to seal the grout?

20   A    No.

21            MR. KNOWLES:  Thank you.

22            THE COURT:  Thank you, sir.  You may step down.  Have

23   a nice day, nice holiday.

24            Well, let's give you each ten minutes to tell me what

25   you think all of this means.

1          MR. KNOWLES:  Thank you, Your Honor.  Thank you for

2     your patience.  I will try to conclude in less than ten

3     minutes.

4          In our brief I think both parties agree that there

5     are the Glover factors to be considered by the Court in

6     determining whether a settlement is reasonable and, while

7     there's a tendency to do a little Monday-morning quarterbacking

8     and saying, well, what risks, what was going to happen, how did

9     this ultimately come out, and you have the foresight of

10     hindsight or -- I don't know how it works out, but you tried

11     the case and you know how this came out, but we have to take a

12     step back, we have to look at what the factors were at the time

13     the settlement was entered into, and it is inherently clear,

14     the record is very clear that everybody knew what the risks

15     were when they entered into this settlement.

16          And what makes this settlement unique, Your Honor, is

17     that we settled with the aggrieved party, the party that was

18     supposedly hurt by the named insured's work.  We settled

19     directly with the -- at that point the owner of all coverage

20     claims, whether they were contractual or extracontractual.

21     They made a knowing decision.  Mr. Schroeder, of all people to

22     come in and testify and support Admiral's case, fully advised

23     his client the H O A of what the risks are, what their costs

24     were, what it was related to, and he can come in and tell you

25     the number is 800,000, but the bottom line is he told the H O A

1    that.

2           The H O A settled with Admiral -- with American

3    Economy because there were multiple cause issues at the

4    bathrooms that were going to haunt their claim.  There were

5    multiple causes because that vapor barrier should have never

6    been installed.  The greenboard was installed incorrectly.

7    Hebert Construction never paid Interior Motives to seal the

8    grout.

9           Now, there may have been problems with the grout, but

10   was that the only cause of the problem?  The greenboard is

11   designed to shed water.  That's why you use greenboard, not

12   regular drywall.  These were all factors that were in the

13   picture at the time the settlement was entered into.

14          And it was not a deal where we tried to -- where my

15   client tried to pay and run.  They tried to pay early on, they

16   tried to pay mid range, and they tried to pay at the end, and

17   they finally get to the H O A to negotiate and negotiated a

18   settlement, an arm's length transaction.  There's no proof of

19   anything of the sort of bad faith collusion or fraud.

20          The issue, I think, really what it boils down to is

21   whether in these circumstances can an insurer ever settle,

22   where you've got a willing H O A who wants to settle, you've

23   got a willing insurance company who wants to settle, both know

24   what the risks are going forward, and they decide to make a

25   business decision and try to settle it.  Well, when things get

1    rotten 13 months later, now that same settling insurance

2    company gets dragged back into court to defend a settlement

3    that maybe in hindsight was an excellent deal for the insured

4    but it was a deal made between parties represented by counsel,

5    parties represented by coverage counsel, and it contemplated a

6    release of all claims.

7           THE COURT:  Well, tell me what you think the risk was

8    as of the time your client settled.

9           MR. KNOWLES:  Well, there's -- I'll attempt to do

10    that.  Obviously there was -- the risk was -- that certainly my

11    client and every other insurer was facing was the prospect that

12    Judge White was going to approve that settlement and enter

13    judgment.  And we did not -- we as well as Valley did not want

14    to engage in this lengthy litigation --

15           THE COURT:  Let's just put some numbers on it.  If

16    you settled you were looking -- they were looking and talking

17    about a 2.4 million allocation for attorney's fees.  Is that

18    right?

19           MR. KNOWLES:  That is correct.  That was a risk.

20           THE COURT:  And we know it ultimately went down to

21    1.6.  But at the time you settled it was 2.4; and of the 2.4

22    there was risk that that would be costs taxed to your client if

23    there was coverage and if there was an excess.  You would have

24    that risk.  Is that right?

25           MR. KNOWLES:  That was a risk, yes.

1           THE COURT:  All right.  The second risk was you

2    hadn't been defending and the other side St. Paul and Admiral

3    had been providing a defense, and am I correct that perhaps

4    your client didn't know exactly how much had been spent but it

5    was a large number and 800,000 really was not surprising to

6    anybody?  Is that fair?

7           MR. KNOWLES:  That is fair, but we felt we were

8    negotiating with the owner of that claim.

9           THE COURT:  And finally there was the risk that there

10   was some exposure for damage -- property damage caused by the

11   work of your insured, of your client, Interior Motives, which

12   was insured by your client.  Is that right?  What's the number

13   you put on that?

14          MR. KNOWLES:  I think it was the number -- that's

15   what Ms Dragseth articulated was approximately a hundred

16   thousand dollars was what they had been contemplating at the

17   time.  And that's what drove our proposal to fund at a hundred

18   thousand.  In terms of --

19          THE COURT:  How do you -- how do you -- you can't

20   avoid the possibility that there was a risk going up to

21   800,000.  Isn't that right?

22          MR. KNOWLES:  Yes.  And there was also a risk, Your

23   Honor, that it would come down to zero.

24          THE COURT:  All right.  So would it be fair to say

25   that the risk was zero to 800,000?

1          MR. KNOWLES:  Globally, yes.  But ultimately the

2     question was going to come down to all these different trades

3     in the bathroom, who was truly responsible for the condition

4     there that caused the need to repair.  And that we attempted to

5     address here today in terms of the factors that American

6     Economy contemplated.

7          And certainly these were all factors everybody knew

8     about at the time they settled.  There was -- certainly the

9     H O A knew what they had.  They were in the best position to

10    know what damage they were dealing with and facing the

11    prospects of having to fund and to fix it.  You've ruled that

12    the duty to defend is going to be separate from what we're

13    talking about here today anyways, so I'd like to focus on

14    really what the issues are.

15         I believe the issues are -- that are left on the

16    table, which is any sort of claim Admiral could make for

17    indemnification or any claim that somehow we're responsible for

18    their decision to proceed with their litigation and not settle

19    ahead of time.  And that really goes to this issue of

20    supplementary payments.  The risks that we were facing and the

21    prospects of going forward, we chose not to take that risk.  We

22    chose to work directly with the H O A and attempt to settle the

23    claim.

24         And also what's telling, Your Honor, is the outright

25    only demand we ever received from the H O A was $150,000 that

1    was the opening demand.  And we ended up settling at 115, so I

2    could see where you're coming from if they came to us and said

3    800,000 and for some reason we negotiated a hundred thousand

4    settlement, but their demand to us was 150 and we settled at

5    115.

6         And the problem that we have is we're all in here

7    feeding data in and trying to figure out why people do what

8    they do.  Well, the fact is they have to be given the freedom

9    to settle their deals and know that it's put to bed.  They

10   cannot be dragged along into a fight where one insurer chooses

11   not to settle or more than one insurer chooses not to fund.

12        And I'll submit to you, Your Honor, the record from

13   Mr. Jager -- Jager's declaration and Mr. Weigel's declaration

14   clearly establishes that Admiral was facing a limits situation.

15   And, instead of paying their limits to get out or attempting to

16   settle like we did, they chose to litigate.  They assumed the

17   risk of that supplementary payments impact, the impact of that

18   ruling.

19        We on the other hand went arm's length, negotiated a

20   deal, and we should not be penalized for doing really what was

21   the right thing, going to the H O A and settling at a number

22   they accepted.  For that reason, Your Honor, we feel that this

23   settlement -- while you can shoot holes -- fire shots at it,

24   try to put holes in it, it was an arm's length transaction.

25   Everybody to the transaction knew --

1          THE COURT:  One of the issues I have is, even if I

2    find it was reasonable, I have to find that in equity would be

3    appropriate to put up a claim bar and prevent any contribution.

4    What do I do with the facts where your client is not providing

5    the insureds with copies of the policy, is not ignoring what I

6    think was a clear requirement that they defend, was saying they

7    were excess only, when I think when the dust settled it's

8    pretty clear they were not excess only?  Why should I in equity

9    give you the relief even if I found the settlement reasonable?

10         MR. KNOWLES:  Well, there's two quick reasons.  One,

11   we don't think we did anything wrong, but certainly whatever we

12   had done was known to the H O A when they settled with us.

13         And, number two, as a matter of fact, if you look at

14   the policy language, Admiral denied coverage on the two of

15   their three policies.  So they -- Admiral's sitting here and

16   they accepted a defense under a February of '00 to February '01

17   policy.  Our policy incepts where we had the A I obligation

18   June of '01 and then later for three years.  We don't cover the

19   same time period.

20         In equity they didn't pay any money that we should

21   have paid because, if you look at the policy language, the

22   coverage grant says we -- this coverage, this policy only

23   applies to property damage that occurs during the policy

24   period.  And I believe you gave an instruction to that effect,

25   consistent with that to the jury in the coverage case, that it

1    was the insured's burden to prove property damage during that

2    particular policy period.

3         Well, Admiral could have never paid on our behalf any

4    indemnity dollars or any exposures because their exposure's

5    restricted to the February of 2000 to February 2001 time

6    period, and we pick up June of 2001 and then take it out in

7    time, so if we're talking equity, equity requires that they pay

8    money that we should have paid and they have the right to get

9    it back.  But the policy doesn't -- they can't pay on our

10   behalf.  They had a different policy period.

11        THE COURT:  All right.  Let me just ask you one more

12   question, and that is as I understand it you contend that, even

13   if I find the settlement was not reasonable, Admiral would

14   nevertheless not be entitled to contribution because it failed

15   to allocate its settlement.  You want to just tell me in an

16   executive summary what that argument is.

17        MR. KNOWLES:  Certainly, Your Honor, and I think you

18   touched upon it last week during oral argument when you had a

19   similar issue.  It's trying to figure out what they paid and

20   why they paid it.

21        As I said, in terms of the claims history, we settled

22   early on at a number that somebody found acceptable, the H O A,

23   which is probably the most important one.  And Admiral chose to

24   litigate.  And as a result Admiral's coming to you and they're

25   attempting to allocate a million to their policy limits and 1.2

1    or I think it's 1.2 million in supplementary payments.  Well,

2    that was incurred because they chose to litigate.

3          That was not incurred because of anything we did,

4    because the entity that that's ultimately paid to agreed that

5    the amount that we offered was acceptable; so, in other words,

6    we should not be penalized for their claims handling decisions,

7    their decisions to litigate, their decision not to fund at

8    mediation in April of '05, when their letters from their

9    retained defense counsel was telling them their exposure is

10   four million dollars.  And there's no evidence that they

11   offered a million dollars.  There's no evidence they ever

12   offered or made their limits available to fund this.

13         Now, it's a little bit of a crystal ball to decide if

14   that would have changed the outcome, but I'll tell you usually

15   it does.  If an H O A knows --

16         THE COURT:  Well, now we're into the world of

17   speculation.

18         MR. KNOWLES:  I understand that.  And that's part of

19   the problem, too, trying to unwind what they have decided to do

20   with their internal accounting.

21         THE COURT:  Thank you.

22         MR. KNOWLES:  Thank you.

23         MR. MULLIN:  Your Honor, the issue here is whether or

24   not this settlement was reasonable and should bar our claim.

25   And I think it's overwhelmingly clear that this is an

1    inappropriate settlement to bar our claim.

2            Evidence that we provided -- we're the only ones who

3    provided -- they had the burden, remember, to come forward and

4    show this is reasonable, number one.  Number two, they have the

5    burden to show there's a bar.  I don't think -- they didn't

6    bring witnesses, other than the self-serving testimony of their

7    own client.

8            But let's look at the facts here.  The significant

9    problem here, the most -- you've sat through trial and you know

10   the most significant property damage, insurance coverage issue

11   in this case is the bathrooms.  It was the most obvious, most

12   direct physical injury to property.  And the person responsible

13   for it is Interior Motives.

14           Now, a lot of talk has been that we're going to

15   allocate it all over the place.  That's not what the issue is

16   here.  That coverage to L L C and Hebert was arising out of

17   their work and that moisture got in behind that tile because

18   they did crummy work.  And the H C -- L C C [sic] and Hebert

19   Construction being held responsible for that.

20           And it's clear -- Jager -- we've provided the Court

21   with Jager's declaration.  He estimated the bathrooms to be a

22   760,000-dollar problem.  That didn't include the floors.  And I

23   do want just to clarify one thing along here.  Exhibit I think

24   it's 4 to Jager's declaration -- it's a January 26 letter to

25   Safeco's counsel thanking them for clarifying that Interior

1    Motives not only did the bathroom but did the floor tile.

2         I don't know what all that cross-examination was

3    about, but the fact of the matter is Safeco has acknowledged

4    that Interior Motives was responsible for both the entryway

5    ceramic tile and the bathroom tile.  That same letter back in

6    January of 2005 says, as you know, we discussed a fundamental

7    issue of water penetration through the grout and have since

8    then continued to investigate, with notice to you, grout

9    installation conditions at the site.  Unfortunately information

10   we are finding is that the grout was set thin, and certainly

11   there is tangible evidence from Mr. Schroeder and others that

12   the tiles were installed in such a manner that there were

13   insufficient gaps to allow for proper grout installation.

14   There appears to be growing evidence to support the plaintiff's

15   claims that there is a relationship between the thin-set grout

16   and the thin gaps as part of the tile installation and water

17   penetration.

18        And this is the letter the next page where he tells

19   Safeco at the very bottom of that letter, Interior Motives

20   issues in this case are going to exceed one million dollars.

21        Doug Weigel was the same way.  He explained in his

22   declaration that the exposure in this particular case for the

23   subcontractors was limited because there was no written

24   contracts.  So they were getting out right and left on statute

25   of limitations and technical defenses.  But the H C I and L C C

1    were held responsible for the subs' work.  Interior Motives'
2    work.

3         And you cannot limit the property damage that arises
4    out of that work to some small percentage to Interior Motives.
5    Once it arises out of -- in other words, they're not going to
6    be responsible just for a hundred thousand dollars of the
7    800,000-dollar bathroom repair.  That 800,000 arises out of
8    their bad work.

9         THE COURT:  All right.

10        MR. MULLIN:  There's a summary judgment that was
11   issued against the L L C for improper installation of grout.
12   They were already held liable for it, for Interior Motives'
13   work.  I won't go over the responses that Safeco gave to the
14   insureds when they tried to get coverage.  We went over that
15   pretty clearly, and I'll just skip that.

16        The exposure in this case was by the time they're
17   going to settle it's not 800,000, it's not a hundred thousand,
18   it's now 7.2 million dollars.  There's no way to do it.  It's
19   done.  There is a settlement.  That settlement is going to be
20   binding on them.  They're not going to go back in and be able
21   to renegotiate what the numbers are.

22        And it is no longer the association as an assignee,
23   just looking to find out what the subs may or may not
24   contribute.  They're now after 7.2 million dollars, and Safeco
25   had a share of it, and when they're sitting there trying to

1    settle, what if we had come into this court, had settled for

2    $86,000?  What do you think they would be saying?  We'd turn

3    the tables.

4         THE COURT:  How do you respond to his argument that

5    you didn't allocate and thus you're precluded?

6         MR. MULLIN:  Well --

7         THE COURT:  How does the -- the Puget Sound Energy

8    case deal with and the Weyerhaeuser case that I dealt with and

9    the offset issues involving St. Paul, how does it play out

10   here?

11        MR. MULLIN:  This is not an offset case; this is an

12   equitable contribution case.  So I don't think that those

13   apply.  And I did some research when I got that and, oddly

14   enough, a case came up very much on point, and you won't

15   believe the parties.  It's Safeco versus Superior Court out of

16   California.  It is 140 Cal App 4th.

17        THE COURT:  Give it to me again.

18        MR. MULLIN:  140 Cal App 4th 874.  It's a 2006

19   decision.  Safeco argued in California the opposite of what it

20   argues here today.

21        In that case it was an equitable -- Safeco sued

22   Century Insurance because Century Insurance said they were

23   excess and they were wrong, so Safeco came after them for

24   contribution for defense and settlement.  This case deals with

25   both defense and indemnity.  And Century's argument was you

1    didn't allocate the underlying settlements that you're trying

2    to get us to reimburse you on.

3            And the court held that Safeco only had to show there

4    was a potential for coverage within those settlements to

5    trigger the obligation.  It then shifts to the other party to

6    show it's excluded.

7            THE COURT:  So they're applying California law?

8            MR. MULLIN:  Yes.

9            THE COURT:  Is there a difference between that and

10   Washington law?  I'm bound by Washington law, and the burden

11   has been announced, has it not, in Weyerhaeuser and Puget Sound

12   cases?  At least in the offset context.

13           MR. MULLIN:  I think that's an important distinction.

14   When we're dealing with an offset you have the potential of the

15   insured not getting money, and so the courts have a special

16   burden put in there.  That's my opinion.  We don't have a case

17   with our situation here.  I'm not seeking an offset.  I'm

18   seeking reimbursement on equitable contribution.

19           THE COURT:  Tell me what you are seeking, because

20   it's been somewhat confusing.

21           MR. MULLIN:  We're seeking the defense costs, which

22   Court knows, our defense in this case was approximately

23   800,000.  It's our --

24           THE COURT:  Yours and St. Paul's?

25           MR. MULLIN:  Yes.  Let me just -- if I can cut

1   through it, I say the 800 number because I think on the defense
2   the obligation needs to be shared by the number of policies on
3   the risk.  St. Paul had one.  We had one.  And Safeco had
4   three.  That puts it at they have three fifths of the share of
5   800 and, had they paid that, we wouldn't have had to pay our
6   400,000.

7           So what we're seeking on defense would be $240,000.
8   That's the amount of money we paid more than we would have had
9   to pay, had Safeco been there.

10          Taxed costs is the same issue.  It is a defense
11  obligation.  It flows directly from the obligation to have
12  defended a suit, and I find it disingenious [sic] to say the
13  least to say that a carrier cannot defend and then settle the
14  day before a reasonableness hearing and say, aha, they're not
15  taxed when I settle.  The policy that they breached requires
16  them to pay supplementary payments, taxed costs of a suit
17  they're to defend.  That's what it says.  That's what they have
18  to do.

19          1.6 million was the supplementary payments.  We paid
20  800,000.  And, had they paid their fair share, three fifths, of
21  the 1.6, we would have only paid 320, which leaves a balance of
22  $480,000 on the supplementary payments.

23          Indemnity was a little more difficult because I'm not
24  sure how the Court's going to rule on whether there's -- their
25  liability is limited simply to Interior Motives' work.  But

1    I -- we're in equity, and I started to think about it, and I

2    thought that the $800,000 or a million dollars that we know

3    is -- can be attributed to Interior Motives' work can be

4    compared to the overall potential of 4.8. And surprisingly it

5    turns out to be about 20 percent or one fifth.

6            THE COURT: How do we know -- we don't know how you

7    folks allocated. You didn't allocate in the --

8            MR. MULLIN: We didn't specifically allocate --

9            THE COURT: So how do we -- I mean how do I know that

10   you didn't treat it all as a potential bad faith claim?

11           MR. MULLIN: Well, I think you know we didn't.

12           THE COURT: Well, no, but I can't -- you didn't make

13   any allocation before the fact. There's nothing in the record

14   that helps me determine what that allocation is. Why wouldn't

15   it be just as fair to say, well, every entry you paid was for

16   things that A E I would have had to pay?

17           MR. MULLIN: For the same reasons the California

18   case, Washington case, and the Fourth Circuit. They're not

19   going to let a breaching carrier benefit, in other words,

20   Washington holds that if you breach the duty to defend you are

21   going to pick up the defense costs and you're going to pick up

22   the settlement and judgment. The burden shifts to the carrier

23   at that point to show that there's no covered claims in that

24   settlement. That's Washington law.

25           In California that's what this court in the Safeco

1    case essentially held, that when you breach, Century Insurance,

2    we're not going to let you off the hook if we can determine

3    that part of that settlement was for potentially covered

4    claims.  Once we got potentially covered claims, your burden is

5    to come in and establish your affirmative defense that they're

6    not covered.  And that's the way it held.

7         THE COURT:  All right.  You -- you've raised an issue

8    that I don't know has been briefed, and that is how you

9    allocate, if I find in your favor, the number of policies and

10   the policy periods and the like.  I don't know that that's

11   really been presented in any briefs that I've received.

12        All right.  Thank you.  I understand your position.

13   What I think I'm going to do on both sides is ask you to both

14   submit proposed findings of fact and conclusions of law by the

15   end of the year, and we'll take the matter under advisement and

16   try and give you a decision sometime in January.

17        I would also ask for briefing limited to that one

18   issue of policy periods and number of policies, if I were to

19   find that I wasn't going to find the settlement reasonable and

20   bar.

21        And I think in all fairness A E I ought to have the

22   opportunity to brief this California case.  I don't think that

23   was in your -- so the briefs can deal with that California case

24   and anything that relates to it, but briefs not to exceed ten

25   pages total and findings of fact, conclusions of law.

1          Can you file 'm -- I know it's the holiday season.

2    Can you each file those by the end of the year or you want more

3    time?

4              MR. MULLIN:  We could get one more week --

5              THE COURT:  That's fine.  And should we have opening

6    briefs and then a short reply?

7              MR. MULLIN:  I would appreciate that just in case

8    there's something --

9              THE COURT:  All right.  Let's say opening briefs by

10   the 5th of January and replies not to exceed five pages by the

11   next Friday, which is the 12th, and we'll renote all of this to

12   that date for purposes of trying to then begin the process of

13   deciding what the answer is.

14             MR. MULLIN:  Very good.

15             THE COURT:  All right.  Thank you.

16             MR. MULLIN:  Thank you.

17             MR. KNOWLES:  Thank you, Your Honor.

18             THE COURT:  We'll be in recess.

19        (At 12:30 p.m. proceedings were adjourned.)

20                        --o0o--

21          I certify that the foregoing is a correct transcript

22   from the record of proceedings in the above-entitled matter.

23
                        \s\ Laurene Kelly
24
                   This 28th day of AUGUST, 2007.
25

<pre>
1                          I N D E X

2                 CHRONOLOGICAL LIST OF WITNESSES
                                                    VOIR
3    Plaintiff's                 DIR CROSS REDIR RE X DIRE VOL

4    Dragseth, Tamara ................... 4    25    72

5                                                   VOIR
     Defendant's                 DIR CROSS REDIR RE X DIRE VOL
6    Schroeder, Arthur B. .............. 76   84   101  101

7

8                 ALPHABETICAL LIST OF WITNESSES

9                                                   VOIR
     Plaintiff's                 DIR CROSS REDIR RE X DIRE VOL
10   Dragseth, Tamara ................... 4    25    72

11                                                  VOIR
     Defendant's                 DIR CROSS REDIR RE X DIRE VOL
12   Schroeder, Arthur B. .............. 76   84   101  101

13

14                          EXHIBITS

15   Description                         MARK REC'D VOL

16   1 .............................................. 95

17

18

19

20

21

22

23

24

25
</pre>